# MORTGAGE RECONSTRUCTION ASSOCIATES
### 4110 SE Hawthorne blvd, # 266
### Portland, Oregon 97214
### Tel: 503-847-6360
### Email: mortgagerecon@gmail.com

November 11, 2010

Executive Trustee Services, LLC
300 Deschutes Way, Ste 304
Tumwater, Washington 98501
**TS Number: OR-191382-C**

Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 92504-3120
**TS Number: OR-191382-C**

And:
GMAC Mortgage
Legal Department
3451 Hammond Avenue
Waterloo, Iowa 50702

GMAC Mortgage
Legal Department
2711 North Haskell Ave, Suite 900
Dallas, Texas 75204

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon
Original Borrower: Dunham, Elmer V. & Mary R.

> **RE: Failure to comply with State of Washington Law**
> **Failure to Comply with State of Oregon Law**
> **Filing of formal complaint with State of Washington Attorney General Rob McKenna**
> **Filing of formal Complaint with State of Oregon Attorney General John Kroger**
> **Filing of Complaint with State of Oregon Division of Finance & Corporate Securities**
> **Filing of Complaint with State of Oregon Department of Justice**

Responsive to your letter dated October 21, 2010, this letter will serve to inform you that, absent your taking corrective action described herein, a formal complaint will be filed with the above criminal justice and public protection departments for prosecution of GMAC Mortgage and Executive Trustee Services, LLC., and their officers and directors personally, for willful and intentional violation of the state laws of both Washington and Oregon.

As Executive Trustee Services, LLC is a corporation registered (Washington Registry # 602673840, filed 12/4/2006) and conducting trustee and foreclosure services business both in the State of Washington, and attempting to conduct foreclosure actions in the State of Oregon, you are simultaneously bound by the laws of both states, and are held to the highest standard of the law in both jurisdictions.

In particular, your office received on October 13, 2010, a letter from Rob McKenna, Attorney General of the State of Washington (copy attached for reference), which recited:

"Your duty includes assuring that every procedural step, every legal notice, and all mandated mediation opportunities are provided to homeowners facing foreclosure in fullest conformance with the law"

4

"Trustees may be foreclosing on homes when there is no clear chain of ownership for the loan or security interest. **Trustees** must be sure that the lender has the authority to foreclose and that the documents which create the chain of ownership are accurate." Despite our repeated requests, you have attempted to sidestep and elude your mandatory responsibility as **trustee** to provide the documents as may or may not prove who is the actual owner of this Note and Trust Deed, , including all intermediary chains of ownerships as the "loan was passed from company to company". Instead, you have attempted to shirk your responsibility as defined by the Attorney General of Washington, and pass it to the *servicer* (Wells Fargo Mortgage)*, who, by your own admission and theirs, is only the servicer, and not the **owner** of the Note and/or Trust Deed.

"Since July 26, 2009, Washington **trustees** have been required to identify the actual owner of the loan…Many default notices have gone out without this required information…" You have intentionally failed to provide the actual owner of the loan. Moreover, your Notice of Default is defective on its face, as it does not contain the required disclosure for the owner of the loan.

" Your role as foreclosure trustee is to ensure that each foreclosure you conduct is completed in good faith and in full compliance with the law…you [as trustee] are the **party most responsible for ensuring that foreclosures are done properly"** You have intentionally attempted to sidestep and fail to accede to your extraordinary and elevated level of responsibility.

"Consequently, I ask you to suspend all foreclosures in which you have not yet confirmed that all foreclosure-related documents were lawfully signed, that the chain of ownership is clear and has been revealed to you in full…" Our Complaints and Requests for Investigation, as well as the state court action which we are now preparing, will specifically subpoena all documents to today's date, to determine if you willfully violated the laws of the States of Washington and Oregon, including, but not limited to:

- Exactly what documents were contained in your file prior to today's date which confirm or refute that you have investigated and can document the actual ownership of the subject Note and Trust Deed, including review of original documents, and each passage of ownership

- Exactly what documents were contained in your file prior to today's date which confirm or refute that you have notified the borrower and identified who is the actual **owner** of the subject Note and Trust Deed, including the required notice on the Notice of Default to the borrower.

- Exactly what documents were contained in your file prior to today's date which confirm or refute that you have notified the borrower of the mediation availability, *including contact information for the actual owner of the subject Note and Trust Deed*

- Exactly what attempts you are able to document that you complied with your extraordinary responsibilities to clearly exhibit or refute both good faith and full compliance with the laws of both the states of Washington and Oregon.

The State of Oregon passed Senate Bill 628 on June 26, 2009, which was signed by the Governor into law on very nearly the same date as the new compliance laws of the State of Washington, on June 30, 2009.

SB 628 (text attached) requires 120 days transpire between the Notice of Default, which is extended to 180 days if the property is residential (the subject property is an owner occupied primary residence). You have failed to comply with Oregon statutory requirements, and your Notice is statutorily defective.

SB 628 requires that Notice of any foreclosure must be served upon the State of Oregon Department of Consumer & Business Services. We have confirmed with DCBS that the requisite notice was not received by this state department.

SB 628 Section 3, Paragraph (4) recites "Provide the address, telephone number and other contact information for: (a) the trustee, **beneficiary...**" Similar to the Washington requiring identification of the owner, verification and direct contact information, you have intentionally and willfully failed to provide this information to the borrower.

Finally, and as a explicit manifestation of your continuing pattern of behavior in your clearly unlawful attempts to avoid the production of documents under the RESPA Qualified Written Request evidencing your possessing any standing whatsoever to presume to conduct any foreclosure proceeding, by way of absence of any evidencing of such authorization from the actual owner of this Note and Trust Deed, you have instead attempted to dodge your duties under law, pretending that this is the responsibility only of the loan servicer. The RESPA 2605 definition of a "servicer" recites no exemption of a trustee, and does not exclude the services provided by a trustee which is attempting to collect additional fees from a borrower pursuant to the terms of the loan. You have been informed by the Attorney General of the State of Washington that you are the **party most responsible** for ensuring that all foreclosures are done properly, and your attempts to circumnavigate that high level of responsibility will not be abided.

IN you October 21 letter, you use the euphemistic phrase that "without specific issues or concerns identified, sending documents unrelated to the servicing of the account, would not be considered an effective and appropriate response or resolution for the customer".

**THE ISSUE COULD NOT POSSIBLY BE MORE SPECIFICALLY IDENTIFIED: YOU HAVE ATTMEPTED TO ELUDE AND DODGE YOUR CLEAR LEGAL OBLIGATION TO PRODUCE THE <u>ORIGINAL</u> NOTE AND TRUST DEED DOCUMENTS (not copies made out to some company Greenpoint Mortgage, that no longer even exists), IDENTIFY THE <u>ACTUAL OWNER</u> OF THIS NOTE, PRODUCE PROOF OF EACH ALLEGED TRASNFER OF SUCH OWNERSHIP AND PROVIDE DIRECT CONTACT INFORMATION TO THE OWNER OF THE NOTE AND TRUST DEED.**

If you persist in pretending that the proving of true ownership of this note to be a "not an appropriate response or resolution for the customer", we direct your attention to the Ohio State Attorney General's recent lawsuit filed against GMAC Mortgage, as well as the State of Washington Attorney General's letter to you on October 13, 2010 (copy attached). If you fail to immediately produce the original note and all evidences of ownership transfer, we will see if the attorneys general of both Oregon and Washington agree with your characterization. In essence, there is no "confidential or proprietary information" that is not required to be disclosed in a home loan which is covered by RESPA, as well as a multiplicity of state laws, and is lodged with a servicer GMAC (and perhaps an owner, which remains to be discovered) who is a recipient of federal taxpayer TARP funds, and thus subject to public disclosure.

Moreover, you attempt to invoke the pathetic excuse that "Most of the information you request does not relate to the servicing". We will be most happy to testify before the Department of Justice the extent to which a production of ownership documentation papers is "does not relate" or is "unduly burdensome" in comparison with the tragedy of throwing another American family out of their home, into which they have invested their hard-earned downpayment savings, made many costly home improvements, where they prepare dinner each night, do their laundry, sleep and wake, and protect their family from the winter cold.

In the instant case, it is plainly evident that you have abjectly failed to meet the standards or even minimally comply with the law. Your conduct and behavior constitute and egregious violation of the laws of two jurisdictional states.

**Therefore, this is our formal demand that the subject foreclosure currently being attempted by Executive Trustee Services be rescinded forthwith.**

If you fail to comply with this demand by November 18, 2010, we suggest you prepare yourself for our immediate commencement of every legal remedy, including both civil and criminal prosecutions, where we will seek monetary recovery, injunctive relief and incarceration of you and your principals. We will be requesting

criminal prosecution of GMAC Mortgage and Executive Trustee Services, and their respective primary corporate officers, for knowing, intentional and illegal violation of the law, abuse of process, fraud, and obstruction of justice (failure to produce documents verifying actual ownership of this loan). Mr. McKenna has directed his legal team to determine which trustees are in compliance with the law, and we will make certain you are prominent in their prosecutions should you fail to comply as above set forth.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel: 503-847-6360

A copy of all of your correspondence, and what documents you have produced (and iteration of this which you have not), as well as this demand letter, are being provided to:

A. US Department of Housing & Urban Development, RESPA Compliance Department.
B. John Manning, Attorney for Mortgage Reconstruction Associates, for use in the court civil cases to be filed imminently.
C. To various publicly available media, in order that the public shall be fully informed as to GMAC Mortgage's cooperativeness, or uncooperativeness, in regards to disclosing or attempting to conceal the complete circumstances and all documents in a residential loan to which they are party.
D. Executive Trustee Services, who have attempted to conduct a foreclosure sale without authorization or evidencing of actual ownership of the note and Trust Deed on which they are attempting to conduct such a foreclosure sale.
E. The State of Oregon Attorney General John Kroger, Dept of Justice, Financial Fraud/Consumer Protection Division
F. The State of Oregon Department of Consumer & Business Services
G. State of Washington - Office of the Attorney General
H. State of Washington – Department of Financial Institutions

# MORTGAGE RECONSTRUCTION ASSOCIATES
### 4110 SE HAWTHORNE BLVD, # 266
### PORTLAND, OREGON 97214
### TEL: 503-847-6360
### EMAIL: MORTGAGERECON@GMAIL.COM

October 2, 2010

TO: GMAC Mortgage
Legal Department
3451 Hammond Avenue
Waterloo, Iowa 50702

Legal Department
2711 North Haskell Ave, Suite 900
Dallas, Texas 75204

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon
Original Borrower: Dunham, Elmer V. & Mary R.

## IN RE: "Qualified Written Request" under 12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA).

We are in receipt of your letter dated September 27, 2010, which included exactly four enclosures: the Note, the Trust Deed, the HUD-1 Statement, and a payment accounting ledger for the subject loan.

While your letter purports to be responsive to the document production requirements, it is not compliant with the requirements as set forth in 12 USC Section 2605 (relevant excerpts are included below). Your letter goes on to state two sentences, to wit:

"In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination"

and:

"Because the letter appears to be questioning nearly every aspect of the loan transaction, it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding the servicing of the account".

Moreover, your letter recites:

"The loan is registered with MERS; therefore, there are no assignments. The loan originated October 4, 2006 with GreenPoint Mortgage Funding Inc. and transferred to GMAC Mortgage, LLC for servicing on January 1, 2007.

You are correct: We are, in fact, demanding detailed information regarding every aspect of this loan, from origination. And you are required to provide this, as set forth in 12 USC Sec 2605.

In order that you have no "difficulty" in identifying what is required, following is an easy to follow list:

1. Who is the OWNER of this note? [by your own admission, GMAC was only transferred the *servicing* of this account]
2. Provide all of the documents which evidence proof of such note ownership by the OWNER of this note.
3. Provide all of the documents which evidences the **transfer** of ownership [it is well established that this is

not GreenPoint Mortgage, as they do not exist any more, your attorney has provided an endorsement stamp from GreenPoint Mortgage to GMAC Mortgage; and certain of your staff have stated by telephone that it is "Aurora Loan Service"].

4. Provide the documents which evidence what price was paid for this loan when purchased from Greenpoint, or any succeeding purchaser of the note.
5. Provide the exact contact information and a contact individual, with name, address, telephone number and email address for the owner of the note.
6. By your own admission, "MERS" (Mortgage Electronic Registration Systems) has some manner of involvement in this loan; provide specificity as to their role; what authorization they had to undertake such a role (including the borrowers specific authorization for such), and all documentation regarding such involvement.
7. You state this loan is "registered with MERS; therefore, there are no assignments". State the reasons why a registration with MERS would implicitly indicate that there are "no assignments".
8. This loan is known to have been "endorsed" by Greenpoint Mortgage to GMAC Mortgage; in sworn testimony before the United States Bankruptcy Court, on April 20, 2010, Case No. 09-40228, the witness for GMAC Mortgage testified that "there appeared to be documents missing from the file". Moreover, this endorsement (which appears to be a tiny rubber stamp with an endorsement signature on it) appears to be the reverse side of a bank check. Provide the remainder of this document, the other side of this document, and all documents associated with this endorsement.
9. If, as you contend on your letter dated September 27, 2010, GMAC is only the servicing agent, provide an explanation of why the loan was "endorsed" to GMAC, yet GMAC claims to be only a "servicing agent".
10. You did not provide a copy of the original appraisal report; provide same.
11. You did not provide a copy of the GFE (Good Faith Estimate); provide same.
12. You did not provide copies of Notices of Default filed by Executive Trustee Services; provide same.
13. You did not provide a specific contact person, telephone and address (you provided only unknown initials and a customer service number that goes to a generic call center); provide same.
14. You did not provide copies of correspondence with Executive Trustee Services, whom you had instructed to initiate foreclosure proceedings; provide same (these were not between you and your attorney, and they are therefore not protected by attorney-client privilege).
15. Provide documentation regarding what account you have been depositing loan payments you have been receiving starting on 06/02/2010 which have been labeled "unapplied funds" in the printouts you provided (these monthly payments have been sent to you starting that date with specific instructions they were to be applied solely to interest).
16. You did not provide disclosure, identity, location and contact information for the present custodian, as of the date of this writing, of the ORIGINAL, INK-SIGNED documents pertaining to the subject loan.

A copy of your reply dated September 27, 2010, as well as this responsive letter are being provided to:

A. US Department of Housing & Urban Development, RESPA Compliance Department.
B. John Manning, Attorney for Mortgage Reconstruction Associates, for use in the federal and state court civil cases.
C. To various publicly available media, in order that the public shall be fully informed as to GMAC Mortgage's cooperativeness, or uncooperativeness, in regards to disclosing or attempting to conceal the complete circumstances and all documents in a residential loan to which they are party.
D. Executive Trustee Services, who have attempted to conduct a foreclosure sale without authorization or evidencing of actual ownership of the note and Trust Deed on which they are attempting to conduct such a foreclosure sale.
E. Your attorney Casper Rankin, of Pite Duncan LLP, San Diego, California
F. The State of Oregon Attorney General John Kroger, Dept of Justice, Financial Fraud/Consumer

Protection Division

G. State of California - Office of the Attorney General, Edmund G. Brown Jr.,  Consumer Financial Protection Agency (as Executive Trustee Services, who are attempting to conduct a foreclosure sale, are registered in offices located at 2225 North Ontario Street, Burbank, California 91504)

H. State of California - Office of the Attorney General, Edmund G. Brown Jr., Consumer Financial Protection Agency (as your attorney Casper Rankin, of Pite Duncan LLP, is practicing out of San Diego, California)

We have requested that an investigation into this loan be specifically undertaken by HUD, in the RESPA Compliance Division, as well as both of the above state attorney general's offices above noted.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel: 503-847-6360


12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA)

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request...the servicer shall:
(C) after conducting an investigation, provide the borrower with...(i) information requested by the borrower

## MORTGAGE RECONSTRUCTION ASSOCIATES
### 4110 SE HAWTHORNE BLVD, # 266
### PORTLAND, OREGON 97214
### TEL: 503-847-6360
### EMAIL: MORTGAGERECON@GMAIL.COM

November 1, 2010

TO: GMAC Mortgage
Attn: Legal Department

Corporate Headquarters
Loss Mitigation and Loan Workout Departments
2711 North Haskell Ave
Suite 900
Dallas, Texas 75204

cc: John Manning, Attorney at Law

Loan #: **0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon
Original Borrower: Dunham, Mary R. and Elmer V.

### RE: RESPA Qualified Written Request and Complaint to HUD

TO: GMAC Mortgage, and their attorneys:

### This is in furtherance of a "Qualified Written Request" under 12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA).

On October 21, 2010, the fourth update of the Qualified Written Request was sent to your office. That memorandum included exact specification as to the documents required, as well as precise questions regarding this loan. An additional copy is attached hereto for your reference. To date, no response thereto has been received from GMAC.

Since that time, we have received written communication from the State of Oregon Department of Justice, Enforcement Division, Financial Fraud/Consumer Protection Section, that they have opened an investigative file into this loan, and sent to your offices a letter requiring your response and documentation. The DOJ investigative case is file number FF9447-10. We are requesting criminal prosecution of GMAC for knowing, intentional and illegal abuse of process (the conduct of the non-judicial foreclosure), fraud, and obstruction of justice (failure to produce documents verifying actual ownership of this loan).

Additionally, since the October 21, letter, investigative research at the Recorder's Office of the County of Multnomah has revealed a recorded Assignment of Deed of Trust (copy attached):

1. This Assignment describes a transfer of "**all beneficial interest**" from MERS to GMAC Mortgage, not to Aurora Loan Services, or to US National Bank, in direct contravention with your letter dated October 6, 2010, wherein you have alleged that ownership was by US Bank.

2. This Assignment purports to assign "together with the money due and to become due thereon", despite the fact that MERS has no ownership or control of the <u>Note</u> (MERS was variously the "nominee" and "legal owner" of the Trust Deed ONLY) , and thus this Assignment is unenforceable and void, as it purports to transfer something not owned by the party (MERS) attempting to assign such ownership or interest.

3. This assignment was presented for recording on April 26th, 2010, at which time GMAC Mortgage was under a strict preclusion, in accord with 11 USC Sec 362 (a) Stay of Proceedings, barring any creditor from taking any action against, or adverse to the interests of, the Debtor Mortgage Reconstruction Associates, in US Bankruptcy Court, Portland District, Chapter 11 Reorganization Bankruptcy Case # 09-40228 rld11. Clearly, an Assignment of Ownership of a Deed of Trust, in the context of the creditor attempting to contemporaneously obtain permission of the court (not granted at that time) to foreclose on a property which is owned by the Debtor, is a violation of federal statute and Automatic Stay then imposed by the Court.

Consequently, this letter shall serve as formal demand that:

A. All documents and answers as set forth in our letter dated October 21, 2010 be produced forthwith, and
B. That explanations, definitions and documents be provided regarding the additional information described and identified in items 1, 2 & 3, hereinabove, and
C. That the foreclosure currently calendared for December 29,2010, by "Executive Trustee Services", in TS No.OR-191382-C, **be immediately rescinded**, in a manner and form similar to the Rescission of Notice of Default filed August 18, 2010, as recorders series number 2010-102509 (which was then immediately followed by another Notice of Default filed the same day, the very next document, 2010-102510).

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com

# MORTGAGE RECONSTRUCTION ASSOCIATES

4110 SE HAWTHORNE BLVD, # 266
PORTLAND, OREGON 97214
TEL: 503-847-6360
EMAIL: MORTGAGERECON@GMAIL.COM

October 21, 2010

TO: GMAC Mortgage
Attn: Legal Department

Corporate Headquarters
Loss Mitigation and Loan Workout Departments
2711 North Haskell Ave
Suite 900
Dallas, Texas 75204

cc: John Manning, Attorney at Law

Loan #: **0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon
Original Borrower: Dunham, Mary R. and Elmer V.

## RE: RESPA Qualified Written Request and Complaint to HUD

### ** FOURTH UPDATED WITH ADDITIONAL DOCUMENTS REQUESTED **

TO: GMAC Mortgage, and their attorneys:

**This is a "Qualified Written Request" under 12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA).**

In furtherance of the Qualified Written Request which was submitted and acknowledged as received by your office on September 22, to which you responded on September 27, 2010, and our updated Second Request to you was dated September 27, and acknowledged as received by your office on October 5, you provided a responsive letter dated October 6, 2010. A third, and very detailed Qualified Written Request was sent to you on October 2, and no response has, as of this writing, been received from your office; that letter is embedded in this Fourth Request, as the documents demanded have not been produced.

Your letter fails to comply with the requirements of RESPA, as defined under 12 USC Section 2605.

You provided a redundant set of documents that you had already provided with your September 27 letter, to wit:

- Note
- Mortgage/Deed of Trust
- HUD-1 Settlement Statement

While a modicum of additional information was contained in two narrative paragraphs of your October 6, 2010 letter ["The current Master Servicer is…" and "The loan is registered with MERS…"], you again failed to provide the documents that have been repeatedly requested, both via Requests for Production in active litigation involving the parties, and in the RESPA Qualified Written Requests.

You own letter recites (see last two lines of page one of October 6, 2010 letter): "However, the loan is currently being subserviced by GMAC Mortgage LLC, and all legal inquiries should be directed to the subservicer". Therefore, this letter is redirected to you, GMAC Mortgage, per your own acknowledgment and admission that you are the party to whom all legal inquiries should be directed.

Applicable RESPA Code, 12 USC Section 2605 RESPA does not limit, restrict or define any documents as not being subject to production due to any "proprietary", "internal", "private" or any other factor which would allow sequestration, hiding, or exclusion from production.


Drawing verbatim form our October 2 letter, we communicated to you:     [GMAC writes]:

    "In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination"

and:

    "Because the letter appears to be questioning nearly every aspect of the loan transaction, it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding the servicing of the account".

You are correct: We are, in fact, demanding detailed information regarding every aspect of this loan, from origination. And you are required to provide this, as set forth in 12 USC Sec 2605.

In order that you have no "difficulty" in identifying what is required, following is an easy-to-follow list:

**[Update notes are in bold, contained in brackets]**

1. Who is the OWNER of this note? (by your own admission, GMAC was only transferred the *servicing* of this account). **[You have since asserted (never heretofore acknowledged by GMAC, or known to the borrower) that US Bank is currently the owner. However, even with your statement that "The loan is currently owned by: US Bank, N.A., as Trustee" you have again intimated that US Bank is not the actual owner of the note, but merely a trustee, by your own admission. Therefore, we reiterate: WHO IS THE OWNER OF THIS NOTE? AND WHAT DOCUMENTS CAN YOU PRODUCE WHICH EVIDENCE SUCH ALLEGED OWNERSHIP?]**.
2. Provide all of the documents which evidence proof of such note ownership by the OWNER of this note.**[you have provided no documents whatsoever as would evidence proof of the ownership which you now allege is by US Bank]**
3. Provide all of the documents which evidences the **transfer** of ownership **[you have provided no documents whatsoever as would evidence the transfers of ownership; on the contrary, you assert that "the loan is registered with MERS, therefore there are no assignments". Consequently, this is in direct contravention of your allegation that US Bank is now the "owner"; therefore, MERS is the only party which could conduct any foreclosure sale]**
4. Provide the documents which evidence what price was paid for this loan when purchased from Greenpoint, or any succeeding purchaser of the note **[no documents whatsoever have been provided by GMAC as evidence what price was paid for this loan, which may have experienced multiple transfers (GreenPoint, GMAC, MERS, Aurora, US Bank, others). This is not "protected" or "private" or "proprietary" information, and is subject to public information disclosure, as it may**

involve the use, direct or indirect, of public funds (including TARP, AIG, FDIC ,etc.)]

5.  Provide the exact contact information and a contact individual, with name, address, telephone number and email address for the owner of the note.**[the contact information you provide for US Bank failed to include the name of an *individual*, and included only a generic call center number where no human person was able to be reached]**

6.  By your own admission, "MERS" (Mortgage Electronic Registration Systems) has some manner of involvement in this loan; provide specificity as to their role; what authorization they had to undertake such a role (including the borrowers specific authorization for such), and all documentation regarding such involvement. **[YOU HAVE WHOLLY FAILED TO RESPOND TO THIS INQUIRY. The language contained in the documents you provided [Deed of Trust, Page 2 of 15, (E)], recites:**
    > **"MERS is a separate corporation that is acting as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this security instrument."**

    **Explain in complete and explicit detail**
    a)  **how MERS can be simultaneously "acting as a nominee" and "the beneficiary" at the same time,**
    b)  **how you intended to have these clearly different descriptions  understood by a borrower signing these documents, and**
    c)  **how it is that MERS is the beneficiary under the security instrument, yet is not the beneficiary under the Note.**

7.  You state this loan is "registered with MERS; therefore, there are no assignments". State the reasons why a registration with MERS would implicitly indicate that there are "no assignments". **[in your letter dated October 6, you recite exactly this same language, yet wholly fail to state any reasons why a registration with MERS would implicitly indicate that there are no assignments; provide you clear and explicit foundation for this interpretation]**

8.  This loan is known to have been "endorsed" by Greenpoint Mortgage to GMAC Mortgage; in sworn testimony before the United States Bankruptcy Court, on April 20, 2010, Case No. 09-40228, the witness for GMAC Mortgage testified that "there appeared to be documents missing from the file".  Moreover, this endorsement (which appears to be a tiny rubber stamp with an endorsement signature on it) appears to be the reverse side of a bank check.  Provide the remainder of this document, the other side of this document, and all documents associated with this endorsement. **[you have abjectly failed to provide any response whatsoever, much less these documents, when they are known, based upon the sworn testimony of GMAC employee, in court as above described, to be contained within your file. Provide these documents]**

9.  If, as you contend on your letter dated September 27, 2010, GMAC is only the servicing agent, provide an explanation of why the loan was "endorsed" to GMAC, yet GMAC claims to be only a "servicing agent".**[no explanation as to why a stamped endorsement to GMAC Mortgage would constitute a "servicing" transfer only, and not an actual transfer of ownership; PROVIDE THAT EXPLANATION, and all documents in the referenced file, plus answers to any documents which were described as "missing" by the sworn testimony of GMAC employee in open court].**

10. You did not provide a copy of the original appraisal report; provide same.**[no appraisal report was produced]**

11. You did not provide a copy of the GFE (Good Faith Estimate); provide same **[no GFE was produced].**

12. You did not provide copies of Notices of Default filed by Executive Trustee Services; provide same.**[no Notices of Default were produced; produce same]**

13. You did not provide a specific contact person, telephone and address (you provided only unknown initials and a customer service number that goes to a generic call center); provide same.**[in violation of the clear prescription of RESPA QWR, no contact person, or telephone number other than the generic call center was provided]**

14. You did not provide copies of correspondence with Executive Trustee Services, whom you had instructed to initiate foreclosure proceedings; provide same (these were not between you and your attorney, and they are therefore not protected by attorney-client privilege). **[you failed to produce copies of Executive Trustee Services correspondence; provide same]**

15. Provide documentation regarding what account you have been depositing loan payments you have been receiving starting on 06/02/2010 which have been labeled "unapplied funds" in the printouts you provided (these monthly payments have been sent to you starting that date with specific instructions they were to be applied solely to interest).[ **following this letter, GMAC sent back a check, # 12024825, in the amount of $436.84, described on the accompanying letter as "representing two of twenty-four installments" and on the actual check as "other"; provide an explanation of why this check was sent, why only two of the past four consecutive monthly payments were returned, and to what account this had been previously deposited at GMAC]**

16. You did not provide disclosure, identity, location and contact information for the present custodian, as of the date of this writing, of the ORIGINAL, INK-SIGNED documents pertaining to the subject loan. **[you have abjectly failed to provide disclosure, identity, location and contact information, as of this date, of the ORIGINAL, INK-SIGNED documents pertaining to the subject loan; provide same]**

A copy of your reply dated October 6, 2010,  as well as this responsive letter are being provided to:

A. US Department of Housing & Urban Development, RESPA Compliance Department.
B. John Manning, Attorney for Mortgage Reconstruction Associates, for use in the court civil cases to be filed imminently.
C. To various publicly available media, in order that the public shall be fully informed as to GMAC Mortgage's cooperativeness, or uncooperativeness, in regards to disclosing or attempting to conceal the complete circumstances and all documents in a residential loan to which they are party.
D. Executive Trustee Services, who have attempted to conduct a foreclosure sale without authorization or evidencing of actual ownership of the note and Trust Deed on which they are attempting to conduct such a foreclosure sale.
E. Your attorney Casper Rankin, of Pite Duncan LLP, San Diego , California
F. The State of Oregon Attorney General John Kroger, Dept of Justice, Financial Fraud/Consumer Protection Division
G. State of California - Office of the Attorney General, Edmund G. Brown Jr.,  Consumer Financial Protection Agency (as Executive Trustee Services, who are attempting to conduct a foreclosure sale, are registered in offices located at 2225 North Ontario Street, Burbank, California 91504)
H. State of California - Office of the Attorney General, Edmund G. Brown Jr., Consumer Financial Protection Agency (as your attorney Casper Rankin, of Pite Duncan LLP, is practicing out of San Diego, California)

We have requested that an investigation into this loan be specifically undertaken by HUD, in the RESPA Compliance Division, as well as both of the above state attorney general's offices above noted.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel: 503-847-6360


12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA)

(2) Action with respect to inquiryNot later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request...the servicer shall:(C) after conducting an investigation, provide the borrower with...(i) information requested by the borrower

# MORTGAGE RECONSTRUCTION ASSOCIATES
### 4110 SE HAWTHORNE BLVD, # 266
### PORTLAND, OREGON 97214
### TEL: 503-847-6360
### EMAIL: MORTGAGERECON@GMAIL.COM

September 27, 2010

TO: GMAC Mortgage
Attn:  Legal Department

Corporate Headquarters
Loss Mitigation and Loan Workout Departments
2711 North Haskell Ave
Suite 900
Dallas, Texas 75204

cc: John Manning, Attorney for Debtor
    Casper Rankin, Attorney for GMAC Mortgage, via email

Loan #: **0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon
Original Borrower: Dunham, Mary R.

### RE: RESPA Sec 6 Qualified Written Request and Complaint to HUD

### ** UPDATED WITH ADDITIONAL DOCUMENTS REQUESTESD IN PARAGRAPH (3) BELOW **

TO: GMAC Mortgage, and their attorneys:

**This is a "Qualified Written Request" under 12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA).**

I am writing to request:

(1) Copies of all documents pertaining to the origination of the above referenced mortgage including the Note, Trust Deed, adjustable rate addendum(s), Truth in Lending statements, Good Faith Estimate (GFE), HUD 1, appraisal, and all required disclosures associated with this transaction for the above referenced loan. The copies should be legible and all documents shall be copied in their entirety, and must be the <u>executed</u> copies of all documents requiring signature.

(2) A copy of the loan history including all payments made, all fees incurred, what has been paid out of the escrow account, and how all payments were applied. This information should cover the entire life of the loan from its origination.

(3) We have reasons to believe that the subject loan is not owned by GMAC Mortgage. GMAC was not the originating lender or owner of the subject loan; the subject loan was issued by: Greenpoint Mortgage.  Additionally, a claim of ownership or real-party-in-interest has been alleged by the GMAC, despite demand of the bankruptcy court to produce verification of such allegation of ownership, not documents have been produced by GMAC Mortgage or their attorneys.

Consequently, it is hereby demanded that each and every document evidencing any chain of ownership of the subject Note instrument, the Trust Deed relating thereto, the amount paid for the purchase of the note and supporting evidence as will verify that amount paid, and all other documents be furnished, together with signature on all documents requiring execution, and identification and contact information for all custodians, and prior custodians, of these documents.

(4) The disclosure, identity, location and contact information for the present custodian, as of the date of this writing, of the ORIGINAL, INK-SIGNED documents pertaining to the subject loan.

As you are aware, these documents have been previously requested, but never furnished by GMAC Mortgage. As of this writing, the documents have not been provided. This letter is now a formal request, under RESPA Section 2605. Consequently, concurrently with this letter, a formal complaint has been submitted to:

**Director, Office of RESPA and Interstate Sales**
**US Department of Housing and Urban Development**
**Room 9154**
**451 7th Street, SW**
**Washington, DC 20410**

Most Sincerely,


Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel: 503-847-6360


Authorization Attached


Relevant Code Section:


12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA)

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--
(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

# **GMAC Mortgage**

September 27, 2010


Mortgage Reconstruction Associates
4110 SE Hawthorne Blvd Ste 266
Portland OR  97214


RE:    Account Number        0307726898
       Property Address      200 SW Florence Avenue #1-7
                             Gresham OR  97080


Dear Chuck Barker:

Please be advised that this letter serves as our response to your Qualified Written Request ("QWR") for information regarding the above-referenced GMAC Mortgage account dated September 22, 2010 and received in our office on September 22, 2010.  In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination.

In response to the inquiry, GMAC Mortgage has enclosed a copy of the account's payment history as required by the Real Estate Settlement Procedures Act ("RESPA").

Because the letter appears to be questioning nearly every aspect of the loan transaction, it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding the servicing of the account.  Nevertheless, in an effort to be responsive to the request, copies of pertinent documentation GMAC Mortgage has in its records are enclosed.

- Note
- Deed of Trust/Mortgage
- HUD-I Settlement Statement

This loan is registered with MERS, MIN # 100013800907701995; therefore, there are no assignments. The loan originated October 4, 2006 with GreenPoint Mortgage Funding Inc and transferred to GMAC Mortgage, LLC for servicing on January 1, 2007.

# <u>GMAC</u> **Mortgage**

Account Number 0307726898
Dunham – Page Two

The authorization form, signed September 14, 2010, advised Mary Ruth Dunham has passed away. In order to update our records, please forward a copy of the death certificate and the executor appointment. Please provide the appropriate documentation to the following address:

> GMAC Mortgage
> ATTN: Assumption Department
> 3451 Hammond Avenue
> Waterloo IA  50702-5345
> Facsimile:  1-972-538-0739

If after reviewing this information, you have any specific questions or concerns regarding the mortgage loan servicing of this account, please contact Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

Enclosures

KB

C: Mary Ruth Dunham and Elmer V Dunham

# MORTGAGE RECONSTRUCTION ASSOCIATES
### 4110 SE HAWTHORNE BLVD, # 266
### PORTLAND, OREGON 97214
### TEL: 503-847-6360
### EMAIL: MORTGAGERECON@GMAIL.COM

October 2, 2010

TO: GMAC Mortgage
Legal Department                    Legal Department
3451 Hammond Avenue                 2711 North Haskell Ave, Suite 900
Waterloo, Iowa 50702                Dallas, Texas 75204

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon
Original Borrower: Dunham, Elmer V. & Mary R.

### IN RE: **"Qualified Written Request" under 12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA).**

We are in receipt of your letter dated September 27, 2010, which included exactly four enclosures: the Note, the Trust Deed, the HUD-1 Statement, and a payment accounting ledger for the subject loan.

While your letter purports to be responsive to the document production requirements, it is not compliant with the requirements as set forth in 12 USC Section 2605 (relevant excerpts are included below). Your letter goes on to state two sentences, to wit:

"In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination"

and:

"Because the letter appears to be questioning nearly every aspect of the loan transaction, it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding the servicing of the account".

Moreover, your letter recites:

"The loan is registered with MERS; therefore, there are no assignments. The loan originated October 4, 2006 with GreenPoint Mortgage Funding Inc. and transferred to GMAC Mortgage, LLC for servicing on January 1, 2007.

You are correct: We are, in fact, demanding detailed information regarding every aspect of this loan, from origination. And you are required to provide this, as set forth in 12 USC Sec 2605.

In order that you have no "difficulty" in identifying what is required, following is an easy to follow list:

1. Who is the OWNER of this note? [by your own admission, GMAC was only transferred the *servicing* of this account]
2. Provide all of the documents which evidence proof of such note ownership by the OWNER of this note.
3. Provide all of the documents which evidences the **transfer** of ownership [it is well established that this is

not GreenPoint Mortgage, as they do not exist any more, your attorney has provided an endorsement stamp from GreenPoint Mortgage to GMAC Mortgage; and certain of your staff have stated by telephone that it is "Aurora Loan Service"].

4. Provide the documents which evidence what price was paid for this loan when purchased from Greenpoint, or any succeeding purchaser of the note.
5. Provide the exact contact information and a contact individual, with name, address, telephone number and email address for the owner of the note.
6. By your own admission, "MERS" (Mortgage Electronic Registration Systems) has some manner of involvement in this loan; provide specificity as to their role; what authorization they had to undertake such a role (including the borrowers specific authorization for such), and all documentation regarding such involvement.
7. You state this loan is "registered with MERS; therefore, there are no assignments". State the reasons why a registration with MERS would implicitly indicate that there are "no assignments".
8. This loan is known to have been "endorsed" by Greenpoint Mortgage to GMAC Mortgage; in sworn testimony before the United States Bankruptcy Court, on April 20, 2010, Case No. 09-40228, the witness for GMAC Mortgage testified that "there appeared to be documents missing from the file". Moreover, this endorsement (which appears to be a tiny rubber stamp with an endorsement signature on it) appears to be the reverse side of a bank check. Provide the remainder of this document, the other side of this document, and all documents associated with this endorsement.
9. If, as you contend on your letter dated September 27, 2010, GMAC is only the servicing agent, provide an explanation of why the loan was "endorsed" to GMAC, yet GMAC claims to be only a "servicing agent".
10. You did not provide a copy of the original appraisal report; provide same.
11. You did not provide a copy of the GFE (Good Faith Estimate); provide same.
12. You did not provide copies of Notices of Default filed by Executive Trustee Services; provide same.
13. You did not provide a specific contact person, telephone and address (you provided only unknown initials and a customer service number that goes to a generic call center); provide same.
14. You did not provide copies of correspondence with Executive Trustee Services, whom you had instructed to initiate foreclosure proceedings; provide same (these were not between you and your attorney, and they are therefore not protected by attorney-client privilege).
15. Provide documentation regarding what account you have been depositing loan payments you have been receiving starting on 06/02/2010 which have been labeled "unapplied funds" in the printouts you provided (these monthly payments have been sent to you starting that date with specific instructions they were to be applied solely to interest).
16. You did not provide disclosure, identity, location and contact information for the present custodian, as of the date of this writing, of the ORIGINAL, INK-SIGNED documents pertaining to the subject loan.

A copy of your reply dated September 27, 2010,  as well as this responsive letter are being provided to:

A. US Department of Housing & Urban Development, RESPA Compliance Department.
B. John Manning, Attorney for Mortgage Reconstruction Associates, for use in the federal and state court civil cases.
C. To various publicly available media, in order that the public shall be fully informed as to GMAC Mortgage's  cooperativeness, or uncooperativeness, in regards to disclosing or attempting to conceal the complete circumstances and all documents in a residential loan to which they are party.
D. Executive Trustee Services, who have attempted to conduct a foreclosure sale without authorization or evidencing of actual ownership of the note and Trust Deed on which they are attempting to conduct such a foreclosure sale.
E. Your attorney Casper Rankin, of Pite Duncan LLP, San Diego , California
F. The State of Oregon Attorney General John Kroger, Dept of Justice, Financial Fraud/Consumer

Protection Division

G. State of California - Office of the Attorney General, Edmund G. Brown Jr., Consumer Financial Protection Agency (as Executive Trustee Services, who are attempting to conduct a foreclosure sale, are registered in offices located at 2225 North Ontario Street, Burbank, California 91504)

H. State of California - Office of the Attorney General, Edmund G. Brown Jr., Consumer Financial Protection Agency (as your attorney Casper Rankin, of Pite Duncan LLP, is practicing out of San Diego, California)

We have requested that an investigation into this loan be specifically undertaken by HUD, in the RESPA Compliance Division, as well as both of the above state attorney general's offices above noted.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel: 503-847-6360


12 USC Section 2605 of the Real Estate Settlement Procedures Act (RESPA)

(2) Action with respect to inquiry

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request...the servicer shall:
(C) after conducting an investigation, provide the borrower with...(i) information requested by the borrower

WITHOUT RECOURSE
PAY TO THE ORDER OF:
**GMAC Mortgage, LLC**

GreenPoint Mortgage Funding, Inc.

Larry R. Kern
Assistant Vice President

# **GMAC Mortgage**

3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

10/19/10

234001-015962

MARY RUTH DUNHAM
ELMER V DUNHAM
4110 SE HAWTHORNE BLVD

PORTLAND OR 97214-5246

IIlIuIuIuIuIIIuIIIIdIuIhIuIuIIIdIuIIIuuIIIIIudIuI

RE:   Account Number       0307726898
      Property Address     200 SW FLORENCE AVE #1-7

                           GRESHAM OR 97080

Dear  MARY RUTH DUNHAM
      ELMER V DUNHAM

*IMPORTANT NOTICE REGARDING INTEREST RATE AND/OR PAYMENT CHANGES*

The interest rate on your loan is scheduled to adjust on
11/01/10.  Your new principal and interest (P&I) amount will
begin effective with the 12/01/10 payment.



Projected principal balance after 11/01/10 payment $    46900.54

| | | | |
|---|---|---|---|
| Previous Index Value | 0.35330% | New Index Value | 0.34170% |
| Current Interest Rate | 3.87500% | New Interest Rate | 3.87500% |
| Current P&I Pymt    $ | 204.09 | New P&I Pymt  $ | 219.39 |
| Margin | 3.50000% | Escrow*       $ | 0.00 |
| | | Total Pymt  $ | 219.39 |

Rate Next Change Date               12/01/10
Princpal and Interest Next Change   12/01/11

*Subject to change if an escrow analysis occurs after the date of
this letter.

Your new interest rate is calculated by adding the margin to the
new index value as defined in your loan documents.  The result of
this addition is subject to rounding and rate cap limitations
according to the terms of your loan documents.

According to the terms of your note, you have a limited payment
which means your new P&I payment shall not increase and/or
decrease more than the specified percent from the prior P&I
payment.  Please note, the above P&I payment may cause negative

# MORTGAGE RECONSTRUCTION ASSOCIATES

March 4, 2010

GMAC Mortgage
Corporate Headquarters
Loss Mitigation and Loan Workout Departments
2711 North Haskell Ave
Suite 900
Dallas, Texas 75204

Casper J. Rankin
Attorney
via email to: crankin@piteduncan.com

And VIA FAX TO: 1-866-340-5043
And VIA FAX TO: 1-866-709-4744
And email to: jimmy.foster@gmacm.com

The Honorable Randall L. Dunn
U.S. Bankruptcy Court
Portland, Oregon Office

**IN RE: U.S Bankruptcy Court, Portland Office**

**Case No. 09-40228**

RE: Mortgage Restructuring

Loan #: 0307726898
Property Address: 200 SW Florence, Unit 1-7, Gresham, Oregon

In the matter of appropriate restructuring of the mortgage relationship as concerns the above referenced loan, and despite having not less than three times completed and submitted the identical information, on similar forms provided by GMAC Mortgage, in good faith furtherance of the modification, we have again completed and attach hereto the completed forms as requested.

As heretofore described, and despite repeated our communications, in writing and via telephone, we have never once, in over a year of these efforts, received any response whatsoever except for generic requests for the same information, and never once an actual engagement of a discussion of the actual relevant numbers and facts of this loan. Most recently, this was again repeated by GMAC in the letter dated January 27, 2010, as the promised response described therein within 20 business days, has, true to form, never been received.

Directing our attention to Mr. Rankin's "Hi John" email (attached) dated February 26, 2010, the facts are incorrectly related in that letter, and remonstration of Mr. Rankin and response is clearly warranted.

First, my telcons with Mr. Rankin were initially quite pleasant. Indeed, I looked forward to the opportunity to actually have a person with whom I could converse and progress to a resolution, as this is rendered abjectly impossible through the GMAC "Loss Mitigation" department. Not only can one never obtain a single point-person of contact, but one has to often endure interminable wait times, and then be connected to a person that has to be taken from ground zero, each and every time. Then, the GMAC staff claim they cannot call back out; I question: how can one conduct any business with a party that cannot/will not call you back? They refuse to provide a direct line or email address, and only receive incoming documents by fax, where we cannot ascertain their personal receipt. An interesting footnote is that Mr. Rankin himself acknowledged that he often cannot obtain a return phone call from GMAC for several days, and we can only presume that he has somewhat more elevated contacts than the lay person can obtain. This is clearly intentionally and purposefully set up to discourage and frustrate borrowers from any prospect of success. Meanwhile, GMAC pushes forth with non-judicial foreclosure

processes, well knowing that financial disadvantaged borrowers cannot afford to counter in a state court forum (particularly in comparison to the essentially unlimited fiscal resources of the mortgage giant GMAC, who, ironically, are subsidized by voluminous infusions – over $60 billion dollars - of taxpayer TARP funds.

Mr. Rankin is falsely representing that I take an "adversarial position". One must not attempt to confuse mortgage customer frustration with an unresponsive and unrepentant giant such as GMAC with our being "adversarial". On the contrary, we have earnestly and tirelessly sought to further a simple, straightforward discussion about resolution of this loan, a reasonable alternative to the lender proclivity to just attempt to wrest the property away from borrowers in the non-judicial foreclosure processes that do not provide (indeed, intentionally skirt around) any court-administered forum for the borrower to object and present their side of the matter at hand, and precious few borrowers can afford to file any state court case. If they had that kind of money, they would not be in arrears.

Mr. Rankin then goes on to state that "he [presumably meaning myself] has drafted his own documents and is trying to bully the creditor into an agreement"... Again this is a false statement on Mr. Rankin's part, and profoundly arrogant. We have proposed in letter form a rational and reasonable revision of the subject loan, carefully taking into consideration the protections of the lender, the borrower, and the American taxpayer, while GMAC demonstrates that they act in what they [perhaps mistakenly] believe to be exclusively their own corporate self-interest. They are blithely unconcerned about the financial harm being inflicted up the borrower's family, or the potential displacement of yet another person, the dwelling occupant. On the other hand, GMAC provides nothing other than generic forms to be filled out, which have no relevance to the subject at hand, where we have rental income and operating expenses, not paystubs, retirement accounts and utility bills. Mr. Rankin goes on to use a word such as "bully", as though it is some mysterious outrage that a borrower, and not the omniscient bank, presents in writing a proposal for resolution of the mortgage. Again, in an exhibition of profound arrogance, he states that the "Creditors have set policies and procedures in place"; this is RELATIONSHIP BETWEEN TWO PARTIES, not some lopsided dictatorial contract of adhesion, where one party makes all the rules to suit themselves, with clear disdain for the "inferior" party, or that the little guy may have their own "policies and procedures" or even legitimate suggestions to resolve the contractual difficulties.

Moreover, Mr. Rankin's letter degrades even further, in his expression that that he is "not yet convinced the case was filed in good faith". On the contrary, in any objective evaluation of the parties behavior in this matter, the earnest and repeated attempts by the Debtor to engage in productive discussion with the Creditor GMAC Mortgage are met with such abject unresponsiveness by GMAC that it cannot be interpreted as anything other than intentional and imbedded corporate policy designed to defray the legitimate attempts of the financially disadvantaged party (the borrower/debtor), and have them simply capitulate in exhaustion and frustration. That is indeed the very embracing of acting not in good faith. Certainly, there has been recent media attention that this proclivity is so pervasive and rampant, that it is effectively institutionalized by mortgage creditors throughout the banking industry...Countrywide, Bank of America, JP Morgan Chase, GMAC; this list is long. Even Congress has taken notice, and slowly, responsibility and accountability are being mandated on the wholesale failure of the mortgage industry to adequately address the modifications of mortgages desperately needed for Americans. If one is to have to assign the term "sham" to one of the parties, there can be no doubt whatsoever that such a label would belong to GMAC Mortgage; merely because they are monumentally larger, does not distance them from corporate responsibility or exonerate them from having to act in genuine good faith. The bankruptcy court is the only forum to which a disadvantaged borrower has practical recourse, debtors are otherwise helpless to apprehend the juggernaut of the non-judicial foreclosure process, and cannot afford the thousands of dollars that it takes to retain counsel and engage in a legal contest in state court.

Finally, in Mr. Rankin's parting shot of arrogance, he states that he still has "not been provided any evidence as to how the Debtor has any legal right to the property". Mr. Rankin's and my specific telephonic conversation on this matter was that I would be happy (my exact words) to provide such documentation (i.e. the Power of Attorney from Mrs. Dunham whilst still alive, the transfer deed, the corp resolution, the corp ownership documents, the

death certificate, the certification that the daughter is the sole family member responsible for administration of the affairs of her mother, etc). In return, I made the equivalent request for documentary evidence that Mr. Rankin has the legal right to represent GMAC, including their contractual retention, and the specific assignment of this case file. For some reason, Mr. Rankin believes that it is plausible to question one party's legal standing to speak, yet pretend that they themselves are not held to the same standard. As of this date, I still have received no documents or evidencing whatsoever from Mr. Rankin.

In continuation of the foregoing, yesterday at 3:00 pm, we were provided with a telephone number and specific identified person, Berritha Medford, that was our supposed designated as our contact at GMAC. At 3:02 pm, we called the number provided (1-800-482-3530- to the reader, please call this number yourself to verify). This was NOT any direct line, but, after listening through the various extensions, we heard the name mentioned we had been given, at extension 8746952. True to GMAC form, it went to someone named "Brad", not to Berritha Medford. We left a voice mail message nonetheless, and a full workday later, no return call has been received from any of them.

GMAC has steadfastly refused to provide the documents which allegedly caused the subject Note to come to life, or the later documents of its attempts to take the property in foreclosure, which had been requested by the Debtor: At the bottom of the response to GMAC Mortgage Motion for Relief from the Stay, and again in a formal Demand of Production of Documents (also attached). The Creditor, GMAC Mortgage, has furnished only a scant few:

-   The six pages of the Note
-   The Interim Interest Addendum
-   The Prepayment Fee Allonge
-   And what appears to be a tiny stamp endorsing "without recourse pay to the order of GMAC Mortgage LLC from Greenpoint Mortgage Funding, Inc.".

Note: it is a relevant query (raised by the endorsement stamp provided) to require disclosure of the actual amount paid by GMAC for this note of face value $44,450.00. Did GMAC pay some discounted amount, say $20,000.00 for this note, and then expect to turn around and profit by demanding the full face value, or forcibly taking the property in foreclosure?

No other documents have since been received from GMAC Mortgage, including any of the critical REQUIRED notices, as the non-judicial foreclosure process is heavily reliant on **mandatory notices to all parties in title ownership, as well as other secured creditors.** GMAC cannot pretend ignorance of the existence of the 2nd lien, it was funded simultaneously with their own note by the same lender, Greenpoint Mortgage, its existence is evidenced in the closing statement, prior to the notes being orphaned to different successors-in-interest (the 2nd lien was transferred to Countrywide Mortgage, and then later absorbed by Bank of America).

The Trust Deed was not provided. The property appraisal, the closing documents, payment calculations and notices, the mandatory default and foreclosure notices, none have ever been provided.

It is this very absence of documents which renders the entire Motion for Relief from Stay as not merely suspect, but fatally flawed and an abuse of process by the creditor GMAC Mortgage, and their attempts to hide these documents, or fail to produce, and push ahead with a defective foreclosure must be apprehended.

Again, there is no plausible excuse that this simple, straightforward modification cannot be concluded. We have a fixed amount of rent revenue, fixed predictable expenses, and debt service payments which can commence immediately. It will prevent the loss of an indeterminate amount by GMAC [who cannot be careless about such matters: GMAC lost over $75,000 on the primary residence of Mary R. Dunham last year when they insisted on foreclosure, and then re-sold Mrs. Dunham's duplex on Bluff Road for $199,000, that she had paid $304,000 for just two years previously; that loan could have been simply modified, made monthly debt service payments, and

held until the market may slowly recover, and thus prevent the loss of any principal]. This should not take more than 30 minutes of intelligent conversation, followed with the commitment of the resolution to paper, exchange of the documents, and execution.

If we are to get this modification accomplished, and not simply battle in and out of court, then we need:
1. A real live person at GMAC
2. An actual direct phone number, one from which they actually pick up the phone, receive messages, and call back
3. An email address for the proactive exchange of documents and written correspondence.

Let us opt for the cooperative approach, rather than the contentious and litigious one.

Most Sincerely,

Chuck. Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel/vm/text: 503-847-6360

# MORTGAGE RECONSTRUCTION ASSOCIATES

August 23, 2010

TO: GMAC Mortgage
   Loss Mitigation and Loan Workout Departments
   2711 North Haskell Ave, Suite 900
   Dallas, Texas 75204

cc: John Manning, Attorney for Debtor

IN RE: U.S Bankruptcy Court, Portland Office
Case No. 09-40228

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

This letter is the latest in the series of communications concerning the modification of the above referenced loan.

There seemed to have been some confusion at GMAC recently; this is not a mortgage assumption, or new application. The original borrower, Mary R. Dunham, is deceased, having passed away almost a year ago from physical complications of Alzheimer's Disease. Mortgage Reconstruction Associates ("MRA" herein), is the family corporate entity which is administering the remaining financial affairs of Mrs. Dunham, but acts solely in that capacity, and is not applying to "assume" the note, per se, but is only the successor party. The foregoing notwithstanding, MRA, as well myself, personally, have expressed willingness to subsidize and net cash shortfall in the proposed note restructure, until such time as the property can again begin to generate sufficient rent to fully cover all of its own expenses and mortgage payments. Furthermore, I have expressed willingness to even guarantee personally these payments.

I must reiterate that which I stated in my recent communications to GMAC: Our sole purpose in the Chapter 11 Reorganization is to conclude a restructure of the mortgage indebtedness which is simultaneously reasonable and fair for both parties, cognizant and aligned with the realities of the real estate and mortgage marketplaces, and compliant with the provisions of applicable bankruptcy code.

As was made acutely clear by the court, it is Judge Dunn's expectation that the parties move definitively and swiftly to a permanent resolution of the subject loan. Therefore, let us now conclude the straightforward work necessary to see the completion of this.

The value of the property was determined by the Court to be $47,346.00. This is the principal amount of the modified note, as it is that value of the asset which determines the secured portion of the debt, and thus the amount of the recast note indebtedness. The proposed terms are as follows:

Principal Balance: **$47,346.00**
Interest Rate: **4.0%\***    Fixed for **5 years**
Interest-only monthly payments of **$157.82**
Following stabilization, in 36 months, switch to a new 30-year fully amortized payment schedule, with a resultant increase in the monthly payment to **$226.46** per month.

\*For the first six months, we request a rate of 2.75%, and payment of $108.50, while the property is getting firmly on its feet. This is similar to other note modifications that GMAC has actually completed.

1.  The principal amount of $47,346.00 would be secured by a new or modified Trust Deed.
2.  The interest rate of 4.0% is reasonable, and, in fact, is *less than* the note rate as stated in the most recent GMAC interest adjustment statement (which was 3.875%).
3.  It is essential to recast for an amount of time, 5 years, which is reasonable to navigate through the nationwide financial crisis in foreclosures, job losses, evaporation of lending programs (and related reduction of the number of possible qualifiable borrowers), and see through to stabilization.
4.  Interest-only payments ensure there is no dangerous "negative amortization", and provide that the note may be accurately classified as a performing asset for bank reporting purposes, and is realistic to be paid from the amount of rent which can be generated in the location and the economy of the region.
5.  The unit is currently leased for $250.00 per month. Operating expenses, debt service and property taxes are slightly moe than this amount (see below).
6.  TO THE EXTENT THAT THERE MAY BE A SHORTFALL IN INCOME SUFFICIENT TO COVER SUCH EXPENSES, THE SUCCESSOR PARTY (MORTGAGE RECONSTRUCTION ASSOCIATES) HEREBY WILL COMMIT TO SUBSIDIZE SUCH SHORTFALL UP TO A MAXIMUM NOT TO EXCEED $100.00 PER MONTH, AND TO PERFORM ALL MAINTENANCE AS WILL BE REQUIRED TO MAINTAIN THE PROPERTY IN GOOD MECHANICAL AND COSMETIC AND RENTABLE CONDITION. Following yesterday's hearing (and despite Judge Dunn's very astute observation that I don't really have any obligation or financial motivation to guarantee a loan or any part of it, as I was never an obligor), I wish to make it clear that I am willing to personally guarantee that subsidy during the term of this agreement.
7.  The monthly costs are set forth below, and the new payment would be $157.82.* **The payment would increase to $226.46 commencing at month 37 and thereafter, in order to begin an amortizing paydown of the principal balance.** A rent increase of $50.00 per month is reasonable to project beginning in December 2010, and a $25.00 increase in December 2011, which, together with the above commitment to subsidize, will result in a total income sufficient to fully cover that increase (at all times, obviously, requiring a level of subsidy contribution as above described).

|  | As of August 2010 | As of June 2011 | As of June 2013 |
|---|---|---|---|
| Monthly Rental Income: | $ 250.00 | $ 300.00 | $ 325.00 |
| Interest-Only Payment: | -108.50 | -157.82 | - 226.46 |
| Insurance (over portion incl w/HO dues): | - 12.41 | - 12.41 | - 12.41 |
| Property Taxes: | - 46.87 | - 46.87 | - 46.87 |
| Homeowners Association Dues: | - 145.02 | - 145.02 | - |
| 145.02 | | | |
| Net Income (Shortfall): | $ (62.80) | $ (62.12) | $ |
| 105.76) | | | |

Let us, at long last, complete the task of this note modification.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360

# MORTGAGE RECONSTRUCTION ASSOCIATES

August 12, 2010

TO: GMAC Mortgage
    3451 Hammond Avenue
    PO Box 780
    Waterloo, IA 50702

    Att: Kyle Breon

cc: John Manning, Attorney for Debtor
    Casper Rankin, Attorney for GMAC Mortgage, via email

IN RE: U.S Bankruptcy Court, Portland Office
    Case No. 09-40228

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

Dear Mr. Breon:

We have today received mail dated August 4, 2010, not from an actual staff member from GMAC, but another generic letter from the "Loss Mitigation Department". This GMAC letter appears to be nothing other than a standard form, it clearly is not based on the communications and documents we have consistently and *repeatedly* sent to GAMC, and, most unnervingly, it wholly fails to address the actual situation of this loan modification.

In order as presented in that letter:

1. It is addressed to Mary Ruth Dunham and Elmer V. Dunham. If the preparer (such as one there is) of his letter had taken even a half minute to peruse the file, they would be aware that Mary Dunham is deceased, and has been for almost a year this upcoming month. Elmer Dunham is 91 years of age, and relies on the undersigned, and his daughter to take care of all financial matters. As GMAC is well aware, the original parties for both "sides" are not the present parties; Greenpoint Mortgage has been replaced by GMAC and the Dunhams have been replaced by the company administering the restructure of this loan, Mortgage Reconstruction Associates.
2. It makes the same request for "Proof of Income". Not only has this been previously provided multiple times, this is abjectly irrelevant to the subject loan modification. Elmer Dunham receives only Social Security and Veterans Benefits (again, he is 91 years of age). The revenue which is used to service the debt, pay the property taxes and homeowners association dues is the <u>rental income</u> produced, all documentation for which has been previously provided to your office, on multiple occasions, most recently again together with the June package sent to GMAC, receipt of which was acknowledged by your office at 2711 North Haskell Ave, Dallas, TX.
3. This is not a "hardship" situation; it is a modification of the loan in cognizance of the diminution of value of the real property, and its concurrent reduced ability to generate given amounts of rent each month.
4. The "financial analysis" form was completed, and sent with supporting documents in the package to your office above described.
5. As specifically noted in those forms sent in June, there are no tax returns yet due for Mortgage Reconstruction Associates. The original borrower, Elmer Dunham, 91 years of age, no longer is

required to file tax returns, as his sole source of income is only Social Security and Veterans Benefits.
6. There is not IRS 4506T applicable, in accord with #5.
7. Finally, and significantly, this is NOT, and never was, a government "Home Affordable" loan modification. The subject loan situation has no applicability to that program, which is designed exclusively for *homeowners* to remain in their homes, and, in those cases, such items as paystubs and tax returns are proper to analyze. This is a:
    a. Rental Property
    b. It is a corporate borrower, administering the assets of a family, the matriarch of which is now deceased
    c. It is part of a US Bankruptcy Court Chapter 11 Plan of Reorganization

A formal proposal for restructure of the subject note has been provided to GMAC on repeat occasions, it is again attached (most recent GMAC Proposal: 7-21-2010).

A reading and response, acceptance, or counter-proposal from an actual person at GMAC is necessary in order to devise the loan restructuring, including telephone, written and email communications, in order to efficiently conclude this arrangement.

Finally, as I have previously requested, could you please provide an email address, as it is cumbersome, environmentally harmful and time-delaying to have to print and mail our correspondence. I have called, on multiple occasions, your direct number provided in your letter, but have only received voice mail; I have left my return telephone number and email address, but have not yet received a reply to either.

Thank You.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
4110 SE Hawthorne Blvd., # 266
Portland, Oregon 97214
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360

Attachment: GMAC Loan Restructure Proposal dated 7-21-2010

# MORTGAGE RECONSTRUCTION ASSOCIATES

July 24, 2010

TO: GMAC Mortgage
    3451 Hammond Avenue
    PO Box 780
    Waterloo, IA 50702

    Att: Kyle Breon

cc: John Manning, Attorney for Debtor
    Casper Rankin, Attorney for GMAC Mortgage, via email

IN RE: U.S Bankruptcy Court, Portland Office
    Case No. 09-40228

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

Dear Mr. Breon:

I have today received your letter dated July 13, 2010

Yours is the first correspondence that we have ever actually received from a specific individual at GMAC Mortgage, in over two years of our seeking to engage in a productive discussion in order to devise and implement a modification of the subject mortgage.

Therefore, I must say thank you, for presenting yourself and making your return contact information available. I will direct all future correspondence through you.

Addressing your letter, we made no request for any "formal assumption". Our sole intention here has been, as above stated: **to engage in a productive discussion in order to devise and implement a modification of the subject mortgage**. Indeed, this was the directive of the court. If your office mistakenly sent out "assumption" forms, then that error must be corrected. We filled out everything that was sent, *on forms provided by GMAC Mortgage,* and returned back to GMAC, together with supporting documents.

In order that you are completely conversant with the situation we are addressing here, it is as follows: there were two original borrowers: Mary R. Dunham and Elmer V. Dunham. Mrs. Dunham passed away in Sept 2009, from the physical debilitation of fast-onset Alzheimers. Mr. Dunham is, at 91 years of age, yet alive and in good health. Mortgage Reconstruction Associates (abbreviated herein as "MRA") was formed to administer and manage these properties, and to be the operating entity through the Chapter 11 Reorganization now underway in the Portland Office of the US Bankruptcy Court. There is no call for any assumption of any kind, although MRA has already indicated willingness to be brought aboard as an additional obligor; certainly the addition of more obligated parties (including corporate entities) is a positive for the note beneficiary.

All that is on the table here is the **modification** of the subject mortgage, to terms which are framed in the context of revenues produced by the rental of the dwelling, and the other opex which require address, including property taxes, insurance, homeowners association dies, and maintenance of the unit. These have been repeatedly proposed and submitted for the accord, response or counter by GMAC, yet this has yet to be completed. The modification proposal is again attached hereto.

Consequently, we request that you please take this on as your personal responsibility to see this through to conclusion.

Finally, could you please provide an email address, as it is cumbersome, environmentally harmful and time-delaying to have to print and mail our correspondence. I have called your direct number provided in your letter, but have only received voice mail; I have left my return telephone number and email address, but have not yet received a reply to either.

Thank You.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
4110 SE Hawthorne Blvd., # 266
Portland, Oregon 97214
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360


For the record, your "Statement of Credit Denial" is startlingly inapplicable, and serves no purpose in furthering the loan modification, as follows:

A. No credit file. MRA is a single purpose corporate entity, formed solely for the administration of these properties. It has no "credit file", nor is it intended that one ever be created.

Insufficient Number of Credit References provided. None were provided. For that matter, none were asked for by GMAC. None exist, other than what is now being created with the recast of the existing mortgages.

Limited Credit Experience. Again, none exists, other than what is now being created with the recast of the existing mortgages.

Lack of Cash Reserves: A current inquiry into cash reserves now shows this to be in excess of $5000.00, which constitutes over TWO YEARS of the subject mortgage payments.

Delinquent Past or Present Credit Obligations with others. As GMAC has identified this as a reason for "credit denial" the data on which this is based is hereby demanded. MRA has no known delinquent obligations whatsoever with "others" (see the Monthly Reports in the Bankruptcy case file), and has just made the fourth consecutive payment to GMAC on the subject property.

Bankruptcy Past or Present. This is an obvious conundrum as the subject mortgage modification is being made as a part of a formal Plan of Reorganization, administered by the US Bankruptcy Court, together with other real properties and lenders.

C.Unable to Verify Income. This is incorrect; the rental agreement, which is the documentary evidencing of all income, was provided together with the package of documents provided to GMAC in June of 2010.

# MORTGAGE RECONSTRUCTION ASSOCIATES

July 21, 2010

TO: GMAC Mortgage
    Loss Mitigation and Loan Workout Departments
    2711 North Haskell Ave
    Suite 900
    Dallas, Texas 75204

C/O: Casper Rankin, Attorney for GMAC Mortgage, via email

cc: John Manning, Attorney for Debtor

### IN RE: U.S Bankruptcy Court, Portland Office

### Case No. 09-40228

    RE: Mortgage Restructuring

Loan #: 0307726898
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

I must reiterate that which I stated in my recent communications to GMAC: Our sole purpose in the Chapter 11 Reorganization is to conclude a restructure of the mortgage indebtedness which is simultaneously reasonable and fair for both parties, cognizant and aligned with the realities of the real estate and mortgage marketplaces, and compliant with the provisions of applicable bankruptcy code.

As was made acutely clear by the court, it is Judge Dunn's expectation that the parties move definitively and swiftly to a permanent resolution of the subject loan. Therefore, let us now conclude the straightforward work necessary to see the completion of this.

The value of the property was determined by the Court to be $47,346.00. This is the principal amount of the modified note, as it is that value of the asset which determines the secured portion of the debt, and thus the amount of the recast note indebtedness. The proposed terms would be slightly amended from our earlier communications to be as follows:

Principal Balance: **$47,346.00**
Interest Rate: **4.0%***    Fixed for **5 years**
Interest-only monthly payments of **$157.82**
Following stabilization, in 36 months, switch to a new 30-year fully amortized payment schedule, with a resultant increase in the monthly payment to **$226.46** per month.

*For the first six months, we request a rate of 2.75%, and payment of $108.50, while the property is getting firmly on its feet. This is similar to other note modifications that GMAC has actually completed.

1. The principal amount of $47,346.00 would be secured by a new or modified Trust Deed.
2. The interest rate of 4.0% is reasonable, and, in fact, equates to the same amount as recited by GMAC in the last known interest adjustment statement.

3. It is essential to recast for an amount of time, 5 years, which is reasonable to navigate through the nationwide financial crisis in foreclosures, job losses, evaporation of lending programs (and related reduction of the number of possible qualifiable borrowers), and see through to stabilization.

4. Interest-only payments ensure there is no dangerous "negative amortization", and provide that the note may be accurately classified as a performing asset for bank reporting purposes, and is realistic to be paid from the amount of rent which can be generated in the location and the economy of the region.

5. The unit is currently leased for $250.00 per month, until November 2010. Operating expenses and debt service paid, as well as all new property taxes which become due, plus insurance, homeowners dues, and to properly maintain the property.

6. TO THE EXTENT THAT THERE MAY BE A SHORTFALL IN INCOME SUFFICIENT TO COVER SUCH EXPENSES, THE SUCCESSOR PARTY (MORTGAGE RECONSTRUCTION ASSOCIATES) HEREBY WILL COMMIT TO SUBSIDIZE SUCH SHORTFALL UP TO A MAXIMUM NOT TO EXCEED $100.00 PER MONTH, AND TO PERFORM ALL MAINTENANCE AS WILL BE REQUIRED TO MAINTAIN THE PROPERTY IN GOOD MECHANICAL AND COSMETIC AND RENTABLE CONDITION. Following yesterday's hearing (and despite Judge Dunn's very astute observation that I don't really have any obligation or financial motivation to guarantee a loan or any part of it, as I was never an obligor), I wish to make it clear that I am willing to personally guarantee that subsidy during the term of this agreement.

7. The monthly costs are set forth below, and the new payment would be $157.82.* **The payment would increase to $226.46 commencing at month 37 and thereafter, in order to begin an amortizing paydown of the principal balance.** A rent increase of $50.00 per month is reasonable to project beginning in December 2010, and a $25.00 increase in December 2011, which, together with the above commitment to subsidize, will result in a total income sufficient to fully cover that increase (at all times, obviously, requiring a level of subsidy contribution as above described).

|  | As of May 2010 | As of Dec 2010 | As of June 2013 |
|---|---|---|---|
| Monthly Rental Income: | $ 250.00 | $ 300.00 | $ 325.00 |
| Interest-Only Payment: | -108.50 | -157.82 | - 226.46 |
| Insurance (over portion incl w/HO dues): | - 11.50 | - 12.00 | - 14.00 |
| Property Taxes: | - 46.83 | - 46.83 | - 46.83 |
| Homeowners Association Dues: | - 135.00 | - 135.00 | - 135.00 |
| Net Income (Shortfall): | $ (51.83) | $ (51.65) | $ (97.29) |

Let us, at long last, complete the task of this note modification.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360

PS: Could you also retrieve from your archive files the document which was never yet produced, which evidences GMAC ownership of this loan, and thus their right to negotiate the modification. Or, is there is a separate "investor" / note owner who has to approve this? Thank You.

# MORTGAGE RECONSTRUCTION ASSOCIATES

July 13, 2010

TO: GMAC Mortgage
   Loss Mitigation and Loan Workout Departments
   2711 North Haskell Ave, Suite 900
   Dallas, Texas 75204

cc: John Manning, Attorney for Debtor
   Casper Rankin, Attorney for GMAC Mortgage, via email

IN RE: U.S Bankruptcy Court, Portland Office
   Case No. 09-40228

**Loan #: 0307726898**
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

Enclosed please find the July, 2010 payment. This is now the fourth consecutive monthly payment sent to you during this reorganization process.

Comprehensive property insurance has been put in force and is now paid in advance.

We have now commenced making property taxes in monthly installments of 1/12 of the annual tax bill.

The dwelling is in excellent condition, with stable occupancy and production of monthly income.

It has now been over a month since I submitted the completed package, together with attachments and supporting documents, to your office.

Since that time, I have received:

NOT A SINGLE CALL BACK.
NOT A SINGLE EMAIL.
NOT A SINGLE LETTER.

NOT EVEN AN ACKNOWLEDGEMENT FROM YOUR OFFICE THAT YOU HAVE RECEIVED THE PACKAGE, MUCH LESS THAT YOU ARE IN GOOD FAITH WORKING ON A MODIFICATION AND PERMANENT RESOLUTION.

Despite assurances from your attorney that you would, in good faith, act responsively, diligently work towards this resolution and be available and in communication, NONE of this has, in fact, occurred. All that has happened is a repeat of your long-established proclivity to be impossible to reach by telephone, NEVER responding to any written communications, receiving your completed documents and supporting attachments, and then making no attempt whatsoever to engage in any dialogue, exchange any documents, or propose or counter-propose a framework to a restructured loan for this property. We have submitted not less than EIGHT comprehensive loan modification proposals, and received not even a single response to any. I have made dozens of telephone calls to your office, and, despite your telephonic recorded message assuring the caller that you would respond, I have yet to receive any call (except one from a GMAC staff member insisting on speaking with the original borrower, my mother-in-law Mary Dunham, who has been deceased now over eight months).

Throughout this, I have offered to subsidize any monthly shortfall necessary to meet all expenses to the extent of up to $100.00 per month. Recently, I have even elevated that to offering to personally guarantee the restructured note. Yet it appears I am singing to an empty auditorium. To state that attempting to initiate a workout dialogue with GMAC Mortgage is profoundly exacerbating is a considerable understatement.

Therefore, I must insist that you cease this practice, and engage this matter with attention, focus and resolution to get it successfully restructured. I have, in good faith, made multiple overtures to do so. We have done the practical work to ensure that the property asset is in excellent condition, occupied with a stable rent paying resident tenant. I am making consistent mortgage payments, in accord with our proposed restructure*. I have put property insurance in place. We are now making property tax payments. It is long past time for you to do your part and get this loan workout resolved. Anything less cannot be interpreted other than as blatant bad faith on your part, and the absence of replacing that with genuine and demonstrable progress and resolution will result in our petitioning the bankruptcy court for not merely reinstatement of the Sec 362(a) Stay, but for an order of censure and penalties for bad faith practices on your part.

As always, I am available and reachable.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
4110 SE Hawthorne Blvd., # 266
Portland, Oregon 97214
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360

*Strangely, the rate of interest that I have repeatedly proposed, 4.0%, is actually *higher* than your own calculated rate, which is currently 3.875% !

# MORTGAGE RECONSTRUCTION ASSOCIATES

April 21, 2010

TO: GMAC Mortgage
    Loss Mitigation and Loan Workout Departments
    2711 North Haskell Ave
    Suite 900
    Dallas, Texas 75204

C/O: Casper Rankin, Attorney for GMAC Mortgage, via email

cc: John Manning, Attorney for Debtor

**IN RE: U.S Bankruptcy Court, Portland Office**

**Case No. 09-40228**

    RE: Mortgage Restructuring

Loan #: 0307726898
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

Dear Mr. Rankin:

It was our pleasure to meet you yesterday.

I must reiterate that which I stated in my most recent communication to GMAC, on April 14: Our sole purpose in the Chapter 11 Reorganization is to conclude a restructure of the mortgage indebtedness which is simultaneously reasonable and fair for both parties, cognizant and aligned with the realities of the real estate and mortgage marketplaces, and compliant with the provisions of applicable bankruptcy code.

As was made acutely clear by the court yesterday, it is Judge Dunn's expectation that the parties move definitively and swiftly to a permanent resolution of the subject loan. Therefore, let us now conclude the straightforward work necessary to see the completion of this.

Furthermore, Judge Dunn has made it clear that any respective issues either of us may have had concerning successor interests of the original parties is now moot: GMAC and MRA are the parties now, and we are commissioned with the responsibility to get this done. Moreover, as we are now focused on the loan resolution and not the ancillary issues (i.e the conduct proper/improper notices of the non-judicial foreclosure), and specifically pending the satisfactory conclusion of this loan restructure, we no longer require production of either of those discovery documents. However, as a result of information disclosed by your witness Albert Augustine, we must insist on your providing the "missing page" which he described, as well as the remainder of the little endorsement stamp document [note: this is no longer for any purpose of establishing GMAC right as an interested party, as above noted, that is now moot; it is because this small stamp appears it may be the reverse side and endorsement of an actual bank check, and GMAC providing only the back side would be a partial concealment of the entire document; if the other side proves to be a bank check, it will evidence that amount that GMAC paid for this note asset; and if they paid some fraction of its face value, it obviously has relevance as a matter of equity].

The amount of the principal balance was stated in Mr. Augustine's testimony to be $47,146.33. The value of the property, as supported by Janice Murdoch's testimony, was determined by Judge Dunn to be $47,346.00 As neither of us knew beforehand that this would be the other parties witness testimony, it is uncanny just how close these figures are. Consequently, per bankruptcy code cramdown provisions, it is that value of the asset which determines the secured portion of the debt, and thus the amount of the recast note indebtedness. The proposed terms would be slightly amended from our earlier communications to be as follows:

Principal Balance: **$47,346.00**
Interest Rate: **4.0%\***   Fixed for **5 years**
Interest-only monthly payments of **$157.82**
Following stabilization, in 36 months, switch to a new 30-year fully amortized payment schedule, with a resultant increase in the monthly payment to **$226.46** per month.

\*For the first six months, we request a rate of 2.75%, and payment of $108.50, while the property is getting firmly on its feet. This is similar to other note modifications that GMAC has actually completed.

1. The principal amount of $47,346.00 would be secured by a new or modified Trust Deed.
2. The interest rate of 4.0% is reasonable, and, in fact, equates to the same amount as recited by GMAC in the last known interest adjustment statement.
3. It is essential to recast for an amount of time, 5 years, which is reasonable to navigate through the nationwide financial crisis in foreclosures, job losses, evaporation of lending programs (and related reduction of the number of possible qualifiable borrowers), and see through to stabilization.
4. Interest-only payments ensure there is no dangerous "negative amortization", and provide that the note may be accurately classified as a performing asset for bank reporting purposes, and is realistic to be paid from the amount of rent which can be generated in the location and the economy of the region.
5. The unit is currently leased for $250.00 per month, until November 2010. Operating expenses and debt service paid, as well as all new property taxes which become due, plus insurance, homeowners dues, and to properly maintain the property.
6. TO THE EXTENT THAT THERE MAY BE A SHORTFALL IN INCOME SUFFICIENT TO COVER SUCH EXPENSES, THE SUCCESSOR PARTY (MORTGAGE RECONSTRUCTION ASSOCIATES) HEREBY WILL COMMIT TO SUBSIDIZE SUCH SHORTFALL UP TO A MAXIMUM NOT TO EXCEED $100.00 PER MONTH, AND TO PERFORM ALL MAINTENANCE AS WILL BE REQUIRED TO MAINTAIN THE PROPERTY IN GOOD MECHANICAL AND COSMETIC AND RENTABLE CONDITION. Following yesterday's hearing (and despite Judge Dunn's very astute observation that I don't really have any obligation or financial motivation to guarantee a loan or any part of it, as I was never an obligor), I wish to make it clear that I am willing to personally guarantee that subsidy during the term of this agreement.
7. The monthly costs are set forth below, and the new payment would be $157.82.\* **The payment would increase to $226.46 commencing at month 37 and thereafter, in order to begin an amortizing paydown of the principal balance.** A rent increase of $50.00 per month is reasonable to project beginning in December 2010, and a $25.00 increase in December 2011, which, together with the above commitment to subsidize, will result in a total income sufficient to fully cover that increase (at all times, obviously, requiring a level of subsidy contribution as above described).

|  | As of May 2010 | As of Dec 2010 | As of June 2013 |
|---|---|---|---|
| Monthly Rental Income: | $ 250.00 | $ 300.00 | $ 325.00 |
| Interest-Only Payment: | -108.50 | -157.82 | - 226.46 |
| Insurance (over portion incl w/HO dues): | - 11.50 | - 12.00 | - 14.00 |
| Property Taxes: | - 46.83 | - 46.83 | - 46.83 |
| Homeowners Association Dues: | - 135.00 | - 135.00 | - 135.00 |
| Net Income (Shortfall): | $ (51.83) | $ (51.65) | $ (97.29) |

Let us, at long last, embark on this cooperative approach, rather than the contentious and litigious one.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360

# MORTGAGE RECONSTRUCTION ASSOCIATES

April 12, 2010

TO: GMAC Mortgage
  Loss Mitigation and Loan Workout Departments
  2711 North Haskell Ave          and:   3451 Hammond Avenue
  Suite 900                               Waterloo, IA 50702
  Dallas, Texas 75204

Also VIA FAX TO: 1-866-340-5043 and VIA FAX TO: 1-866-709-4744

CC: US Trustee M. Vivienne Popperl and US Trustee Carla McClurg
   John Manning, Attorney; Casper Rankin, Attorney

## IN RE: U.S Bankruptcy Court, Portland Office

### Case No. 09-40228

RE: Mortgage Restructuring

Loan #: 0307726898
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

Following the email from Casper Rankin to John Manning (respective counsel) requesting that a payment be made pending loan workout (and we have since requested what amount GMAC believes to be the current payment, but have received no information back whatsoever), and in furtherance of our letter dated January 10, 2010 (copy attached), multiple sets of documents forwarded to your office since that date, including on specific GMAC forms, and over a dozen unreturned telephone calls to your office, enclosed please find the following:

1. A printed hard copy of both Powers of Attorney and Authorization [Mary R. Dunham (deceased) and Elmer V. Dunham, and the Authorization from Janice Murdoch to Charles Barker].
2. Proof of Evidence of Insurance for the subject property
3. Certified Funds in the amount of $140.00 [the actual amount of current payment is unknown; consequently, payment in amount as proposed herein is enclosed as good faith commencement of monthly payments]
4. An updated note restructuring outline, using the most current data and figures available, set forth below.

Our sole purpose in the Chapter 11 Reorganization is to conclude a restructure of the mortgage indebtedness which is simultaneously reasonable and fair for both parties, cognizant and aligned with the realities of the real estate and mortgage marketplaces, and compliant with the provisions of applicable bankruptcy code.

Contrary to what little communication is received (none whatsoever from GMAC, the sole communication has been from their counsel Casper Rankin), this is not a one-sided relationship where one or the other party dictates the form and structure of loan modification. This is a contractual relationship, involving successor parties (and GMAC has yet to prove their claim of any interest in this note, while we have done so repeatedly, and such burden of proof cannot be selectively applied to only **one** party). We have, in good faith, proposed a reasonable structure for loan modification, provided proof of insurance, and commenced payments. It is now time for GMAC to reflect the same good faith and actually engage in a working conversation as will result in a successful conclusion of this loan modification.

CRITICAL

Therefore, the following updated proposed restructure of this mortgage loan is outlined as follows:
As a function of the substantial decline in Portland Metropolitan market values, the value of this condominium has diminished significantly since the time of acquisition. This is compounded by the extreme difficulties in any new buyer qualifying for any loan, as essentially the sole financing left in the market is available only to those persons who can become approved for FNMA/FHLMC/FHA loans. Moreover, the federal $8000.00 tax credit is now sunsetting this month, which may further dampen any prospective buyers. This is not an affluent neighborhood; this is an area of working folks, the very ones who have had their jobs disappear, and new employment prospects are dim. The recast of the debt will be equal to the amount of the current value (which could require more than one appraisal, as there may be differing analyses). The trustee determined that there was no equity in the property, and, unfortunately, this appears to be a correct assessment.

The proposed terms are as follows:

Principal Balance: **$42,000.00**
Interest Rate: **4.0%**      Fixed for **5 years**
Interest-only monthly payments of **$140.00**
Following stabilization, in 24 months, switch to a new 30-year fully amortized payment schedule, with a resultant increase in the monthly payment to **$200.51** per month.

1. The principal amount of $42,000.00 would be secured by a new or modified Trust Deed.
2. The interest rate of 4.0% is absolutely reasonable, given that mortgage rates have dropped to nearly that level currently. It provides acceptable and predictable return for the lender.
3. It is essential to recast for an amount of time, 5 years, which is reasonable to navigate through the nationwide financial crisis in foreclosures, job losses, evaporation of lending programs (and related reduction of the number of possible qualifiable borrowers), and see through to stabilization.
4. Interest-only payments ensure there is no dangerous "negative amortization", and provide that the note may be accurately classified as a performing asset for bank reporting purposes, and is realistic to be paid from the amount of rent which can be generated in the location and the economy of the region.
5. The unit is currently leased for $250.00 per month, until November 2010. Operating expenses and debt service must be generated to adequately make the herein described monthly payment, pay all new property taxes which become due, to pay the costs of insurance, homeowners dues, and to properly maintain the property. TO THE EXTENT THAT THERE MAY BE A SHORTFALL IN INCOME SUFFICIENT TO COVER ALL SUCH EXPENSES, THE SUCCESSOR PARTY (MORTGAGE RECONSTRUCTION ASSOCIATES) HEREBY WILL COMMIT TO SUBSIDIZE SUCH SHORTFALL UP TO A MAXIMUM NOT TO EXCEED $100.00 PER MONTH, AND TO PERFORM ALL MAINTENANCE AS WILL BE REQUIRED TO MAINTAIN THE PROPERTY IN GOOD MECHANICAL AND COSMETIC AND RENTABLE CONDITION.
6. The monthly costs are set forth below, and the new payment would be $140.00. **The payment would increase to $200.51 commencing at month 25 and thereafter, in order to begin an amortizing paydown of the principal balance**. A rent increase of $50.00 per month is reasonable to project beginning in December 2010, and a $25.00 increase in December 2011, which, together with the above commitment to subsidize, will result in a total income sufficient to fully cover that increase of $60.51 per month.

|  | As of April 2010 | As of May 2012 |
|---|---|---|
| Monthly Rental Income: | $ 250.00 | $ 325.00 |
| Interest-Only Payment: | -140.00 | - 200.51 |
| Insurance (over portion incl w/HO dues): | - 11.50 | - 11.50 |
| Property Taxes: | - 46.83 | - 46.83 |
| Homeowners Association Dues: | - 135.00 | - 135.00 |
| | ------------- | ------------- |
| Net Income (Shortfall): | $ (83.33) | $ (68.84) |

As we have expressed on so many repeat occasions, we seek to engage in a working dialogue, to proceed to a mutually agreeable accorded resolution, and then present the same to the court for approval (as opposed to the far more costly and time-consuming motions, petitions, oppositions, hearings, valuations testimony, expert witnesses hiring and presentations, attorney costs, etc.). If you could please appoint someone with adequate expertise and decision-making authority, and establish a communication methodology which is viable (trying to reach someone by phone through the GMAC system is abominably frustrating and time-consuming; every single one of my attempts to reach some at GMAC, at the supposed "contact number", resulted in a no person answering the telephone, leaving yet another voice mail, and no call being ever returned (despite the message machine assuring one that a call will be returned within 48 hours). Moreover, GMAC staff members appear to be working in outdated technology as far as electronic communication...archaically only able to receive faxes (who even uses a fax machine anymore?), and not even being available for correspondence by email...we will need a viable communication path in order to complete these loan modifications efficiently.

Please provide the documents which have been requested repeatedly, including the original note, evidencing of any right or claim of interest in the note by GMAC, and all notices and documents pertaining to the attempted taking of the property in the non-judicial foreclosure proceeding (copy of Demand for Production again attached).

Let us opt for the cooperative approach, rather than the contentious and litigious one.

Most Sincerely,

Chuck Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel/vm/txt: 503-847-6360


Attachments to Hard Copy:
Power of Attorney for Mary R. Dunham
Power of Attorney for Elmer V. Dunham
Authorization from Janice Murdoch to Charles Barker
Evidence of Insurance Certificate
Certified Funds Payment in advance for upcoming month of May 2010
Copy of January 10, 2010 letter to GMAC Mortgage
Demand for Production of Documents

# MORTGAGE RECONSTRUCTION ASSOCIATES

January 10, 2010

TO: GMAC Mortgage
Attn: Legal Department

Corporate Headquarters
Loss Mitigation and Loan Workout Departments
2711 North Haskell Ave
Suite 900
Dallas, Texas 75204

And VIA FAX TO: 1-866-340-5043
And VIA FAX TO: 1-866-709-4744

And email to: jimmy.foster@gmacm.com

## IN RE: U.S Bankruptcy Court, Portland Office

## Case No. 09-40228

RE: Mortgage Restructuring

Loan #: 0307726898
Property Address: 200 SW Florence, Unit I-7, Gresham, Oregon

We have received specific instructions from the Judge of the Portland Office of the United States Bankruptcy Court, in the above referenced case, in the hearing which occurred January 6, 2010, that we are authorized to contact you directly regarding the below, and that you are authorized by the Court to respond directly to us, the Petitioner/Debtor, as well.

The above referenced loan has a balance outstanding which exceeds the value of the property security collateral. In accord with US Bankruptcy Code, it is our intention to bifurcate the secured debt as a separate creditor classification from the unsecured debt, based upon the establishment of an accurate present-day valuation of the real property which secures your Trust Deed, and affirm the secured portion, and discharge the unsecured portion. This is applicable only to non-owner occupied properties (as prescribed under HUD definition), and is commonly referred to as a "cram-down": the bankruptcy judge-ordered reduction of a mortgage balance to equate to the actual amount of the present value of the security collateral, and the modification of the terms of the remaining mortgage.

This administration of this has been necessitated to be conducted through, and with the oversight, of the Bankruptcy Court, due to the abject failure of your loan modification or "workout" department to competently complete a simple, straightforward restructuring of these loans, to align with the economic conditions of the market and the borrowers.

The above referenced loan is in jeopardy of substantive financial loss to GMAC Mortgage. Your acceptance of billions of dollars in TARP funds (none of which went to assist borrowers reeling with the impact of the collapsed economy), as well as government programs which actually pay your bank many thousands of dollars to merely conclude loan modifications (although no such similar offer is made by the government to the

struggling property owners) , your inability to facilitate even simple, straightforward modifications such as the subject one, is indicative of either fiscal carelessness, or possibly a more ominous intentional and purposeful attempt to wrest control of the properties from the struggling borrows. This cannot be abided, and thus we have had to resort to the protections and codified procedure for loan modifications as set forth in 15 USC Bankruptcy Code.

In the case of the Unit I-7 property, an excruciatingly minor modification has been proposed repeatedly throughout the past year+, which, at that time, required NO diminution whatsoever of the principal balance. Now, with further degradation of the real estate market, and continuing high unemployment in Oregon, and dramatically fewer persons able to qualify for the few remaining loan types still available (essentially, only FNMA, FHLMC, FHA and VA; no portfolio, stated income, difficult credit score, small business owner/little net tax return income, etc. loans are now available, which has sliced out a large percentage of the possible buyer population), the principal balance must be reduced to the amount of the value of the security property. Thus, if your loan modification department had exhibited even a modicum of efficiency, this loan could have been restructured many months ago, as we have been diligently, yet fruitlessly, attempting to do for over a year. Enough burden has already been placed upon the American taxpayers who have contributed so heavily to the saving of GMAC Mortgage, and the $63,000,000,000 bailout of your 51% owner GM.

This must be completed forthwith. It is not any complex or mysterious process. It will require work by a GMAC staff member or attorney who is not constrained by the conventions of the standard "paystub/qualifying ratio" protocol, and who has sufficient authority, or can engage the appropriate person at GMAC.

**It is important to bear in mind that this is a rental property, which are specifically codified to allow bankruptcy court mandated restructure of loan terms, unlike owner-occupied properties which may have gained similar access to cram-down rules had legislation concerning the same passed in 2009.**

The restructure of these mortgage loans is proposed as follows

The value of this property has diminished significantly since the time of acquisition. The most optimistic assessments of value indicate that $42,000 would be the very most obtainable, and even then, there are extreme difficulties in any new buyer qualifying for any loan, as above noted. . This is not an affluent neighborhood; this is an area of working folks, the very ones who have had their jobs disappear, and new employment prospects are dim. The recast of the debt will be equal to the amount of the current value (which may require more than one appraisal, as there may be differing analyses). The proposed terms are as follows:

Principal Balance: **$42,000.00**
Interest Rate: **4.0%**      Fixed for **5 years**
Interest-only monthly payments of **$140.00**
Following stabilization, in 12 months, switch to a new 30-year fully amortized payment schedule.

1.  The principal amount of $42,000.00 will be secured by a new Trust Deed on the subject property.
2.  The interest rate of 4.0% is absolutely reasonable, given that mortgage rates have dropped to nearly that level currently. It provides acceptable and predictable return for the lender.
3.  It is essential to recast for an amount of time, 5 years, which is reasonable to navigate through the current nationwide financial crisis in foreclosures, job losses, evaporation of lending programs (and related reduction of the number of possible qualifiable borrowers), and see through to stabilization and recovery.
4.  Interest-only payments ensure there is no dangerous "negative amortization", and provide that the note may be accurately classified as a performing asset for bank reporting purposes, and is realistic to be paid from the amount of rent which can be generated in the location and the economy of the region.

5. There is sufficient rental income which can be generated to adequately pay all new property taxes which become due, to pay the costs of insurance, homeowners dues, owner-required utilities, and to properly maintain the property.

6. The monthly costs total $108.00 per month, and the new payment would be $140.00. The unit is currently leased for $250.00 per month, until November 2010. This is adequate, albeit just so, to pay all of this mortgage payment, homeowners dues, property taxes, insurance and maintenance.

We would like to engage in immediate dialogue, to determine if an accord can be derived, and then presented to the court for approval (as opposed to the far more costly and time-consuming motions, petitions, oppositions, hearings, valuations testimony, expert witnesses hiring and presentations, attorney costs, etc.). If you could please appoint someone with adequate expertise and decision-making authority, and establish a communication methodology which is viable (trying to reach someone by phone through the GMAC system is abominably frustrating and time-consuming, one gets shunted to whomever is "available" instead of a single person who develops conversance with the subject matter, and GMAC staff members appear to be working in outdated technology as far as electronic communication...the few calls ever received were from numbers which are blocked from return calls, archaically only able to receive faxes (who even uses a fax machine anymore?), and not even being available for correspondence by email...we will need a viable communication path in order to complete these loan modifications efficiently.

Let us opt for the cooperative approach, rather than the contentious and litigious one.

Most Sincerely,

Chuck. Barker
Mortgage Reconstruction Associates
mortgagerecon@gmail.com
Tel: 503-847-6360

CALL LOG

To GMAC Mortgage                                         RE: Loan # 0307726898

Tel #: 1-800-482-3530       Ext #: 8746952
FAX #: 1-866-502-6647

Designated Contact Person:  Bernisa (sp?) Medford

We were given the above name and general number (but not the ext #) on 3/3/2010 at 3:00 pm.

Attempted calls to GMAC at above number:

| 3/3/2010   | 3:02 pm  |
| 3/4/2010   | 10:15 am |
| 3/5/2010   | 2:44 pm  |
| 3/8/2010   | 9:10 am  |
| 3/12/2010  | 1:55 pm  |
| 3/16/2010  | 8:26 am  |
| 3/17/2010  | 10:28 am |
| 3/17/2010  | 11:19 am |
| 3/22/2010  | 11:48 am |
| 3/31/2010  | 1:19 pm  |
| 3/31/2010  | 1:25 pm  |

As of 3/31/2010, 11 calls made, detailed vm left each time, with return tel number (with voice mail) and email address; not a single return call (other than the baffling call described below), voice mail, regular mail or email has been received whatsoever.
-------------------------------------------------------------------------------------------------------------------
One call was received from GMAC, as follows:

Unidentified number appeared on phone screen.
I answered, identifying myself as Chuck Barker
The woman on the phone asked to speak with Mary Ruth Dunham.
I replied that Mrs. Dunham was deceased, last September.
The woman only then identified herself as being from GMAC, and asked if I had a power of attorney from Mary Dunham.
I replied that there was an executed power of attorney, that it had been sent to GMAC repeatedly during the time that Mrs. Dunham, my mother-in-law, was still alive; however that upon her death, the power of attorney is automatically extinguished, and that the person administering all matters concerning Mary R. Dunham was myself.
The woman then stated that she could not speak with me, and she abruptly terminated the call.
[Note: this is particularly exasperating, as it is indicative of the proclivity of staff members at GMAC to fail to peruse the subject matter or research their files, as it has been made repeatedly clear that the original borrower, Mary R. Dunham, was deceased in September 2009]
-----------------------------------------------------------------------------------------------------

Hard copy set, including all GMAC forms completed, mailed March 4, 2010
Hard copy set also faxed to number on B. Medford's voice mail

Fax memo again requesting contact sent 3/31/2010 to fax # 1-866-502-6647 (no em address has been provided by GMAC, each call goes to voice mail directly, no person has ever answered).

7/22/2010. After lengthy hold, was connected to:    . He was able to read from his screen that they had logged in my most recent hard copy letter on 7/21/2010, but could not tell I anyone had actually read the letter, or if anyone intended to. I asked if he could tell when they had received the GMAC package I had sent in for the loan modoication, and, after some delay, he was able to find that was logged in on June 21. I asked for any status. Again, after some delay, he stated that it appeared the "assumption" had not been approved, but that it was now in review for modification. He was not able to determine who was purportedly reviewing it. He asked to place me on hold, and I was then disconnected.

7/22/2010 Called back in. Was informed I could not be
Finally directed to  , ID #, tel #    . Left detailed message with my name, loan number, property address, call back number and email; requested reply. Automated phone message stated calls would be return within 24 to 48 hours. NO call back, letter, email or any form of communication has been received.

6. MERS is the Mortgage Electronic Registration System, Inc. MERS acts solely as the nominee for the Lender and Lender's successors and assigns. MERS is the beneficiary is the Security Instrument (Deed of Trust). By signing the Deed of Trust, the Dunham's gave authorization for the title to be held by MERS.

7. The title is held under MERS and continues to be for the life of the loan. By recording the title under MERS, it eliminates the need for assignments at the time of servicing transfers.

8. Subject to business and trade practices which are proprietary and confidential.

9. Subject to business and trade practices which are proprietary and confidential.

10. Section XI of the Real Estate Settlement Procedures Act ("RESPA") requires GMACM to provide documents related to the servicing of the account. As the appraisal does not fit this criteria, it is not provided.

11. Section XI of the Real Estate Settlement Procedures Act ("RESPA") requires GMACM to provide documents related to the servicing of the account. As the Good Faith Estimate (GFE) does not fit this criteria, it is not provided.

12. Notices of Default are enclosed.

13. Name and contact information is provided at conclusion of letter.

14. Subject to business and trade practices which are proprietary and confidential.

15. With the foreclosure status of the account, payments received will be applied to a holding account unless it is the full reinstatement amount. The enclosed account history reflects these funds in the holding account. If you are asking for the bank account information that information is subject to business and trade practices which are proprietary and confidential.

16. This does not pertain to the servicing of the account; however, this information is provided in number 1.

If you have any further questions, please contact me at 800-627-0128 extension 2365373 or directly at 319-236-5373.

Sincerely,

Bryan Duggan
Advocacy Resolution Specialist
Executive Offices

Enclosures

C:      Department of Justice
        Civil Enforcement Division
        Attn: Michelle Letney
        1162 Court Street NE
        Salem OR 97301-4096

# GMAC Mortgage

October 6, 2010

Mortgage Reconstruction Associates
Attn: Chuck Barker
4110 SE Hawthorne Blvd #266
Portland OR 97214

RE:     Account Number        0307726898
        Mortgagors            Mary Ruth Dunham and Elmer V Dunham
        Property Address      200 SW Florence Ave #1-7
                              Gresham OR 97080

Dear Chuck Barker:

Please be advised that this letter serves as our response to your Qualified Written Request
("QWR") for information regarding the above-referenced GMAC Mortgage account
dated September 27, 2010 and received in our office on October 5, 2010. In your
correspondence, you request detailed information and documentation regarding nearly
every aspect of the mortgage loan transaction, beginning with its origination.

In response to your inquiry, GMAC Mortgage has enclosed a copy of the account's
payment history as required by the Real Estate Settlement Procedures Act ("RESPA").

Because your letter appears to be questioning nearly every aspect of the loan transaction,
it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding
the servicing of the account. Nevertheless, in an effort to be responsive to your request,
copies of pertinent documentation GMAC Mortgage has in its records are enclosed.

- Note
- Mortgage/Deed of Trust
- HUD-I Settlement Statement

The current Master Servicer is: Aurora Loan Services LLC. The loan is currently owned
by: US Bank N.A., as Trustee, 60 Livingston Ave, 4th Floor, St Paul, MN 55107, phone
number 800-236-3488. However, the loan is currently being subserviced by GMAC
Mortgage, LLC and all legal inquiries should be directed to the subservicer.

# GMAC Mortgage

November 15, 2010

Mortgage Reconstruction Associates
Attn: Chuck Barker
4110 SE Hawthorne Blvd, # 266
Portland OR 97214

RE:   Customer Names          Mary Ruth Dunham and Elmer V Dunham
      Account Number          0307726898
      Complaint Number        FF9447-10
      Property Address        200 SW Florence Ave #1-7
                              Gresham OR 97080

Dear Mary Ruth Dunham and Elmer V Dunham:

This letter is in response to one dated October 27, 2010, and received in our office November 2, 2010, from the Oregon Department of Justice regarding the complaint you filed with that office on behalf of Mr. and Mrs. Dunham. Specifically this is regarding the response to the Qualified Written Request (QWR).

GMAC Mortgage, LLC (GMACM) responded to your QWR on September 27, 2010, October 6, 2010 and October 21, 2010. Section XI of the Real Estate Settlement Procedures Act ("RESPA") pertains to the servicing of mortgage loans and the administration of escrow accounts. Specifically, RESPA states, "If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence with 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken with such period." Continuing, RESPA provides that the servicer shall investigate, correct (where appropriate), and respond "not later than 60 days" after receipt of the borrower's QWR.

This account was originated by Greenpoint Mortgage and GMACM is under no requirement to produce information regarding the origination of the account completed by another company. The following are responses to your requests related to the servicing of the account.

1. The owner of the Note is Aurora Loan Services, Inc., PO Box 2963, Phoenix AZ 85062-2963. Their telephone number is 800-550-0508. GMACM is the servicer of the account and all legal inquires should be directed to the servicer.
2. Subject to business and trade practices which are proprietary and confidential.
3. Subject to business and trade practices which are proprietary and confidential.
4. Subject to business and trade practices which are proprietary and confidential.
5. Address and telephone number were provided above.

# <u>GMAC</u> Mortgage

October 6, 2010
Account Number 0307726898
Page Two

This loan is registered with MERS, MIN # 100013800907701995; therefore, there are no assignments. The loan originated October 4, 2006 with GreenPoint Mortgage Funding and transferred to GMAC Mortgage, LLC for servicing on January 1, 2007.

If after reviewing this information, you have any specific questions or concerns regarding the mortgage loan servicing of this account, please contact GMAC Mortgage Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

Enclosures

DV

# **GMAC Mortgage**

November 18, 2010

Mortgage Reconstruction Associates
ATTN: Charles Barker
4110 SE Hawthorne Blvd #266
Portland OR 97214

RE:  Account Number      0307726898
     Mortgagors          Mary Ruth Dunham
                         Elmer V Dunham
     Property Address    200 SW Florence Ave #1-7
                         Gresham OR 97080

Dear Charles Barker:

This letter is in response to your correspondence dated 11/01/10 in which you request additional documentation on the above-referenced account. The documents sent in response to your previous inquiry dated 09/27/10 and 10/06/10 and identified as a Qualified Written Request ("QWR"), relate to the servicing of Mary Ruth Dunham and Elmer V. Dunham's account, as the law, specifically the Real Estate Settlement Practices Act ("RESPA"), requires. A final QWR response was sent on 10/21/10.

Most of the information you request does not relate to the servicing of Mary Ruth Dunham and Elmer V. Dunham's account as 12 USC §2605(e)(1)(A) requires. This section of the statute says that QWR requests pertain to "information relating to the servicing of such loan..." Our previous correspondence provided you with the information that relates to the servicing of the Mary Ruth Dunham and Elmer V. Dunham's account. Without specific issues or concerns identified, sending documents unrelated to the servicing of the account, would not be considered an effective and appropriate response or resolution for the customer.

Mortgage Electronic Registration System (MERS) operates within the existing legal framework of all 50 states and applies technology and electronic commerce to:

- transform paper-based processes to an electronic format.
- improve operational efficiencies.
- increase the liquidity of mortgage rights.
- increase the value of mortgage servicing rights.
- improve mortgage industry profitability.
- improve the flow and accuracy of information relative to ownership.
- facilitate continuing improvements through electronic commerce.

www.gmacmortgage.com
1450 Hammond Ave
Waterloo, IA 50702

November 18, 2010
Account Number 0307726898
Page Two

Please be advised, a transfer of assignment from MERS to GMAC Mortgage, due the activity on the account does not affect servicing of the account.

For information related to the origination of the Mary Ruth Dunham and Elmer V. Dunham's loan, please contact the loan originator or request the documents from Mary Ruth Dunham and Elmer V. Dunham's directly as they would have received them at closing.

If Mary Ruth Dunham and Elmer V. Dunham's are facing financial difficulties and are interested in learning about the loss mitigation options available to them, please direct them to our Loss Mitigation Department at 1-800-850-4622.

Any further correspondence that does not provide specific items or concerns on which research can be completed and a response provided, will be considered as having already received a response. If specific concerns exist, those concerns may be sent in writing to:

> GMAC Mortgage
> ATTN: Customer Care
> PO Box 1330
> Waterloo IA  50704-1330

If after reviewing this information, you have any specific questions or concerns regarding the mortgage loan servicing of this account, please contact Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

GC

# GMAC Mortgage

October 21, 2010

Mortgage Reconstruction Associates
Attn Chuck Barker
4110 SE Hawthorne Blvd #266
Portland OR 97214

RE:   Account Number        0307726898
      Mortgagors           Mary Ruth Dunham and Elmer V Dunham
      Property Address     200 SW Florence Ave #1-7
                           Gresham OR 97080

Dear Chuck Barker:

This letter is in response to your correspondence dated October 2, 2010 in which you request additional documentation on the above-referenced account. The documents sent in response to your previous inquiry dated September 27, 2010, and identified as a Qualified Written Request ("QWR"), relate to the servicing of Mary Ruth Dunham and Elmer V. Dunham's account, as the law, specifically the Real Estate Settlement Practices Act ("RESPA"), requires.

Most of the information you request does not relate to the servicing of Mary Ruth Dunham and Elmer V. Dunham's account as 12 USC §2605(e)(1)(A) requires. This section of the statute says that QWR requests pertain to "information relating to the servicing of such loan..." Our previous correspondence provided you with the information that relates to the servicing of the Mary Ruth Dunham and Elmer V. Dunham's account. Without specific issues or concerns identified, sending documents unrelated to the servicing of the account, would not be considered an effective and appropriate response or resolution for the customer.

GMAC Mortgage had provided you with true copies of your documents. These documents have the original signatures from the origination of the account. For information related to the origination of the Mary Ruth Dunham and Elmer V. Dunham's loan, please contact the loan originator or request the documents from Mary Ruth Dunham and Elmer V. Dunham directly as they would have received them at closing.

Please direct Mary Ruth Dunham and Elmer V. Dunham to our Loss Mitigation Department at 1-800-850-4622 for further information regarding their modification request.

Any further correspondence that does not provide specific items or concerns on which research can be completed and a response provided, will be considered as having already received a response. If specific concerns exist, those concerns may be sent in writing to:

> GMAC Mortgage
> 3451 Hammond Avenue
> Waterloo IA 50702

Our Customer Care Department may also be contacted at 1-800-766-4622 between the hours of 6:00 am to 9:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday, should you have any additional questions or concerns.

Customer Care
Loan Servicing/EK
www.gmacmortgage.com
3451 Hammond Ave
Waterloo, IA 50702

# **GMAC Mortgage**

September 27, 2010

Mortgage Reconstruction Associates
4110 SE Hawthorne Blvd Ste 266
Portland OR 97214

RE:  Account Number   *0307726898*
     Property Address   200 SW Florence Avenue #1-7
                        Gresham OR 97080

Dear Chuck Barker:

Please be advised that this letter serves as our response to your Qualified Written Request ("QWR") for information regarding the above-referenced GMAC Mortgage account dated September 22, 2010 and received in our office on September 22, 2010. In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination.

In response to the inquiry, GMAC Mortgage has enclosed a copy of the account's payment history as required by the Real Estate Settlement Procedures Act ("RESPA").

Because the letter appears to be questioning nearly every aspect of the loan transaction, it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding the servicing of the account. Nevertheless, in an effort to be responsive to the request, copies of pertinent documentation GMAC Mortgage has in its records are enclosed.
  • Note
  • Deed of Trust/Mortgage
  • HUD-1 Settlement Statement

This loan is registered with MERS, MIN # 100013800907701995; therefore, there are no assignments. The loan originated October 4, 2006 with GreenPoint Mortgage Funding Inc and transferred to GMAC Mortgage, LLC for servicing on January 1, 2007.

www.gmacmortgage.com
3451 Hammond Ave
Waterloo, IA 50702

# GMAC Mortgage

Account Number 0307726898
Dunham – Page Two

The authorization form, signed September 14, 2010, advised Mary Ruth Dunham has passed away. In order to update our records, please forward a copy of the death certificate and the executor appointment. Please provide the appropriate documentation to the following address:

> GMAC Mortgage
> ATTN: Assumption Department
> 3451 Hammond Avenue
> Waterloo IA 50702-5345
> Facsimile: 1-972-538-0739

If after reviewing this information, you have any specific questions or concerns regarding the mortgage loan servicing of this account, please contact Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.

Customer Care
Loan Servicing

Enclosures

KB

C: Mary Ruth Dunham and Elmer V Dunham

# GMAC Mortgage

September 27, 2010

Mortgage Reconstruction Associates
4110 SE Hawthorne Blvd Ste 266
Portland OR 97214

RE:    Account Number      0307726898
       Property Address    200 SW Florence Avenue #1-7
                           Gresham OR 97080

Dear Chuck Barker:

Please be advised that this letter serves as our response to your Qualified Written Request ("QWR") for information regarding the above-referenced GMAC Mortgage account dated September 22, 2010 and received in our office on September 22, 2010. In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination.

In response to the inquiry, GMAC Mortgage has enclosed a copy of the account's payment history as required by the Real Estate Settlement Procedures Act ("RESPA").

Because the letter appears to be questioning nearly every aspect of the loan transaction, it is difficult for GMAC Mortgage to identify any specific concern(s) you have regarding the servicing of the account. Nevertheless, in an effort to be responsive to the request, copies of pertinent documentation GMAC Mortgage has in its records are enclosed.

- Note
- Deed of Trust/Mortgage
- HUD-I Settlement Statement

This loan is registered with MERS, MIN # 100013800907701995; therefore, there are no assignments. The loan originated October 4, 2006 with GreenPoint Mortgage Funding Inc and transferred to GMAC Mortgage, LLC for servicing on January 1, 2007.

www.gmacmortgage.com
3451 Hammond Ave
Waterloo, IA 50702

# GMAC Mortgage

Account Number 0307726898
Dunham – Page Two

The authorization form, signed September 14, 2010, advised Mary Ruth Dunham has passed away. In order to update our records, please forward a copy of the death certificate and the executor appointment. Please provide the appropriate documentation to the following address:

> GMAC Mortgage
> ATTN: Assumption Department
> 3451 Hammond Avenue
> Waterloo IA 50702-5345
> Facsimile: 1-972-538-0739

If after reviewing this information, you have any specific questions or concerns regarding the mortgage loan servicing of this account, please contact Customer Care at 1-800-766-4622 between the hours of 6:00 am to 10:00 pm CT Monday through Friday and 9:00 am to 1:00 pm CT on Saturday.


Customer Care
Loan Servicing

Enclosures

KB

C: Mary Ruth Dunham and Elmer V Dunham

I - 7

First American Title Accommodation
Recording Assumes No Liability

RECORDING REQUESTED BY:
**Mortgage Electronic Registration Systems, Inc., Solely as Nominee for GreenPoint Mortgage Funding, Inc.**

RECORDED MAIL TO:
Pite Duncan, LLP
4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, CA 92177-0933

## ASSIGNMENT OF DEED OF TRUST

Assignor                Mortgage Electronic Registration Systems, Inc., Solely as Nominee for
                        GreenPoint Mortgage Funding, Inc.
                        100 Wood Hollow Drive, Novato, CA 94945

Assignee                GMAC Mortgage, LLC
                        1100 Virginia Drive, P.O. Box 8300, Fort Washington, PA 19034

4450430

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to GMAC
Mortgage, LLC all beneficial interest under that certain Deed of Trust dated October 4, 2006,
executed by, Mary Ruth Dunham and Elmer V. Dunham, wife and husband to First American title
Co., as trustee, for Mortgage Electronic Registration Systems, Inc., Solely as Nominee for
GreenPoint Mortgage Funding, Inc., as beneficiary, and recorded as Instrument No. 2006-190060,
on October 12, 2006, in the State of Oregon, Multnomah County Recorder's Office. Together with
the money due and to become due thereon with interest, and all rights accrued or to accrue under the
instrument secured by the Deed of Trust.

Dated: _4-26-10_          **Mortgage Electronic Registration Systems, Inc., Solely
                          as Nominee for GreenPoint Mortgage Funding, Inc.**
                          By: _____
                          Its: _Ass'T. Secretary_ Janine Yarnoah

State of _PENNSYLVANIA_     )
                           ) ss.
County of _MONTGOMERY_     )
On _APRIL 26th 2010_       before me, _John J. Castagna_, personally appeared
_Janine Yarnoah_           who proved to me on the basis of satisfactory evidence to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true
and correct.

WITNESS my hand and official seal.

_____
Notary Public

(This Area for Official Notary Seal)
COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
John J. Castagna, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Feb. 25, 2014
Member, Pennsylvania Association of Notaries 1-31673516-M

27 FLAVEL

AFTER RECORDING RETURN TO:

**Foreclosure Department**
**RECONTRUST COMPANY, N.A.**
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063
TS No. 09 -0115699

Multnomah County Official Records
C Swick, Deputy Clerk

**2009-119084**


0054679820090119084010011

**$21.00**

1R-MTG ASGT
$5.00 $11.00 $5.00

08/18/2009 03:50:20 PM
Cnt=1 Stn=29 ATMCS

## ASSIGNMENT OF DEED OF TRUST

For Valuable Consideration, the undersigned as Beneficiary, hereby grants, conveys, assigns, and transfers to THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDE RS CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-24, C/O BAC HOME LOANS SERVICING, LP, 400 COUNTRYWIDE WAY SV-35, SIMI VALLEY, CA 93065, all beneficial interest under that certain Deed of Trust, dated 12/07/2006, executed by MARY R DUNHAM, AN UNMARRIED WOMAN, Grantor(s), to FIDELITY (MULTNOMAH) NATIONAL TITLE, Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as Beneficiary, recorded on 12/08/2006 as Recorder's fee/file/instrument/microfilm/reception number 2006-227053, Records of Multnomah County, Oregon, describing land. There in: as more fully described in said Deed of Trust.

Together with note or notes therein described or referred to, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated _____ 08.14 _____, 20 __09__

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

State of **CALIFORNIA** )
                                      ) ss
County of **VENTURA** )

By: _____

LETICIA QUINTANA, Assistant Secretary

On 08.14.09, before me, Susan R. Hardison, _____, notary public, personally appeared _____ **Leticia Quintana** _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

Notary Public in and for the State of **CALIFORNIA**
Residing at _VTA_
My Commission Expires: _CL6-15-10_

SUSAN R. HARDISON
Commission # 1675268
Notary Public - California
Ventura County
My Comm. Expires Jun 15, 2010

*ORASGN.doc (01/08)*

75th OREGON LEGISLATIVE ASSEMBLY--2009 Regular Session

# Senate Bill 628

Sponsored by Senator BONAMICI, Representative HOLVEY

### SUMMARY

The following summary is not prepared by the sponsors of the measure and is not a part of the body thereof subject to consideration by the Legislative Assembly. It is an editor's brief statement of the essential features of the measure **as introduced.**

Requires mandatory mediation between trustee and grantor before sale to foreclose residential trust deed. Provides for notice and procedures for conducting mediation.
Sunsets on January 2, 2014.
Declares emergency, effective on passage.

1    **A BILL FOR AN ACT**

2    Relating to residential property foreclosures; creating new provisions; amending ORS 86.740; and

3    declaring an emergency.

4    **Be It Enacted by the People of the State of Oregon:**

5    **SECTION 1.** ORS 86.740 is amended to read:

6    86.740. (1) Subsequent to recording notice of default as provided in ORS 86.735 and at least 120

7    days before the day the trustee conducts the sale, notice of the sale [*shall*] **must** be served pursuant

8    to ORCP 7 D(2) and 7 D(3) or mailed by both first class and certified mail with return receipt

9    requested[,]. **If the sale is for the purpose of foreclosing a residential trust deed, the notice**

10    **described in this subsection must be served as provided in this subsection at least 180 days**

11    **before the date of the sale.  A separate notice in accordance with section 3 of this 2009 Act**

12    **that prescribes mandatory mediation in advance of the sale must also be served as provided**

13    **in this subsection if the sale is for the purpose of foreclosing a residential trust deed. The**

14    **notices described in this subsection must be served or mailed** to the last-known address of the

15    following persons or [*their*] **the** legal representatives **of the persons**, if any:

16    (a) The grantor in the trust deed.

17    (b) [*Any*] **A** successor in interest to the grantor whose interest appears of record, or of whose

18    interest the trustee or the beneficiary has actual notice.

19    (c) [*Any*] **A** person, including the Department of Revenue or any other state agency, [*having*]

20    **that has** a lien or interest subsequent to the trust deed if the lien or interest appears of record or

21    the beneficiary has actual notice of the lien or interest.

22    (d) [*Any*] **A** person [*requesting*] **that requests** notice as provided in ORS 86.785.

23    **(e) The Department of Consumer and Business Services.**

24    (2) A notice served by mail under subsection (1) of this section is effective when the notice is

25    mailed.

26    (3)(a) The disability, insanity or death of [*any*] **a** person to whom notice of sale must be given

27    under this section does not delay or impair in any way the trustee's right under a trust deed to

28    foreclose under the deed. If the disability, insanity or death occurs [*prior to the recording of*] **before**

29    **the** notice of default **is recorded**, the notice [*shall*] **must** be given instead to the guardian, the

30    conservator of the estate of the person or the administrator or personal representative of the person,

NOTE: Matter in **boldfaced** type in an amended section is new; matter [*italic and bracketed*] is existing law to be omitted.
New sections are in **boldfaced** type.

LC 2676

SB 628

1   as the case may be, in the manner and by the time set forth in this section.

2   (b) If the disability, insanity or death of [*any*] **a** person to whom notice of sale must be given

3   under this section occurs on or after the [*recording of*] notice of default **is recorded**, the trustee

4   shall, if and when the trustee has knowledge of the disability, insanity or death, promptly give the

5   guardian, conservator of the estate or the administrator or personal representative, as the case may

6   be, the notice provided in ORS 86.745. This notice shall be given by first class and certified mail

7   with return receipt requested, to the last-known address of the guardian, conservator or adminis-

8   trator or personal representative.

9   (c) [*In the event*] **If** there is no administrator or personal representative of the estate of the

10   person to whom notice of sale must be given under this section, the notice may be given instead to

11   the heirs at law or devisees of the deceased person in the manner and by the time set forth in this

12   section.

13   **(4)(a) If the trustee knows or has reason to know that the grantor of a residential trust**

14   **deed primarily speaks or reads a language other than the English language, the trustee shall**

15   **cause the notices described in subsection (1) of this section to be served to the grantor in**

16   **both the English language and in the language the grantor primarily speaks or reads.**

17   **(b) For purposes of this subsection, a trustee has reason to know that a grantor prima-**

18   **rily speaks or reads a language other than the English language if the trustee or an agent**

19   **or affiliate of the trustee has previously communicated with the grantor in the other lan-**

20   **guage in the course of a transaction related to the residential trust deed or in the course**

21   **of servicing a note or loan related to the residential trust deed.**

22   **SECTION 2.** Sections 3 to 7 of this 2009 Act are added to and made a part of ORS 86.705

23   to 86.795.

24   **SECTION 3.** A notice prescribing mandatory mediation in advance of a trustee's sale to

25   foreclose a residential trust deed must:

26   (1) Set forth the name, address, telephone number and other contact information for the

27   grantor or other person named in the residential trust deed;

28   (2) Itemize the amount in default and past due on the obligation secured by the residen-

29   tial trust deed, the amount that must be paid to cure the default and all associated costs and

30   fees;

31   (3) Provide the account number or other information the trustee or beneficiary or an

32   agent of the trustee or beneficiary uses to identify the obligation the grantor owes to the

33   beneficiary;

34   (4) Provide the address, telephone number or other contact information for:

35   (a) The trustee, beneficiary and agent of the trustee or beneficiary that is authorized to

36   negotiate on the trustee's or beneficiary's behalf; and

37   (b) The Oregon State Bar's lawyer referral service;

38   (5) State that the trustee and the grantor must participate in a mandatory process of

39   mediation for the purpose of avoiding a trustee's sale;

40   (6) State that the trustee and the grantor will each bear half of the cost of the mediation;

41   (7) List the documents and other information the grantor must bring to the mediation;

42   (8) List the names of at least three persons qualified under section 6 of this 2009 Act to

43   serve as mediators and provide for each an address, telephone number and other contact

44   information; and

45   (9) State that the grantor is entitled to be represented at the mediation by an attorney.

[2]

SB 628

1     SECTION 4. (1) Within 30 days after the date on which the trustee caused a notice that
2 prescribes mandatory mediation to be served or mailed as described in ORS 86.740 (1), the
3 trustee shall send a second notice by first-class mail to the grantor that:
4     (a) Schedules a time and location for the mediation on a date that is not later than 90
5 days after the date on which the notice that prescribes mandatory mediation was served or
6 mailed as described in ORS 86.740 (1); and
7     (b) Proposes a mediator from the list in the notice of mandatory mediation and informs
8 the grantor that the grantor may object in writing to the trustee's nomination and propose
9 another mediator from the list within 10 business days after the mailing date for the second
10 notice.
11     (2) If the grantor objects to the trustee's proposed mediator, the trustee will schedule
12 the mediation with the mediator that the grantor proposes unless the trustee objects. If the
13 trustee and the grantor each object to the other's proposed mediator, the trustee will
14 schedule the mediation with the remaining mediator.
15     (3) The trustee shall pay the initial expenses of the mediation and is entitled to receive
16 the grantor's portion of the expenses of the mediation in accordance with the provisions of
17 section 5 of this 2009 Act.
18     (4) During the period that begins on the date the notice of mandatory mediation de-
19 scribed in ORS 86.740 (1) was served or mailed and ending on the date on which a mediation
20 conducted under this section concludes, a trustee or an agent or affiliate of the trustee may
21 not add fees or charges to the obligation the grantor owes the trustee. This subsection does
22 not affect:
23     (a) Interest charged under the terms of the loan agreement or other evidence of the ob-
24 ligation; or
25     (b) Service fees or charges that the grantor paid as part of the obligation before the date
26 on which the notice described in ORS 86.740 (1) was served or mailed.
27     SECTION 5. (1) If a grantor is represented at a mediation conducted to avoid a sale of
28 real property described in a residential trust deed, the mediator, the trustee or the grantor
29 may offer a reasonable settlement proposal to avoid the sale, including a proposal generated
30 by an automated loan modification formula developed by the Federal Deposit Insurance
31 Corporation. With the consent of both parties, the mediator may adopt rules to facilitate a
32 settlement and may, with the parties' consent, have authority to suspend or continue the
33 mediation, provided that the mediation may not be continued later than 120 days after the
34 date on which the initial notice that prescribed mandatory mediation was served.
35     (2) If the grantor is not represented, the mediator shall use the automated loan modifi-
36 cation formula developed by the Federal Deposit Insurance Corporation to generate a
37 settlement proposal.
38     (3) If the trustee and grantor reach a settlement, the mediator shall witness and sign a
39 document that sets forth the terms of the settlement. The mediator shall report to the De-
40 partment of Consumer and Business Services that the parties have reached a settlement.
41 The trustee within two business days after signing a settlement document under this sub-
42 section shall dismiss all proceedings under ORS 86.705 to 86.795, reinstate the residential
43 trust deed and continue the obligation under the terms of the settlement document.
44     (4) If the parties do not reach a settlement, the mediator shall report to the department
45 that the parties have not reached a settlement. Unless the trustee and the grantor agree,

[3]

SB 628

1  the mediator may not in the mediator's report recommend a resolution to the dispute. The
2  trustee may proceed with the sale scheduled according to the notice required under ORS
3  86.740 (1) to foreclose a residential trust deed.

4  (5) If the trustee and grantor reach a settlement, the grantor may elect to include the
5  grantor's portion of the cost of the mediation in the payment plan described in the settle-
6  ment document. If the trustee and grantor do not reach a settlement, the grantor shall bear
7  the grantor's portion of the cost of the mediation.

8  SECTION 6. To qualify as a mediator for the purposes of the mediation described in
9  section 5 of this 2009 Act, a person must be trained in the use of the automated loan mod-
10  ification formula developed by the Federal Deposit Insurance Corporation and be:

11  (1) A member of the Oregon State Bar or otherwise qualified as a mediator as provided
12  in rules adopted under ORS 1.002; or

13  (2) A housing counselor approved by the United States Department of Housing and Urban
14  Development in accordance with the department's Housing Counseling Program Handbook
15  7610.1.

16  SECTION 7. (1) A grantor that did not receive a notice that prescribes mandatory medi-
17  ation as provided under ORS 86.740 (1) 180 days before the date of a sale to foreclose a resi-
18  dential trust deed may apply to the Department of Consumer and Business Services for an
19  order to suspend the sale. If the department finds that a notice required under ORS 86.740
20  (1) was not served or mailed to the department, the department may issue the requested
21  order.

22  (2) An order issued under subsection (1) of this section shall extend the scheduled date
23  of the sale for a period of 60 days, pending the completion of a mediation conducted in ac-
24  cordance with section 5 of this 2009 Act, and shall notify the trustee in accordance with ORS
25  183.415 that the trustee is entitled to a hearing under ORS 183.413 to 183.470. If the trustee
26  by clear and convincing evidence demonstrates that the grantor received the required notice,
27  the department shall rescind the order.

28  (3) If the mediation concludes without a settlement before the 60-day period expires, the
29  department shall rescind the order and allow the sale to proceed as if the department had
30  not issued the order.

31  SECTION 8. Sections 2 to 7 of this 2009 Act are repealed on January 2, 2014.

32  SECTION 9. ORS 86.740, as amended by section 1 of this 2009 Act, is amended to read:

33  86.740. (1) Subsequent to recording notice of default as provided in ORS 86.735 and at least 120
34  days before the day the trustee conducts the sale, notice of the sale must be served pursuant to
35  ORCP 7 D(2) and 7 D(3) or mailed by both first class and certified mail with return receipt
36  requested[. *If the sale is for the purpose of foreclosing a residential trust deed, the notice described in*
37  *this subsection must be served as provided in this subsection at least 180 days before the date of the*
38  *sale. A separate notice in accordance with section 3 of this 2009 Act that prescribes mandatory medi-*
39  *ation in advance of the sale must also be served as provided in this subsection if the sale is for the*
40  *purpose of foreclosing a residential trust deed. The notices described in this subsection must be served*
41  *or mailed*] to the last-known address of the following persons or the legal representatives of the
42  persons, if any:

43  (a) The grantor in the trust deed.

44  (b) A successor in interest to the grantor whose interest appears of record, or of whose interest
45  the trustee or the beneficiary has actual notice.

[4]

SB 628

1    (c) A person, including the Department of Revenue or any other state agency, that has a lien
2 or interest subsequent to the trust deed if the lien or interest appears of record or the beneficiary
3 has actual notice of the lien or interest.

4    (d) A person that requests notice as provided in ORS 86.785.

5    [(e) The Department of Consumer and Business Services.]

6    (2) A notice served by mail under subsection (1) of this section is effective when the notice is
7 mailed.

8    (3)(a) The disability, insanity or death of a person to whom notice of sale must be given under
9 this section does not delay or impair in any way the trustee's right under a trust deed to foreclose
10 under the deed. If the disability, insanity or death occurs before the notice of default is recorded,
11 the notice must be given instead to the guardian, the conservator of the estate of the person or the
12 administrator or personal representative of the person, as the case may be, in the manner and by
13 the time set forth in this section.

14    (b) If the disability, insanity or death of a person to whom notice of sale must be given under
15 this section occurs on or after the notice of default is recorded, the trustee shall, if and when the
16 trustee has knowledge of the disability, insanity or death, promptly give the guardian, conservator
17 of the estate or the administrator or personal representative, as the case may be, the notice pro-
18 vided in ORS 86.745. This notice shall be given by first class and certified mail with return receipt
19 requested, to the last-known address of the guardian, conservator or administrator or personal rep-
20 resentative.

21    (c) If there is no administrator or personal representative of the estate of the person to whom
22 notice of sale must be given under this section, the notice may be given instead to the heirs at law
23 or devisees of the deceased person in the manner and by the time set forth in this section.

24    [(4)(a) If the trustee knows or has reason to know that the grantor of a residential trust deed pri-
25 marily speaks or reads a language other than the English language, the trustee shall cause the notices
26 described in subsection (1) of this section to be served to the grantor in both the English language and
27 in the language the grantor primarily speaks or reads.]

28    [(b) For purposes of this subsection, a trustee has reason to know that a grantor primarily speaks
29 or reads a language other than the English language if the trustee or an agent or affiliate of the trustee
30 has previously communicated with the grantor in the other language in the course of a transaction re-
31 lated to the residential trust deed or in the course of servicing a note or loan related to the residential
32 trust deed.]

33    **SECTION 10.** The amendments to ORS 86.740 by section 9 of this 2009 Act become oper-
34 **ative on January 2, 2014.**

35    **SECTION 11.** This 2009 Act being necessary for the immediate preservation of the public
36 **peace, health and safety, an emergency is declared to exist, and this 2009 Act takes effect**
37 **on its passage.**

38

[5]

*oregonian* 10·7·10

# Foreclose freeze widens as chorus for probes grows

**Housing** | The moves come as the president pocket vetoes a bill that some say could foster fraud over seized properties nationwide

**By JACKIE CALMES
and DAVID STREITFELD**
NEW YORK TIMES NEWS SERVICE

WASHINGTON — As slipshod bookkeeping by some big mortgage lenders continued to rattle the housing market Thursday, another major lender indicated it would suspend sales of foreclosed homes, and White House officials said President Barack Obama would not sign a bill that critics suggested could facilitate foreclosure fraud.

Demands for investigations and nationwide moratoriums also grew. The chairman of the House Committee on Oversight and Government Reform, Rep. Edolphus Towns, D-N.Y., called on lenders to voluntarily suspend foreclosures until they completed internal investigations. On Wednesday, Attorney General Eric Holder said Obama's Financial Fraud Enforcement Task Force is looking at the growing reports of foreclosure fraud.

The president's pocket veto — rejecting a bill by withholding his signature while Congress is away — effectively kills the measure since lawmakers, who are out of town until after the Nov. 2 midterm elections, are not in position to override his decision with a two-thirds vote of the House and Senate.

The bill would have mandated that notarizations of mortgages

Please see **FORECLOSURE**, Page B10

# Foreclosure:
## Title insurer says a review is under way

**Continued** from Page B7

and other financial documents done in one state, including those done electronically, be recognized in other states. By the time the bill arrived at Obama's desk, however, it was caught in the controversy over major institutions' acknowledgment of problems in processing documents for tens of thousands of foreclosures. Those included suspected forgeries and notaries' failure to review the paperwork as required.

Critics, particularly consumer groups, said the measure for interstate notarizations would have made it even easier for banks and other lenders to rush foreclosures. JPMorgan Chase, Bank of America and GMAC Mortgage have stopped foreclosures in nearly half the states, pending investigations into the process.

A fourth major lender, PNC Financial Services Group, also has suspended sales of foreclosed homes for 30 days, according to a memo from a title insurer, Commerce Title, that works closely with the bank.

PNC is alerting title insurance companies that it is postponing the closings effective immediately, according to the memo. "We have been given notice from PNC Legal that there is a moratorium going into effect" on residential foreclosures, the memo from Commerce Title said.

A PNC spokesman, Frederick Solomon, declined to comment beyond saying the lender was reviewing its mortgage-servicing procedures.

Pittsburgh-based PNC became one of the country's largest lenders two years ago with the acquisition of Ohio-based National City Corp. National City, an aggressive lender during the housing boom, collapsed during the financial crisis.

Given the outcry over the far-reaching foreclosure crisis, congressional aides said lawmakers were unlikely to take umbrage at Obama's decision to let the notary measure expire. The White House, in announcing the pocket veto, indicated that it could work with Congress later on an alternative.

Obama's communications director, Dan Pfeiffer, said Thursday in a statement, "We need to think through the intended and unintended consequences of this bill on consumer protections, especially in light of the recent developments with mortgage processors.

"The authors of this bill no doubt had the best intentions in mind when trying to remove impediments to interstate commerce.

"We will work with them and other leaders in Congress to explore the best ways to achieve this goal."

The measure had sponsors from both parties and was so uncontroversial in Congress that it passed without roll-call votes, in the House by a voice vote in April and in the Senate by unanimous consent last week.

Oregonian 3-6-11

# Plan would slow foreclosure process

**State AGs seek
to delay bank
proceedings when
borrowers are trying
to modify mortgages**

**By NELSON D. SCHWARTZ
and DAVID STREITFELD**
NEW YORK TIMES NEWS SERVICE

State attorneys general have presented the nation's five biggest banks a list of demands that could drastically alter the foreclosure process and give the government sweeping authority over how mortgage servicers deal with millions of Americans in danger of losing their homes.

Under the blueprint, banks would be prohibited from starting foreclosure proceedings while a borrower is actively trying to lower the interest rate or ease other terms of the home loan, a process known as a mortgage modification.

Any borrower who successfully made three payments in a trial modification would be given a permanent modification. When a modification is denied, it would be automatically reviewed by an ombudsman or independent review panel.

The proposed changes, which will be discussed by the attorneys general when they meet in Washington early this week, would compel the banks to treat each borrower in default individually.

It was the banks' attempt to process foreclosures on a large scale that led to robo-signing, in which lawyers and bank officials signed thousands of doc-



CHRIS O'MEARA/THE ASSOCIATED PRESS
**A foreclosed home is shown on Pine Island in Lee County, Fla., in November. State attorneys general have presented the nation's five biggest banks a list of demands that could drastically alter the foreclosure process.**

uments a month after only a cursory review.

The ensuing furor over robo-signing, and other abuses such as foreclosures that proceeded with missing documentation, prompted the attorneys general and regulators to begin a broad investigation last fall.

The blueprint from the attorneys general, obtained by The New York Times, is still just a draft, and weeks, if not months, of tough negotiations with banks remain. Several big banks, including Citigroup and Wells Fargo, declined to comment on it.

The government's current

program to help troubled home borrowers, known as HAMP, continues to face fierce criticism. Both conservatives and liberals have found fault with the program, which aided far fewer homeowners than originally promised.

The latest proposal, delivered to the banks late Thursday, represents a significant expansion of powers for the newly created Consumer Financial Protection Bureau, which government officials say has taken a more aggressive stance in the talks than some other banking regulators.

In addition to the attorneys

general and the consumer bureau, the package is backed by the Department of Housing and Urban Development, the Department of Justice and the Federal Trade Commission.

If adopted in anything like its current form, the proposal would probably compel banks to hire many more customer service employees or slow the foreclosure process even further. Many households are already in foreclosure for more than 500 days.

But a program aimed at reducing the volume of foreclosures would affect far more than the families in distress. It would also help reshape the housing market.

About 2 million households are in foreclosure, and 2.2 million more are severely delinquent. Housing analysts have been waiting for these properties to make their way back onto the market, where they will swell available inventories and, at least initially, depress prices. Housing prices are already on the verge of falling through the floor established in the spring of 2009.

Giving some of these households loan modifications, allowing families to stay in their houses at least for a while, might help stabilize the market. But it also might prolong the day of reckoning, shifting a housing recovery to 2013 or 2014.

"Do you rip the Band-Aid off and deal with a shorter and sharper housing decline that ultimately puts homes in the hands of borrowers who can afford them for the long term?" said Mike Larson of Weiss Research. "Or do you let this drag on and on?"

# in Virginia at core of dispute

**Continued** from Page One

according to RealtyTrac Inc. Federal agencies and state attorneys general are investigating the foreclosure and loan-modification practices of the nation's largest banks.

The legal concerns revolve around Mortgage Electronic Registration Systems Inc., a Reston, Va., corporation set up in the mid-1990s by the mortgage banking industry to rapidly record the ownership of mortgages so they could be packaged and sold as securities.

MERS essentially allowed lenders to sell loans without recording each transaction with county recorder offices, experts say. That rapid and sometimes reckless securitization of such loans contributed to the 2008 financial crisis and housing slump. The problems clouding the foreclosure process — including last year's robo-signing scandal that forced several big banks to suspend foreclosures in about two dozen states — continue to drag down the housing market today.

Since October, federal judges in five Oregon cases have halted foreclosures involving MERS, saying its participation caused lenders to violate the state's recording law. Three of those decisions came last month, the key one in U.S. Bankruptcy Court in Eugene.

Attorneys say it's not clear whether lenders in Oregon will simply start over or head to court to foreclose, steps that could prolong the crisis for months and drive up costs, attorneys say. Some suggest lenders might not have access to the documents they need to comply with state law.

"A lot of us are questioning whether there is a solution," said David Ambrose, a Portland attorney who represents lenders in mortgage transactions. "It's pretty amazing. There are a lot of unanswered questions."

MERS is listed as an agent for lenders on more than 60 million U.S. home loans, about half of all such loans.

Homeowners nationwide have challenged its standing. In New York last month, a federal bankruptcy judge ruled that MERS lacked authority to foreclose on homes it didn't own.

In Oregon, lenders can fore-

close without going to court. But state law also requires that the loan's ownership history, or assignments, be recorded with local county governments before proceeding with a nonjudicial foreclosure.

In the Eugene court case, Donald E. McCoy III filed for bankruptcy protection in part to block U.S. Bank from foreclosing on his Central Point home. He then sued the bank and MERS, along with his original lender BNC Mortgage Inc., claiming they had not properly recorded BNC's subsequent sale of the loan to investors.

Chief Bankruptcy Judge Frank R. Alley III found McCoy's allegation persuasive and refused to grant the bank's request for a dismissal.

"Oregon law permits foreclosure without the benefit of judicial proceeding only when the interest of the beneficiary (lender) is clearly documented in a public record," Alley wrote. "When the public record is lacking, the foreclosing beneficiary must prove its interest in a judicial proceeding."

In response to that ruling, First American Financial Corp., one of the nation's largest title insurers, began warning lenders and buyers in title documents that it wouldn't insure titles with a cloudy public record in Oregon, company attorney Alan Brickley said.

"It's simply saying we have a concern, and you should have a concern," said Brickley, who's based in Portland.

But attorneys representing lenders and consumers say that warning will have a chilling effect on the sales of foreclosed homes in which MERS is involved.

"If you can't get title insurance, that almost stops the process," Ambrose explained.

U.S. District Judge Anna J. Brown last month blocked two

foreclosure sales by CitiMortgage Inc. and BAC Home Loan Servicing, saying the lenders had failed to properly record documents.

Also last month, MERS told its member lenders in a memo distributed nationally to stop foreclosing in its name while it works to address the legal challenges.

"It's a fundamental change that they have to deal with and the question is whether they can," said Margaret E. Dailey, a real estate attorney in Newport.

The full impact of these developments is only now beginning to play out in Oregon. Not all foreclosures involve MERS.

Dailey on Friday counted more than 70 foreclosures rescinded at the Lincoln County recorder's office since the start of the year, including 45 in February.

A review by The Oregonian of Deschutes County clerk's office records shows that BofA's ReconTrust withdrew more than 60 foreclosure sale notices Friday and 35 on Thursday.

BofA spokeswoman Jumana Bauwens said the cancellations resulted from a review late last year of its foreclosure process. The bank wants to ensure that homeowners nearing a foreclosure sale have exhausted other opportunities, including loan modifications and short sales, she said.

"We are not going through and saying rescind everything," Bauwens said late Saturday.

Experts caution that the rulings eventually could be overturned. But buyers and lenders probably will look to the Oregon Legislature for a potential fix, attorneys say. Already, one bill has been introduced, Senate Bill 484, that would make it harder for banks to sell or foreclose on properties using MERS.

•

*Brent Hunsberger, 503-221-8359*
*bhunsberger@oregonian.com*
*twitter.com/onlymoney*



ROSS D. FRANKLIN/THE ASSOCIATED PRESS/2009

**A foreclosure sign sits outside a home for sale in Phoenix, Ariz. Hundreds of foreclosure sales have been suspended in Oregon as federal agencies and state attorneys general are investigating the foreclosure and loan-modification practices of the nation's largest banks.**

Desk might recommend filing a complaint with the Oregon attorney general

16, 2011                                WINNER OF SEVEN PULITZER PRIZES                                BREAKING NEWS AT **OREGONLI**

# Hundreds of foreclosure sales halte

Legal challenges to lenders nationwide have also taken root in Oregon, where sales are being stopped or withdrawn

**By BRENT HUNSBERGER**
THE OREGONIAN

Sales of hundreds of foreclosed homes in Oregon have been halted or withdrawn in recent weeks after federal judges repeatedly questioned their legality, according to a number of real estate attorneys in the state.

Lenders have withdrawn more than 300 foreclosure sales since February in Deschutes County alone, one of the Oregon area's hardest hit by the housing collapse. About 130 of those notices were filed in the past week, attorneys say.

Dozens of foreclosure listings by Re-

 EXCLUSIVE

conTrust Co., the foreclosure arm of Bank of America Corp., have disappeared from its website, attorneys say. A BofA spokeswoman said the bank was canceling certain sales to ensure that those homeowners had fully explored options to avoid foreclosure.

And, in a potential deal breaker for other foreclosure cases, one of the nation's largest title-insurance companies is warning lenders that it might not guarantee title in some cases.

The developments underscore that the challenges disrupting foreclosures in other states have finally hit home in Oregon. Foreclosure sales in the state totaled 10,500 last year, or 28 percent of all home sales,

Please see **FORECLOSURES,** Page A12

**Online:** To read federal court dec Oregon halting fc sales and The Or past coverage of foreclosure crisis, **oregonlive.com/**

**In Business:** St mortgage modific overhaul | **Page I**

# Judges demand more info from mortgage servicers

**Continued from 1B**

completed foreclosures could be slowed for months.

There's little question that the controversy has had an impact. It is at least partly responsible for a

**Cover story** 6% drop in scheduled foreclosure auctions, to about 114,000, in the first 25 days of October compared with Sept. 1-25, according to RealtyTrac, a firm that collects data on foreclosure activity around the country.

"We're seeing a dramatic decrease in the number of (new) cases being scheduled and an increase in the number of foreclosure sales being canceled," says Circuit Court Judge Sandra Taylor, who handles cases in Tampa and in Key West, Fla.

In Lee County, Fla., which includes Cape Coral and Fort Myers, foreclosure filings in circuit court dropped to 565 in October, down from 933 in September and 865 in August.

Two weeks ago, 402 out of 578 scheduled foreclosure sales were canceled, says Charlie Green, clerk of the circuit courts. That's more than two out of three. A typical ratio is less than one out of three.

Most often, banks were behind the delay, he says. "The banks and big law firms are slowing things down," Green says.

Some large servicers are still suspending foreclosure sales in some states while they review their documents and, if necessary, amend and refile them.

Many states require that servicers' employees verify that foreclosure documents are accurate and that the affidavits they sign saying so be signed in the presence of a public notary. Depositions recently made public by homeowners' lawyers have shown that so-called robo-signers signed thousands of such documents a month and didn't



By Martin E. Klimek for USA TODAY

**In Sacramento:** Renee Lee is trying to slow her foreclosure by demanding to see her mortgage note.

Bank of America has said it is preparing to refile affidavits in 102,000 foreclosure actions in the 23 judicial approval states but not in the other 27 until it completes a state-by-state review.

"We are just underway in reprocessing those cases and will start resubmitting them to courts shortly. It will take several weeks to return all 102,000 to the courts," says Bank of America spokesman Dan Frahm.

After those affidavits are resubmitted, judges will make rulings, and foreclosure sales in those states will resume.

**Paperwork problems**

Wells Fargo, which hadn't stopped foreclosure sales, says it's refiling documents in 55,000 cases after a review found paperwork problems.

Ally Financial's GMAC Mortgage unit is doing independent reviews of foreclosure procedures in all 50 states. Any case going to sale gets another review.

In 23 states, GMAC also temporarily suspended evictions and foreclosure sales while conducting its review. As it reviews each case, and makes corrections as paperwork that resulted after mortgages were transferred from lenders to investors and then to other investors during the housing bubble.

Late last month, New York Judge Arthur Schack dismissed a foreclosure action brought by OneWest Bank and gave it 60 days to provide more information if it brings the case back for reconsideration.

Among other things, Schack ordered it to provide an affidavit explaining the employment history of a OneWest vice president who said she had reviewed the documents in the case.

Schack said the official, Erica Johnson-Seck, has claimed in several foreclosure actions before him to be a vice president of IndyMac and its successor, OneWest, as well as Deutsche Bank and Mortgage Electronic Registration Systems. MERS tracks mortgage ownership and acts as a stand-in for the owners in foreclosures.

In the case last month, the judge questioned whether Johnson-Seck's various document-signing authorities posed a conflict of interest. He also said there was a lack of evidence that the over by the government.

He also cited Johnson-Seck's deposition in a Florida lawsuit in July in which she said she signs about 750 mortgage documents a week but didn't spend more than 30 seconds reading them.

"There are outstanding questions about Ms. Johnson-Seck's employment, whether she executed sworn documents without a notary public present and whether she actually read and personally reviewed the information in the documents that she executed," Schack ruled.

OneWest declined to comment on Schack's decision.

New York courts aren't just relying on judges to ensure foreclosures are handled properly. Chief Judge Jonathan Lippman is insisting that lawyers for mortgage companies do their part.

Starting last month, lawyers for firms bringing foreclosures must sign and file an affirmation that they reviewed the documents — and that they asked banks and lenders to verify their accuracy, too. Lawyers who file fraudulent affirmations may face court sanctions.

The new rule will affect 80,000 pending cases in the state and all what they should've done anyway," Lippman says.

He says it won't slow the foreclosure process unless lawyers can't sign affirmations because of problems with the paperwork.

"Then, it should be delayed," Lippman says. "The integrity of the judicial process is at stake."

Gale Berg, a lawyer who represents homeowners in foreclosure in New York, says the rule will double or triple work for lawyers, many of whom didn't always read court files in the past.

"Many attorneys get files the day of the (court) conferences and haven't even read" them, Berg says.

"It's one more procedural impediment," says Joshua Stein, a New York commercial real estate attorney who watches the residential market. "The only thing this can do is make it more complicated and slow."

A new court check on foreclosures in Maryland could have the same effect. Last month, the Maryland Court of Appeals allowed circuit courts to appoint independent lawyers to review foreclosure documents in which problems are found. The company foreclosing would have 30 days to show that the documentation is valid.

The safeguard follows the discovery of hundreds of inaccurate documents in foreclosure papers in the state. Hundreds of pending cases are under review, and many will face tighter scrutiny, says retired judge Alan Wilner, who chairs the court of appeals' rules and procedure committee.

"It no doubt will (add more time) to the process," he says.

**Further warnings**

State attorneys general, who recently launched a 50-state investigation of foreclosure practices, are also pressing mortgage companies and the courts to ensure laws are followed strictly.

Ohio Attorney General Richard view foreclosure case documents "very closely."

"Judges have to be more painstaking about evidence presented," says Cordray. If that slows the process, "that's of the lenders' making," he says.

Washington Attorney General Rob McKenna told companies and others who carry out foreclosures in that state to confirm that documents are correct and, if not, to halt foreclosures.

In Texas, Attorney General Greg Abbott last month asked 30 companies to temporarily halt foreclosures in that state until they reviewed their practices.

With more oversight of foreclosures, some homeowners have renewed hope that they may delay foreclosures.

The Service Employees International Union (SEIU) has begun a campaign instructing homeowners to write letters demanding that companies produce the actual mortgage note when foreclosing. The SEIU has helped more than 150,000 borrowers.

In some courts, foreclosures have been delayed or stopped when companies couldn't produce the actual note, which may have been lost as mortgages were sold and resold to investors.

In 2007, 14 foreclosure cases brought on behalf of mortgage investors were dismissed by U.S. District Court Judge Christopher Boyko in Cleveland. He ruled that the investors failed to prove they owned the properties.

"We launched this campaign to have accountability from some of the banks," says Eliseo Medina, international secretary treasurer at SEIU.

Renee Lee, 53, of Sacramento, plans to fight her foreclosure. An activist with SEIU and a California state employee, she's demanding that Bank of America produce her mortgage note. She hopes to slow the bank's action.

"I'm still living in the home. I'm going to be the one they have to haul out or drag out of there."

JOHN M. VINCENT/THE OREGONIAN/2009

The nation's biggest lender, Bank of America, on Friday extended a freeze on foreclosures to all 50 states as concern spread among federal officials that lenders and their agents are not following proper procedures as they seize homes. The Charlotte, N.C.-based bank has scores of branches in Oregon, including this one on Northwest Lovejoy Street in Portland.

# Foreclosure freeze widens

**Investigation** | Bank of America agrees to temporarily halt seizures nationwide, not only in states requiring judicial review

**By JEFF MANNING**
THE OREGONIAN

A populist legal effort challenging the legality of foreclosure procedures employed by many of the nation's lenders is slowing the tidal wave of seizures.

Bank of America agreed Friday to a temporary nationwide halt on foreclosures, including Oregon, because of widespread allegations that lenders and their agents have not followed proper procedure in seizing homes from defaulted borrowers. Bank of America, JPMorgan Chase & Co., Ally Financial Inc. and PNC Financial Services already froze foreclosures in as many as 23 states where lenders are required to go to court to foreclose.

Meanwhile, more than 40 state attorneys general are believed to be working on a joint investigation of the industry's foreclosure practices. Members of Congress, including Oregon members Rep. Earl Blumenauer and Sen. Jeff Merkley, both Democrats, are calling for a nationwide foreclosure moratorium and an independent investigation.

"I'm pretty amazed," said Hope Del Carlo, a Portland consumer lawyer who has long labored on behalf of struggling homeowners. "The announcement today from BofA was huge. It could be a sign of the tide turning."

The procedural issues are highly technical, typically challenging whether the many entities involved in foreclosures have the proper legal standing. In an era when home mortgages were often securitized and sold multiple times, the issue of which entity has the authority to repossess a property often became cloudy.

"The changes in the mortgage industry led to some real sloppiness," said Melissa Huelsman, a Seattle consumer attorney. "Some

just completely ignored the law."

The foreclosure challenges have tapped into seething public resentment toward the financial industry that continues from the economic downturn and resulting bailout.

"Good Grief America," a southern Oregon support group for foreclosure victims, has aggregated some of the breaking news about foreclosure challenges on its website.

In a seathing manifesto, the group proclaims that "Housing was the vehicle that Wall Street used to drain the life out of America. The (loan) servicers lose money when they modify and make a windfall when they foreclose, yet the big Wall Street banks keep taking bailouts and welfare from our U.S. Treasury."

Oregon and Washington have been difficult states for homeowners attempting to challenge their lenders. Both are nonjudicial foreclosure states, meaning lenders here usually don't have to go to court to foreclose. As a result, their paperwork is rarely subject

Please see **FORECLOSURES**, Page B9

---

"The changes in the mortgage industry led to some real sloppiness. Some just completely ignored the law."

**Melissa Huelsman,** a Seattle consumer attorney

---

# Foreclosures: Aid uncertain for those who lost homes

**Continued** from Page B6

to court review.

Nevertheless, Oregonians have launched a flurry of legal challenges in 2010. One of the most interesting is a case filed by Natache Rinegard-Guirma, who in September, without an attorney, sued Bank of America, her loan servicer and several other entities.

She alleged that the trustee in the case, LSI Title Co. of Oregon, does not have standing to foreclose on her Northeast Portland home as there is no record of LSI's appointment as the trustee.

On Oct. 6, U.S. District Court Judge Garr King stunned many local lawyers when he granted Rinegard-Guirma's request for a preliminary injunction putting the foreclosure on hold.

To get a preliminary injunction, litigants typically must show that there is a substantial likelihood they will succeed on the merits of the case.

Rinegard-Guirma declined comment, as did Bank of America.

Authorities in seven states have launched investigations.

But industry lawyers are expecting a more widespread investigation, according to Patrick McManemin, a partner at Patton Boggs LLP, a Washington, D.C.,-based law firm that represents banks, loan servicers and financial institutions.

"We are aware of, or involved in, a large number of investigations that lead us to believe there are in the neighborhood of 40 state attorneys general who have initiated investigations or expressed an interest," McManemin said in a telephone interview.

Oregon Attorney General John Kroger apparently is not one of the 40. But a spokesman said the attorney general's office is keeping a close eye on developments.

Although the new legal challenges have put some ongoing foreclosures on hold, most lawyers contacted for this story said it seems unlikely that they could offer retroactive help for those who have lost their home.

But not everyone agrees.

"This is a huge, mega-issue," said bankruptcy attorney Ike Shulman, co-founder of the National Association of Consumer Bankruptcy Attorneys.

Foreclosures that were thought to be completed may come back to life "like a hangar-full of dead bodies starting to wake up," he said.

•

*Brent Hunsberger of The Oregonian staff contributed to this report.
Jeff Manning: 503-294-7606;
jmanning@news.oregonian.com*

*Oregonian*
*10-7-10*

## BUSINESS

# News highlights

**NEWS UPDATE: FORECLOSURE CONTROVERSY**

## Blumenauer asks big lenders to halt foreclosures

U.S. Rep. Earl Blumenauer, D-Ore., joined a host of other state and federal politicians this week in calling on major lenders to halt foreclosures in their states. Sen. Jeff Merkley, D-Ore., asked several federal agencies to investigate.

Several large lenders have halted foreclosure proceedings in at least 23 states where servicers are required to go before a judge to proceed. Oregon does not require that step, state Attorney General John Kroger's office has said, so foreclosures here have not been halted.

But Blumenauer, running for re-election next month, and other private attorneys contend that documents required in the foreclosure process in Oregon might have been improperly signed.

"It is highly likely that filings made by or on behalf of your bank suffer the same flaws, such as the signing of affidavits and other legal documents without confirming the accuracy of information alleged in those documents," Blumenauer wrote Wednesday in letters to the presidents of Bank of America Corp., JPMorgan Chase & Co. and Wells Fargo Corp.

On Monday, Merkley asked Treasury Secretary Timothy Geithner and U.S. Housing and Urban Development Secretary Shaun Donovan to investigate Ally Financial Inc., which owns GMAC Mortgage.

The federal government is, in fact, looking into allegations that mortgage lenders in the foreclosure crisis have been evicting homeowners using flawed court papers, Attorney General Eric Holder said Wednesday.

President Barack Obama's financial fraud enforcement task force has a mortgage component, Holder noted during a news conference.

In Ohio, state Attorney General Richard Cordray is suing Ally Financial and its GMAC Mortgage division, alleging fraud that could involve hundreds of foreclosures in that state.

It could be the first in a wave of lawsuits by state attorneys general over what appear to be widespread problems in documents used by the nation's largest mortgage lenders.

An e-mail Wednesday to Kroger's office was not returned.

*— Brent Hunsberger*



www.usatoday.com

USA TODAY

# Money

SECTION B

**Thursday, October 7, 2010**

# Moneyline

## Wednesday markets



| Index | Close | | Change |
|---|---|---|---|
| Nasdaq composite | 2380.66 | ▼ | 19.17 |
| Standard & Poor's 500 | 1159.97 | ▼ | 0.78 |
| Treasury note, 10-year yield | 2.39% | ▼ | 0.09 |
| USA TODAY Internet 50 | 150.84 | ▼ | 2.60 |
| Oil, light sweet crude, barrel | $83.23 | ▲ | 0.41 |
| Euro (dollars per euro) | $1.3935 | ▲ | 0.0085 |
| Yen per dollar | 82.93 | ▼ | 0.25 |

Sources: USA TODAY research, MarketWatch.com

▶ **Market scoreboard with currencies, 4B**

# Ohio attorney general sues lender

## Lawsuit alleges GMAC Mortgage improperly foreclosed on homes

**By Stephanie Armour**
USA TODAY

Ohio Attorney General Richard Cordray Wednesday filed a civil lawsuit against GMAC Mortgage and its parent, Ally Financial, alleging they used fraudulent affidavits and documents to mislead courts in hundreds of home foreclosures in the state.

Calling it a "grave situation," Cordray said Ally Financial's actions raise questions about the legitimacy of foreclosures in Ohio and 22 other states. He said the concerns extend to the practices of other major servicers across the country. Cordray's lawsuit, filed in state court, also seeks a court order barring GMAC from proceeding with foreclosures in the state.

GMAC, JPMorgan Chase and Bank of America have recently suspended foreclosures in 23 states, including Ohio, where seizing homes requires court approval.

The actions came after lawyers for homeowners obtained sworn statements from the lenders' employees indicating that foreclosure filings may not have been properly notarized or verified. Those revelations have led to multiple investigations by state attorneys and demands in Congress for federal action.

U.S. Attorney General Eric Holder said Wednesday the Justice Department is looking into reports that the nation's largest mortgage servicers wrongly foreclosed on homes.

The federal Financial Fraud Enforcement Task Force is reviewing reports about the flawed foreclosures.

The task force includes state attorneys general, the Treasury Department and the Department of Housing and Urban Development.

The Ohio attorney general's lawsuit alleges GMAC Mortgage violated the state's consumer laws and seeks up to $25,000 in penalties for each violation.

It cites a deposition by GMAC employee Jeffrey Stephan in a Maine lawsuit in which he said he signed up to 10,000 foreclosure affidavits a month from 2006 and into 2010 without having them properly notarized or reviewing the underlying documents as required.

Cordray is also asking JPMorgan Chase and Bank of America to suspend further action on foreclosures involving affidavits signed by employees that have given similar depositions.

In a statement Wednesday, Ally Financial said its practices were not fraudulent or deceitful. If "procedural mistakes" were made in legal documents, GMAC "immediately" went to work to remedy the situation, it said.

Since foreclosure papers typically are not filed until customers are six to 12 months delinquent, their default and GMAC's right to foreclose are not in dispute, Ally said.

Cordray says he hasn't ruled out criminal actions against Ally Financial or Stephan.

# Wells Fargo, GMAC review foreclosure procedures

LOS ANGELES — Two big mortgage lenders are reviewing foreclosures as public officials heighten pressure on the industry over allegations that errors were made in documents used to evict homeowners.

GMAC Mortgage, a unit of Ally Financial Inc., said Tuesday that it has enlisted legal and accounting firms to conduct independent reviews of its foreclosure procedures in all 50 states. GMAC already has halted foreclosures in 23 states.

Separately, Wells Fargo & Co. said it would review pending foreclosures for potential defects in response to requests from lawmakers and public officials. The San Francisco-based company says it has not turned up any evidence of problems.

"We have no plans to initiate a foreclosure moratorium," company spokeswoman Vickee Adams said.

In May, a Wells Fargo executive acknowledged in a deposition that he verified only the dates on up to 150 foreclosure documents he signed daily.

The executive said he relied on co-workers to ensure that other information in the documents was correct.

Mortgage lenders have come under criticism as evidence has surfaced that they have been using flawed court papers to evict homeowners. That has led state and federal officials to ramp up pressure on the mortgage industry.

*— The Associated Press*

# Economy:
## New shocks could pile on the problems

**Continued** from Page B6

Born of a record financial collapse, this recession has been more severe than any since the Great Depression and has left an enormous oversupply of houses and office buildings, along with crippling debt. The decision last week by leading mortgage lenders to freeze foreclosures, and calls for a national moratorium, could cast a long shadow of uncertainty over banks and the housing market. Put simply, the national economy has fallen so far that climbing back could take years.

The math yields somber conclusions, with implications not just for this autumn's elections but also — barring a policy surprise or economic upturn — for 2012 as well:

At the current rate of job creation, the nation would need nine more years to recapture the jobs lost during the recession. And that doesn't even account for 5 million or 6 million jobs needed in that time to keep pace with an expanding population. Even top Obama officials concede the unemployment rate could climb higher still.

Median house prices have dropped 20 percent since 2005. Given an inflation rate of about 2 percent — a common forecast — 13 years would pass until housing prices climb back to their peak, according to Allen Sinai, chief global economist at Decision Economics, a consulting firm.

After plummeting in 2009, the stock market has spiraled up, buoying retirement accounts and perhaps the spirits of middle-class Americans. As a measure of economic health, though, that gain is overstated. Robert Reich, the former labor secretary, notes that the most profitable companies in the domestic stock indexes generate about 40 percent of their revenue from abroad.

Few doubt the U.S. economy remains capable of electrifying growth, but few expect that any time soon.

"We still have a lot of strengths, from a culture of entrepreneurship and venture capitalism, to flexible labor markets and attracting immigrants," said Barry Eichengreen, an economist at the University of California at Berkeley. "But we're going to be living with the overhang of our financial and debt problems for a long, long time to come."

New shocks could push the nation into another recession or deflation.

"We are in a situation where our vulnerability to any new problem is great," said Carmen Reinhart, a professor of economics at the University of Maryland.

_Oregonian_

# Mortgage system is broken, official says

**Senate panel** | Problems go beyond flawed foreclosure paperwork, the head of a national inquiry tells leaders

**By MARCY GORDON**
THE ASSOCIATED PRESS

WASHINGTON — The problems in the mortgage industry go far beyond the controversy over flawed foreclosure documents and call for an overhaul of the system of administering home loans, the state attorney general leading a nationwide investigation told a Senate panel Tuesday.

As Iowa Attorney General Tom Miller testified at a hearing of the Senate Banking Committee, senators also insisted that focusing solely on the so-called "robo-signing" is a mistake.

The banking industry, meanwhile, was criticized for maintaining that the problem was mainly technical. That view "shows a certain type of arrogance," Miller said.

"There's so much at stake," he told the panel. The entire system of servicing and modifying mortgages, and foreclosing on borrowers must be changed "so that it works productively," he said.

A resolution could involve penalties for mortgage companies that don't comply with required practices, said Miller, a Democrat who was re-elected this month. "We'll need ultimately agreement from the banks, and so far our discussions have been productive."

CNBC reported that Bank of America Corp., JPMorgan Chase & Co. and Wells Fargo & Co. are nearing a settlement with the 50 attorneys general in which they would compensate borrowers whose homes were improperly foreclosed upon.

But Miller said after the hearing that a settlement wasn't close. "That's totally wrong. We're a long way from an agreement," he told reporters. "We're at the beginning stages of a negotiation."

Sen. Chris Dodd, D-Conn., the panel's chairman, said many people believe that the problems with shoddy paperwork in foreclosures "are simply the tip of a much larger iceberg, that they are emblematic of much deeper problems in the mort-

Sen. Jon Tester, D-Mont., said some in the industry "have been a little bit glib."

The banking panel was examining the highly charged issue amid growing concern and public anger over the disarray stemming from faulty foreclosure documents. A man in the audience in the hearing room interrupted testimony by a JPMorgan Chase official, standing and shouting, "He is lying." The demonstrator, from the Neighborhood Assistance

Please see **FORECLOSURES**, Page B6

## Foreclosures: BofA making changes, bank executive says

**Continued** from Page B3

Corp. of America, was removed from the room by police officers.

A congressional watchdog said in a report issued earlier Tuesday that the foreclosure documents distress could threaten major banks with billions of dollars in losses, deepen the disruption in the housing market and hurt the government's effort to keep people in their homes.

Revelations that several big mortgage companies sped through thousands of home foreclosures without properly checking paperwork already have raised alarm in Washington. If the irregularities are widespread, the consequences could be severe, the Congressional Oversight Panel said in the report. The full impact is still unclear, the report cautions.

Employees or contractors of several major banks have testified in court cases that they signed, and in some cases backdated, thousands of certifying documents for home seizures. Financial firms that service a total $6.4 trillion in mortgages are involved. Bank of America, JPMorgan Chase and Ally Financial Inc.'s GMAC Mortgage have suspended foreclosures for some period because of flawed documents.

Barbara Desoer, president of Bank of America's home loans division, told the banking committee the company is changing its foreclosure process after an extensive review found areas needing improvement. The bank found in its review that its foreclosure decisions weren't based on inaccurate documents but did see ways the paperwork could be improved, Desoer said.

Among the changes, the legal documents used in the process will each be reviewed by the signer and promptly notarized, she said.

Desoer said the bank is replacing and resubmitting affidavits that were filed previously in about 102,000 foreclosure cases that haven't yet gone to judgment in the 23 states where courts play a role in the process. Also, Charlotte, N.C.-based Bank of America is putting in new procedures for selecting and monitoring the law firms it retains to process foreclosures.

# More censure for handling of foreclosures

## 2nd mortgages add to confusion and defaults

By Stephanie Armour
USA TODAY

Bankers, housing regulators and members of Congress agreed on this much in the week's second congressional hearing on foreclosure problems: The system needs fixing.

Some bank officials Thursday told a House subcommittee that their efforts to help borrowers in default were stymied by investors who require that foreclosures keep moving forward even as the borrowers are trying to get a modified mortgage to lower their monthly payments.

"It can be extremely confusing," said Rebecca Mairone, Bank of America's default servicing executive. "It continues to be a problem. We are directed by investor requirements to do so."

Other bank officials, and federal regulators, said second loans pose another obstacle to getting more mortgages modified because the holders of both the first and second loans must agree to the modification.

Homeowners may not get payments lowered as dramatically if they have a second mortgage that can't be modified, and that could lead to redefaults.

The Obama administration's Home Affordable Mortgage Program (HAMP), launched about 18 months ago to prevent foreclosures, also drew criticism this week.

The government reported Thursday that nearly 755,800 trial and permanent modifications have been canceled through October. Fewer than 500,000 mortgages have been permanently modified since the program started.

But the Federal Reserve predicts there will be 2.25 million foreclosure filings this year and again next year, and about 2 million more in 2012, according to other testimony Thursday.

"I think it's safe to say that HAMP isn't meeting its goal of preventing foreclosures," said Rep. Maxine Waters, D-Calif., who chaired the hearing.

HAMP also has been plagued by complaints that banks lose homeowners' paperwork and fail to provide modifications after borrowers complete a trial period, which is required before the modification becomes permanent.

Seventeen Democratic senators, led by New Jersey Sen. Robert Menendez, sent a letter to Treasury this week calling for changes to the program.

They included automatic modifications for homeowners who successfully complete the required trial period and creation of a federal office to assist homeowners in getting modifications.

"Countless constituents tell us stories of being stonewalled by banks for very long periods of time; of not being told the reasons for the rejection of their modification request; of significant delays caused by banks losing paperwork; or of trial modifications canceled with no rationale," according to the senators' letter.

# Admission by GMAC arms foes of hasty foreclosures

**Improprieties** | Lawyers and regulators see legal violations and possible cases of fraud

**By DAVID STREITFELD**
NEW YORK TIMES NEWS SERVICE

The recent admission by a major mortgage lender that it had filed dubious foreclosure documents could inspire a broad legal furor against hasty foreclosures, which have prompted complaints nationwide since housing prices collapsed.

Lawyers for distressed homeowners and law enforcement officials in several states Friday seized on revelations by GMAC Mortgage, the country's fourth-largest home-loan lender, that it had violated legal rules in its rush to file as many foreclosures as quickly as possible.

Attorneys general in Iowa and North Car-olina said they were beginning separate investigations of the lender, and the attorney general in California directed the company to suspend all foreclosures in that state until it "proves that it's following the letter of the law."

The federal government, which became the majority owner of GMAC after supplying $17 billion to prevent the lender's failure, said Friday that it had instructed the com-

Please see **FORECLOSURE,** Page B10

# Foreclosure:
## Disclosures may imperil titles to homes

**Continued** from Page B6`

pany to clean up its act.

Florida lawyers representing borrowers in default said they would start filing motions as soon as next week to have hundreds of foreclosure actions dismissed.

While GMAC is the first big lender to publicly acknowledge that its practices might have been improper, defense lawyers and consumer advocates have long argued that numerous lenders have used inaccurate or incomplete documents to remove delinquent owners from their houses.

The issue has broad consequences for the millions of buyers of foreclosed homes, some of whom might not have clear title to their bargain property. And it may offer unforeseen opportunities for those who were evicted.

"You know those billboards that lawyers put up seeking divorcing or bankrupt clients?" asked Greg Clark, a Florida real estate lawyer. "It's only a matter of time until they start putting up signs that say, 'You might be entitled to cash payment for wrongful foreclosure.'"

The furor already has begun in Florida, which is one of the 23 states where foreclosures must be approved by courts. Nearly half a million foreclosures are in the Florida courts, overwhelming the system.

J. Thomas McGrady, chief judge in the foreclosure hotbed of Tampa and St. Petersburg, said the problems went far beyond GMAC. Four major law firms doing foreclosures for lenders are under investigation by the Florida attorney general.

"Some of what the lenders are submitting in court is incompetent; some is just sloppy," said McGrady of the 6th Judicial Circuit in Clearwater, Fla. "And

somewhere in there could be a fraudulent element."

In many cases, the defaulting homeowners do not hire lawyers, making problems generated by the lenders hard to detect. GMAC, which is based in Detroit and is now a subsidiary of Ally Financial, first put the spotlight on its procedures when it told real estate agents and brokers last week that it was immediately and indefinitely stopping all evictions and sales of foreclosed property in the states — all on the East Coast and in the Midwest — where foreclosures must be approved by courts.

That was a highly unusual move. So was the lender's simultaneous withdrawal of key affidavits in pending cases. The affidavits were sworn statements by GMAC officials that they had personal knowledge of the foreclosure documents.

The company played down its actions, saying the defects in its foreclosure filings were "technical." It has declined to say how many cases might be affected.

A GMAC spokeswoman also declined to say Friday whether

the company would stop foreclosures in California as the attorney general, Jerry Brown, demanded. Foreclosures in California are not judicial.

GMAC began as the auto-financing arm of General Motors. During the housing boom, it made a heavy bet on subprime borrowers, giving loans to many people who could not afford a house.

GMAC appears to have been forced to reveal its problems in the wake of several depositions given by Jeffrey Stephan, the team leader of the document-execution unit in the lender's Fort Washington, Pa., offices.

Stephan, 41, said in one deposition that he signed as many as 10,000 affidavits and other foreclosure documents a month; in another he said it was 6,000 to 8,000.

The affidavits state that Stephan, in his capacity as limited signing officer for GMAC, had examined "all books, records and documents" involved in the foreclosure, and that he had "personal knowledge" of the relevant facts.

In the depositions, Stephan

said he did not do this.

In a June deposition, a lawyer representing a foreclosed household put it directly: "So other than the due date and the balances due, is it correct that you do not know whether any other part of the affidavit that

you sign is true?"

"That could be," Stephan replied.

GMAC said Step available for an in lender said its "fail "reflect any disres courts or the judicia

## PORT CALENDAR

| VESSELS IN PORT |
| --- |
| **GRAIN VESSELS** |
| ARNICA: Vancouver anchor |
| BLUE DIAMOND: Astoria anchor |
| CHAOYN QUEEN: Vancouver anchor |
| CIELO DI PISA: Astoria anchor |
| INCE KASTAMONU: Astoria anchor |
| MICHELE BOTTIGLIERI: Kalama Export |
| NENA J: Kalama United Harvest. |
| NEW SPIRIT: Astoria anchor |
| OINOUSSIAN LION: Astoria anchor |
| RZS JOY: Vancouver United Harvest |
| SPLENDEUR: Astoria anchor |
| THALASSINI KYRA: Portland CLD O'dock |
| UNITED MILOS: Astoria anchor |

| **OTHER VESSELS** |
| --- |
| BARGE PETROCHEM SUPPLIER AND TUG: Longview anchor |
| DODGE ISLAND: Astoria Pier 1 West |
| GENCO PROGRESS: Vancouver 2, Berth 1 |
| PANARROW: Portland Berth 415 |
| SEA BELL: Portland Berth 204 |
| SEASPAN BARGE 259: Portland Ashgrove |
| TERRAPIN ISLAND: Astoria Pier 1 Face |

| **PORTLAND SHIP REPAIR YARD AND INACTIVE VESSELS** |
| --- |
| BEAVER STATE: Portland Berth 301 |
| LECONTE: Portland Berth 305 |
| NOAA RAINIER: Portland Dry Dock No. 5 |

SEA VENTURE: Portland DP V
**VESSELS I**

**TODAY**
CAPE SCOTT, from Seattle, .t
GLOBAL FORWARDER, from
Vancouver 2, Berth 7
SEA STAR 8, from Busan. So
ria anchor

**SUNDAY**
CRESCENT HARBOUR, from
Portland Glacier
LEO FOREST, from Matsuna
Longview Weyerhaeuser
PYXIS: from Toyohashi, Japa
4H
SAGA BELJAFLOR, from Van
couver 2, Berth 8

**TO DEPA**

**TODAY**
MICHELE BOTTIGLIERI, for C
from Kalama anchor
SEA BELL, for Vancouver, B.C
Berth 204

**SUNDAY**
GENCO PROGRESS, for Sob
couver 2, Berth 1
SAGA BELJAFLOR, for Long F
Vancouver 2, Berth 8



Thursday, October 7, 2010

# Moneyline

## Wednesday markets



| Index | Close | Change |
|---|---|---|
| Nasdaq composite | 2380.66 | ▼ 19.17 |
| Standard & Poor's 500 | 1159.97 | ▼ 0.78 |
| Treasury note, 10-year yield | 2.39% | ▼ 0.09 |
| USA TODAY Internet 50 | 150.84 | ▼ 2.60 |
| Oil, light sweet crude, barrel | $83.23 | ▲ 0.41 |
| Euro (dollars per euro) | $1.3935 | ▲ 0.0085 |
| Yen per dollar | 82.93 | ▼ 0.25 |

Sources: USA TODAY research, MarketWatch.com

► Market scoreboard with currencies, 4B

**Quotes on your cellphone**

# Ohio attorney general sues lender

### Lawsuit alleges GMAC Mortgage improperly foreclosed on homes

By Stephanie Armour
USA TODAY

Ohio Attorney General Richard Cordray Wednesday filed a civil lawsuit against GMAC Mortgage and its parent, Ally Financial, alleging they used fraudulent affidavits and documents to mislead courts in hundreds of home foreclosures in the state.

Calling it a "grave situation," Cordray said Ally Financial's actions raise questions about the legitimacy of foreclosures in Ohio and 22 other states. He said the concerns extend to the practices of other major servicers across the country. Cordray's lawsuit, filed in state court, also seeks a court order barring GMAC from proceeding with foreclosures in the state.

GMAC, JPMorgan Chase and Bank of America have recently suspended foreclosures in 23 states, including Ohio, where seizing homes requires court approval.

The actions came after lawyers for homeowners obtained sworn statements from the lenders' employees indicating that foreclosure filings may not have been properly notarized or verified. Those revelations have led to multiple investigations by state attorneys and demands in Congress for federal action.

U.S. Attorney General Eric Holder said Wednesday the Justice Department is looking into reports that the nation's largest mortgage servicers wrongly foreclosed on homes.

The federal Financial Fraud Enforcement Task Force is reviewing reports about the flawed foreclosures.

The task force includes state attorneys general, the Treasury Department and the Department of Housing and Urban Development.

The Ohio attorney general's lawsuit alleges GMAC Mortgage violated the state's consumer laws and seeks up to $25,000 in penalties for each violation.

It cites a deposition by GMAC employee Jeffrey Stephan in a Maine lawsuit in which he said he signed up to 10,000 foreclosure affidavits a month from 2006 and into 2010 without having them properly notarized or reviewing the underlying documents as required.

Cordray is also asking JPMorgan Chase and Bank of America to suspend further action on foreclosures involving affidavits signed by employees that have given similar depositions.

In a statement Wednesday, Ally Financial said its practices were not fraudulent or deceitful. If "procedural mistakes" were made in legal documents, GMAC "immediately" went to work to remedy the situation, it said.

Since foreclosure papers typically are not filed until customers are six to 12 months delinquent, their default and GMAC's right to foreclose are not in dispute, Ally said.

Cordray says he hasn't ruled out criminal actions against Ally Financial or Stephan.

igistration re-
s Lakefront Grill,
herwood Road,
ww.oan.org or

**rketing Pro-
ices:** 11:30
Predictable Mar-
During Unpre-
BridgePort
W. Marshall St.;
50 nonmember;
on.org
**ess Alliance:** 5-7
ter Hours. Ad-
n required. Wells
00 S.W. Fifth Ave.;
ine, $10 at the
ers $15, $20 at
ortlandalliance.
6759

ers of businesses can stop
wasting time and start mak-
ing more money. Register at
the website. Pho Gia, 1944 N.E.
Sandy Blvd.; $5 members, $10
nonmembers; www.apacc-or.
org/Dsp_Event.php

**Credit and Financial Devel-
opment Division:** 5:30 p.m.
"Managing Sales Tax in the
Credit Department." Red Lion
Convention Center, 1021 N.E.
Grand Ave.; $27 members, $35
nonmembers; 503-233-2248

**Formic Media Inc.:** 5:30-7 p.m.
"Search Marketing for the Holi-
days." Formic Media, 300 N.E.
Failing St.; free; 503-517-9059,
ext. 122

# Wells Fargo, GMAC review foreclosure procedures

LOS ANGELES — Two big mortgage lenders are reviewing foreclosures as public officials heighten pressure on the industry over allegations that errors were made in documents used to evict homeowners.

GMAC Mortgage, a unit of Ally Financial Inc., said Tuesday that it has enlisted legal and accounting firms to conduct independent reviews of its foreclosure procedures in all 50 states. GMAC already has halted foreclosures in 23 states.

Separately, Wells Fargo & Co. said it would review pending foreclosures for potential defects in response to requests from lawmakers and public officials. The San Francisco-based company says it has not turned up any evidence of problems.

"We have no plans to initiate a foreclosure moratorium," company spokeswoman Vickee Adams said.

In May, a Wells Fargo executive acknowledged in a deposition that he verified only the dates on up to 150 foreclosure documents he signed daily.

The executive said he relied on co-workers to ensure that other information in the documents was correct.

Mortgage lenders have come under criticism as evidence has surfaced that they have been using flawed court papers to evict homeowners. That has led state and federal officials to ramp up pressure on the mortgage industry.

— *The Associated Press*

## Economy:
### New shocks could pile on the problems

**Continued** from Page B6

Born of a record financial collapse, this recession has been more severe than any since the Great Depression and has left an enormous oversupply of houses and office buildings, along with crippling debt. The decision last week by leading mortgage lenders to freeze foreclosures, and calls for a national moratorium, could cast a long shadow of uncertainty over banks and the housing market. Put simply, the national economy has fallen so far that climbing back could take years.

The math yields somber conclusions, with implications not just for this autumn's elections but also — barring a policy surprise or economic upturn — for 2012 as well:

At the current rate of job creation, the nation would need nine more years to recapture the jobs lost during the recession. And that doesn't even account for 5 million or 6 million jobs needed in that time to keep pace with an expanding population. Even top Obama officials concede the unemployment rate could climb higher still.

Median house prices have dropped 20 percent since 2005. Given an inflation rate of about 2 percent — a common forecast — 13 years would pass until housing prices climb back to their peak, according to Allen Sinai, chief global economist at Decision Economics, a consulting firm.

After plummeting in 2009, the stock market has spiraled up, buoying retirement accounts and perhaps the spirits of middle-class Americans. As a measure of economic health, though, that gain is overstated. Robert Reich, the former labor secretary, notes that the most profitable companies in the domestic stock indexes generate about 40 percent of their revenue from abroad.

Few doubt the U.S. economy remains capable of electrifying growth, but few expect that any time soon.

"We still have a lot of strengths, from a culture of entrepreneurship and venture capitalism, to flexible labor markets and attracting immigrants," said Barry Eichengreen, an economist at the University of California at Berkeley. "But we're going to be living with the overhang of our financial and debt problems for a long, long time to come."

New shocks could push the nation into another recession or deflation.

"We are in a situation where our vulnerability to any new problem is great," said Carmen Reinhart, a professor of economics at the University of Maryland.

## alendar

**IN PORT
ESSELS**
ed Harvest
anchor
ria anchor
thor
bort
ria anchor
nchor
Columbia Grain
nd CLD Irving
larvest.
oria anchor
**ESSELS**
PPLIER AND TUG:

nd Berth 607
ew Berth 7
Pier 1 West
Weyerhaeuser Log A
land Berth 305
ew Berth 8
Bulk Terminal
lland Berth 204
rtland Ashgrove
ria Pier 1 Face

THERESE SELMER: Longview anchor
**PORTLAND SHIP REPAIR
YARD AND INACTIVE VESSELS**
BARGE COMMENCEMENT BAY AND TUG: Port-
land Berth 312
BEAVER STATE: Portland Berth 301
LECONTE: Portland Berth 305
NOAA RAINIER: Portland Dry Dock No. 5
TAKU: Portland Berth 304
**VESSELS DUE**
**TODAY**
CHEMBULK HOUSTON, from Taiwan, Mailiao at
Vancouver 2, Berth 5
WESTWOOD RAINIER, from Vancouver, B.C. at
Longview Weyerhaeuser Cargo
**TO DEPART**
**TODAY**
BLUE BAIE, for Chiba, Japan, from Vancouver
United Harvest
CLIPPER LOTUS, for Vancouver, B.C., from
Longview Berth 7
ENGLISH BAY, for Lanshan, China, from
Longview Weyerhaeuser Log A
THERESE SELMER, for Long Beach, Calif., from
Longview Berth 5

# Lenders may settle in face of inquiry

**Foreclosures** | A 50-state investigation could lead to financial penalties or new independent monitoring

**By ALAN ZIBEL
and CURT ANDERSON**
THE ASSOCIATED PRESS

WASHINGTON — A joint investigation by every state and the District of Columbia that was announced Wednesday could force mortgage companies to settle allegations that they used flawed documents to foreclose on hundreds of thousands of homeowners.

It could take months, at least, for any settlement to be reached. But legal experts say lenders could be forced to accept an independent monitor to ensure they follow state foreclosure laws. The banks could also be subject to financial penalties and be forced to pay some people whose foreclosures were improperly handled.

For banks, "the most efficient way for them to get out from under this is to settle across the board," said Kathleen Engel, a law professor at Suffolk University in Boston.

Employees of several major lenders have acknowledged in depositions that they signed thousands of foreclosure documents without reading them as required by state laws.

"This is not simply about a glitch in paperwork," said Iowa Attorney General Tom Miller, who's leading the inquiry. "It's also

Please see **FORECLOSURES,** Page C4

# Foreclosures: Few expected to recover their homes

**Continued** from Page C1

about some companies violating the law and many people losing their homes."

At a news conference, Miller said the states might be open to alternatives to financial penalties for the banks. They might, for example, agree instead to have lenders step up their efforts to help people reduce their loan payments so they can avoid foreclosure.

The document problems could prolong the housing downturn if many homebuyers become unwilling to purchase foreclosed homes. But for a few months, anyway, the problems could help prop up prices, because fewer low-priced foreclosed homes will be for sale.

Analysts don't expect many people who lost homes to foreclosure to recover them.

The industry has begun to respond to pressure from state and federal officials. JPMorgan Chase & Co. said Wednesday it would extend its review of its foreclosure cases to 41 states

— doubling the number of its cases under review to 115,000. JPMorgan had previously said it was halting foreclosures in the 23 states where foreclosures must be approved by a judge.

This week, GMAC Mortgage, a unit of Ally Financial Inc., said it had hired legal and accounting firms to review its foreclosure procedures in all 50 states. GMAC has halted some foreclosures in 23 states. Bank of America has done so in all 50.

And Wells Fargo & Co. has said it would review pending foreclosures for potential defects. Wells Fargo says it has discovered no problems.

In their announcement Wednesday, the state officials said they would review evidence that documents were signed by mortgage company employees who didn't verify the information in them. They also said many documents appeared to have been signed without a notary public witnessing that signature — a violation of state law.

Attorneys general have taken the lead in responding to the revelations. State officials, not the federal government, enforce foreclosure laws, which vary by state.

As part of their inquiry, state officials will be able to issue subpoenas to extract potentially incriminating documents from the industry. Such evi-

## In Oregon

Oregon courts don't have to approve a lender's move to foreclose, so some practices under fire in other states don't apply here. But Oregon law does require lenders to inform property owners of their basic right and file an affidavit at least fiv days beforehand in support of foreclosure, explaining — amon other things — why loan modifi cation wouldn't be appropriate

In a statement Wednesday, Attorney General John Kroger said compliance with the state law will be a focus of the inquir in Oregon.

"It's crucial that we find out whether Oregonians are losing their homes based on imprope foreclosures," Keith Dubanevich, Kroger's chief of staff and special counsel, said in a state ment. "And if wrongdoing is di covered, we need to put a stop to it."

dence could be used in law suits or to force settlement with lenders.

A key question is wheth state investigators can persua bank employees to divulge so of the industry's secrets, said R Brescia, an Albany Law Scho professor who has tracked t mortgage crisis. Some mo gage company workers cou have a powerful incentive do so rather than face crimin charges, he noted.

# Moneyline

## Wednesday markets



**Dow Jones industrial average**

11,200
11,150
11,100
11,050
11,000

9:30 a.m. **11,020**   ▲ 75.68   4:00 p.m. **11,096**

| Index | Close | | Change | |
|---|---|---|---|---|
| Nasdaq composite | 2441.23 | ▲ | 23.31 | |
| Standard & Poor's 500 | 1178.10 | ▲ | 8.33 | |
| Treasury note, 10-year yield | 2.42% | ▼ | 0.01 | |
| USA TODAY Internet 50 | 155.08 | ▲ | 2.02 | |
| Oil, light sweet crude, barrel | $83.01 | ▲ | 1.34 | |
| Euro (dollars per euro) | $1.3965 | ▲ | 0.0051 | |
| Yen per dollar | 81.77 | ▼ | 0.11 | |

Sources: USA TODAY research, MarketWatch.com

▶ **Market scoreboard with currencies, 4B**



### Quotes on your cellphone

Send text message to **4INFO** (44636) with **STOCK TICKER** (DELL) or **FUND TICKER** (AGTHX).

## Obama seeks permanent college tax credit

Calling education an "economic imperative," President Obama asked Congress to make permanent the $2,500 American Opportunity Tax Credit, set to expire at the end of the year. "I am calling on Congress to make this tax credit permanent so it's worth up to $10,000 for four years of college, because we've got to make sure that in good times or bad, our families can invest in their children's future and in the future of our country," Obama said.

## JPMorgan Chase quarterly income up 23%

JPMorgan Chase posted a 23% gain in net income for the third quarter, mostly because the banking giant set aside less money to cover losses from bad loans. Revenue fell sharply in a sign that tighter regulations and a sluggish economy are taking a toll. The bank earned $4.4 billion, or $1.01 per share. It earned $3.6 billion, or 82 cents, during the same period last year. Revenue fell 15% to $24.3 billion.

# States start foreclosure investigati

## Attorneys general coordinate mortgage documentation cases

By Stephanie Armour
USA TODAY

The USA's state attorneys general are vowing to halt improper mortgage foreclosures as they open a coordinated 50-state investigation into the industry's alleged use of faulty or fraudulent documents to complete tens of thousands of foreclosures.

"We want to get to the bottom of what went wrong, and ensure it never happens again," Iowa Attorney General Tom Miller, who's heading the investigation, announced Wednesday.

Though no deadline for completing the investigation was announced, Miller said the group would work "diligently and expeditiously."

The announcement by the attorneys general comes amid an expanding number of reviews by regulators, the Justice Department and mortgage servicers themselves after disclosures that servicer employees signed foreclosure documents without proper verification or notarization. Pending completion of internal reviews, Bank of America has suspended foreclosure sales in all 50 states, and GMAC Mortgage and JPMorgan Chase have suspended them in the 23 states that require court approval to complete foreclosures.

In e-mailed replies to questions from USA TODAY, Miller said his group would begin by contacting mortgage servicers, getting a better understanding of the problem's scope, and weighing possible remedies. "We know that in many cases, despite this foreclosure mess, people will still lose their homes. But we hope that, in some cases, lenders will work with homeowners to modify the close-call mortgage cases and save those homes from foreclosure," he said. "That's a win-win."

Despite the outcry about improper foreclosure procedures, delays could hurt the nation's fragile housing market and its recovery.

For example, Fannie Mae and Freddie Mac, which own or have guaranteed many mortgages in default, are owned by the government. Foreclosed houses that they can't sell are a taxpayer expense.

Their regulator warned Wednesday that servicers should review their processes and ensure that they've followed state laws, but a servicer that has not identified problems "should not postpone its foreclosure activities."

"Delays in foreclosures add cost and other burdens for communities, investors and taxpayers," said the Federal Housing Finance Agency.

For Fannie Mae and Freddie Mac loans, "delay means that taxpayers must continue to support (Fannie and Freddie) financing of mortgages without the benefit of payment, and neighborhoods are left with more vacant properties," it said.



www.usatoday.com

**Money** SECTION B

**Thursday, October 14, 2010**

# Ripe astation



CASEY ARKS/THE OREGONIAN

# Lackadaisical paperwork an issue in foreclosures

**Mortgages** | Big lenders are expected to face off against homeowners in court cases over missing documentation

**By GRETCHEN MORGENSON and ANDREW MARTIN**
NEW YORK TIMES NEWS SERVICE

About a month after Washington Mutual Bank made a multimillion-dollar mortgage on a mountain home near Santa Barbara, Calif., a crucial piece of paperwork disappeared.

But bank officials were unperturbed. After conducting a "due and diligent search," an assistant vice president simply drew up an affidavit stating that the paperwork — a promissory note memorializing the borrower's commitment to repay the mortgage — could not be found, according to court documents.

The handling of that lost note in 2006 was hardly unusual. Mortgage documents of all sorts were treated with an almost lackadaisical recklessness during the mortgage lending spree from 2005 through 2007, according to court documents, analysts and interviews.

Now those missing documents and possibly fraudulent documents are at the center of a potentially seismic legal clash that pits big lenders against homeowners and their advocates concerned that the lenders' rush to foreclose flouts private property rights.

That clash — expected to be played out in courtrooms across the country and scrutinized by law enforcement officials investigating possible wrongdoing by big lenders — leaped to the forefront of the mortgage crisis this week as big lenders began lifting their freezes on foreclosures and insisted the worst was behind them.

Federal officials meeting in Washington on Wednesday indicated that a government review of the problems would not be complete until the end of the year.

In short, the legal disagreement amounts to whether banks can rely on flawed documentation to repossess homes.

While even critics of the big lenders acknowledge that the vast majority of foreclosures involve homeowners who have not paid their mortgages, they argue that the borrowers are entitled to due legal process.

Banks "have essentially sidestepped 400 years of property law in the United States," said Rebel Cole, a professor of



ABOVE | Pinot noir grape clusters at Ponzi Vineyards near Beaverton reveal damage inflicted this week by flocks of ravenous migratory birds. A late harvest is proving ripe picking for birds. Growers estimate that 1 to 50 percent of their crops will be eaten before harvest this year.

LEFT | A small utility truck heads into the vineyards Wednesday to retrieve freshly picked grapes at Alloro Vineyard in Sherwood. Oregon vintners have worked hard this season at scaring off birds, making use of propane cannons, reflective tape, and even field hands banging trash can lids.

BRENT WOJAHN/THE OREGONIAN

## e destroying much of this year's late grape harvest

### Oregon wine grape harvests

40 thousand tons

| '98 | '99 | '00 | '01 | '02 | '03 | '04 | '05 | '06 | '07 | '08 | '09 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14.7 | 17.9 | 18.6 | 22.8 | 22 | 24 | 24 | 27 | 34.4 | 38.6 | 34.7 | 40.2 |

Source: National Agricultural Statistics Service, Oregon Field Office

MARK GRAVES/THE OREGONIAN

reflective tape — anything at hand to detour wave after wave of birds that seem to have flown straight from the set of Alfred Hitchcock's legendary horror film.

"If there's any one saving grace," said Kevin Chambers, whose Oregon Vineyard Management Co. has sold more pinpane can-nons this year than in the past five years combined, "it's that they can't eat it all."

seless in a fight that hasn't been this in-se since the cool, late-ripening 1997

Tonight
mild,
tonight

OCEAN SPIRIT (BAHAMAS): Longview Berth 6
ORIENTE NOBLE: Portland CLD Irving
PARITE: Vancouver United Harvest
ROYAL OCEAN: Astoria anchor
SPRING OCEAN: Portland Berth 206
TRIDENT PROTECTOR: Astoria anchor
WADI ALKARNAK: Kalama Export

**OTHER VESSELS**

BALSA 58: Vancouver 2, Berth B
DORGE ISLAND: Astoria Pier 1 West
DRY BEAM: Longview Weyerhaeuser Log A
ERNST OLDENDORFF: Vancouver 2, Berth I
GLOBAL SENTINEL: Portland Berth 305
GREAT DREAM: Longview Berth B
NEW NIKKI: Vancouver anchor
NEWLEAD PROSPERITY: Portland International
Terminals
OLGA TOPIC: Vancouver anchor
PACIFIC JAVA: Kalama BHP
PLOVER ARROW: Portland Berth 604
SEASPAN BARGE 25t: Portland Ashgrove

TAKU: Portland Dry Dock No. 3
USNS BRIDGE: Portland Berth 312

**VESSELS DUE**

**TODAY**
I PMC, 24, from Yokohama, Japan, at Kalama
Chemical
FUTURE, from China at Astoria anchor

**FRIDAY**
AURIGA LEADER, from Tacoma at Vancouver
2, Berth IG
CENTURY LEADER NO. 5, from Ulsan,South
Korea, at Portland Berth 601
TRITON BULKER, from Lazaro Cardenas, Mex-
ico, at Portland Berth 603
YANG HAI, from Nakhodka, Russia, at Portland
Berth 603

**TO DEPART**

**TODAY**
WADI ALKARNAK, for Chiwan, China, from Ka-
lama Export

Canadian border a
the other near Syracuse, according to
Iwanowicz, New York state deputy se
the environment.

Ohio will get $39.4 million and Indi
million. The other states participating
settlement include: Delaware, Illinois
Louisiana, Massachusetts, Missouri,
Jersey, Pennsylvania, Virginia and Wis
— McCla

# Mortgages:
## BofA plans to move on foreclosures

**Continued** from Page B1

Others are more sanguine about the dispute.

Joseph Mason, a finance professor at Louisiana State University, said concerns about proper foreclosure documentation were overblown. At the end of the day, he said, even if the banks botched the paperwork, homeowners who didn't make their mortgage payments still needed to be held accountable.

"You borrowed money," he said. "You are obligated to repay it."

After freezing most foreclosures, Bank of America, the largest U.S. consumer bank, said this week that it would soon resume foreclosures in about half of the country because it was confident that the cases had been properly documented. GMAC Mortgage said it was also proceeding with foreclosures, on a case-by-case basis.

While some other banks have also suggested they can wrap up faulty foreclosures in a matter of weeks, some judges, lawyers for homeowners and real estate experts like Cole expect the courts to be inundated with challenges to the banks' actions.

"This is ultimately going to have to be resolved by the 50

state supreme courts who have jurisdiction for property law," Cole predicted.

The country's mortgage lenders contend that any problems that might be identified are technical and will not change that they have the right to foreclose en masse.

"We did a thorough review of the process, and we found the facts underlying the decision to foreclose have been accurate," Barbara Desoer, president of Bank of America Home Loans, said earlier this week. "We paused while we were doing that, and now we're moving forward."

Some analysts are not sure that banks can proceed so freely. Katherine Porter, a visiting law professor at Harvard University and an expert on consumer credit law, said that lenders were wrong to minimize problems with the legal documentation.

"The misbehavior is clear: They lied to the courts," she said. "The fact that they are saying no one was harmed, they are missing the point. They did actual harm to the court system, to the rule of law. We don't say, 'You can perjure yourself on the stand because the jury will come to the right verdict anyway.' That's what they are saying."

As the legal system begins sorting through the competing claims, one thing is not in dispute: The pell-mell origination of mortgage loans during the real estate boom and the patchwork of financial machinery and documentation that supported it were created with speed and profits in mind, and with little attention to detail.

# Vineyards:
## Despite losses, 2010 vintage looking good

**Continued** from Page B1

its relatively short 40-year history has had to embrace the unsettling notion that nothing is guaranteed in a region perched on the edge of where wine grapes can be successfully cultivated.

"We came here because this is exactly what Oregon is supposed to be like," said Ronni Lacroute, co-owner of WillaKenzie Estate Winery in Yamhill. "We're not supposed to be like California."

Lacroute recalls industry "oldtimers" explaining the rule of thumb that any vineyard operation set on surviving late Oregon harvests needs at least five different techniques for scattering birds.

"You can pick your own methods, but the key is moving everything around and keeping it all unpredictable," she said. "If you lose that unpredictability, the birds will just eat you alive."

Some vineyard owners, despite their best efforts at raising a ruckus, are reporting 50 percent losses due to bird damage.

Roland Wanzenried sells grapes mainly to U-pickers at his small vineyard near North Plains. The birds grew so brazen earlier this month that he was forced to leave his job several times to drive home and wander the vines with a shotgun, firing sporadic blasts into the autumn air.

"It didn't take them long to figure out my pattern," he said. "They'd just perch in nearby

trees wai
was ente
in the en
ished me

Bird pr
lems relat
by no mea
the north

At Valle
sonville,
Mike Wis
share of
But those
to the mo
bear amb

"We sh
quickly,"
definitely

Both be
are dentir
same reas
and other
mally be
late as the

"This is
ing right
gins, vine
Hills Wine
He added
the most
nearly thr
vines in O

Winem
mistic, ho
portion of
salvaging
will make

"We're b
but we've
decades w
said Luisa
ation wine
yards near
levels aren
to be seeir
far are real

Laurent
of Soléna
agreed.

"We star
and the fru
he said. "La
bird pressu
But they, a

14   ■ ■

# EDITORIALS

# About foreclosure: Not so fast

## Bank of America and Obama show they recognize some problems with how U.S. mortgages worked



PAUL LACHINE/NEWSART

Anyone wanting to understand why America faces a foreclosure crisis might begin in the Portland courtroom of U.S. District Judge Garr King.

King this week issued an 18-page opinion in the matter of Natache D. Rinegard-Guirma, whose Northeast Portland home was being foreclosed upon. The very names of the defendants in her motion to stop the foreclosure give a clue to the dizzying complexity of the home-lending business, which spun so far out of control that it triggered the country's deepest financial crisis since the 1930s.

Here's whom Rinegard-Guirma had to sue: Bank of America, as successor by merger to LaSalle Bank, as trustee under the pooling and servicing agreement dated Aug. 1, 2006, Mortgage Electronic Registration Systems Inc., Litton Loan Servicing LP, and the original and purported successor trustees, LSI Title Co. of Oregon and Quality Loan Servicing Corp. of Washington. In other words, her lender and her title company were acquired and her loan was bound up with servicing companies that helped manage the repayment process — not that they were really en-

gaged with her personally. When she sued to stop the foreclosure, none of the defendants showed up at the hearing, which is why the court granted her first injunction.

That got their attention, so the judge allowed Rinegard-Guirma, representing herself, to file an amended complaint, and the defendants to respond. When it was over, he granted another Rinegard-Guirma injunction, albeit for different reasons. Almost coincidentally, Bank of America announced Friday it was halting all foreclosure sales in the country indefinitely, although it cited no

reasons. The bank services some 14 million mortgage loans, of which about 14 percent are past due or in foreclosure.

At the same time, President Barack Obama used a pocket veto to block a bill that was aimed at making it easier to manage mortgage processes across state lines, but which would likely have accelerated the foreclosure wave by making it even easier for lenders to evict borrowers and resell their houses.

"We need to think through the intended and unintended consequences of this bill on consumer protections," wrote the White House

communications directo especially in light of the r developments with r gage processors." The ment said the administr would work with legisla craft a better bill.

In the Rinegard-Gu case, Judge King found culties with the role of gage Electronic Registi Systems, which may have had standing to sue the forced sale of a rower's property. It is, r simply, a firm created b real estate industry to tronically track a mor as it swirls through the h of financial institution traders — "a straw man bankruptcy court in Or described the company in a different c

So, for the time being, many borrower Rinegard-Guirma in danger of losing houses can relax a little. In time, the sy is likely to produce an orderly foreclo process.

But individual homeowners — and country as a whole — will spend years t to untangle the snarl created as mortg flew recklessly into the poorly unders machinery of the financial markets. The system created multiple messes — an some cases, multiple defendants.

rewards fading, employee
incentive trips are back. **6**

An inspector says the U.S. kept
poor records on energy loans. **7**

No Easy Answer
How to fix what ails Heat
and LeBron James. **11**



Y          B1

# Business Day

## The New York Times

TUESDAY, MARCH 8, 2011

---

# About Mideast Oil Pay Off for Russia

By ...EW E. KRAMER

Whatever the even-
...the Arab world's so-
...there is a clear eco-
...so far: Vladimir V.

...ch pumps more oil
...rabia, is reaping a
...he steep rise in glo-
...es resulting from in-
...egions of the Middle
...h Africa. Riding the
..., the Russian ruble
...r against the dollar
...any other currency,
...) consumer inflation
...on year.

...ks are buoyant, too:
...< closed last week at
...6 percent since the
...e year. (Monday was
...sia.)

...ians could not step
...potential big drop in
...on, because Russia
...ny oil wells standing
...allow it to increase
...ght now Russia is
...ts top capacity.

...ek's closing of $114,
...h of those barrels of
...country's main ex-



A storage area at the Priobskoye field in Western Siberia in Russia.

JOSEPH SYWENKYJ FOR THE NEW YORK TIMES

port blend, has risen 24 percent
since the beginning of the year.

Last week, the prime minister,
Mr. Putin, sat down for a meeting
with Russia's finance minister,
Aleksei L. Kudrin, which was na-
tionally televised on state news
channels for the public's enlight-
enment as the two discussed, just

short of gloating, the benefits to
Russia of a global oil panic.

"Mr. Kudrin, budget revenues
have become considerable," Mr.
Putin said matter-of-factly.

Mr. Kudrin agreed, noting that if
prices hold Russia will be able to re-
sume contributions to its sovereign

*Continued on Page 8*

---

# Foreclose Deal Near, State Officials Say

By NELSON D. SCHWARTZ

WASHINGTON — A broad agreement could be
struck within two months to overhaul how millions of
foreclosures are handled by the nation's biggest banks
and to expand the use of home loan modifications, ac-
cording to Tom Miller, the attorney general of Iowa.

All 50 state attorneys general, along with federal
regulators, have been stepping up pressure on the mort-
gage servicers over their foreclosure lapses in recent
days and presented them with an outline of a settlement
late last week. But Mr. Miller's comments at a press
conference here on Monday was the first time officials
have said when an agreement might come.

"I'm hoping we can wrap it up in a couple of
months," he said. "That's a hope, but we're going to
move as fast as we can."

There have been reports that a broad settlement
with the banks was imminent, but Mr. Miller played
down that prospect, citing thorny issues like the ques-
tion of just which homeowners should benefit from any
proceeds of any settlement.

The attorneys general and federal government
agencies are pressing for a financial settlement that
could total over $20 billion. When asked about these es-
timates, Mr. Miller and three other attorneys general
declined to comment on Monday.

While the attorneys general and the newly created
Consumer Financial Protection Bureau support such a
fund for homeowner relief, there has been growing crit-

*Continued on Page 4*





WALL ST

# States Say Foreclosure Deal Nears With Banks

*From First Business Page*



STEPHEN CROWLEY/THE NEW YORK TIMES

From left, John Suther of Colorado, Lisa Madigan of Illinois, Tom Miller of Iowa and Roy Cooper of North Carolina.

icism of the government's existing program to modify mortgages, known as the Home Affordable Modification Program. Last week, Republicans in the House pushed to kill the program, which has helped far fewer homeowners than promised.

A fund with at least $20 billion would represent a sharp expansion of modification efforts for the more than four million Americans facing the loss of their homes.

Many more Americans have mortgage loans that exceed the value of their homes because of falling housing prices, and critics warn that if an aid program is too generous, it could encourage borrowers to walk away from their homes.

Mr. Miller said the attorneys general were "very concerned of people taking advantage" of any program intended to help people facing the loss of their homes.

What is more, determining exactly who to help will be a "hot point" as various government regulators and the attorneys general try to reach a settlement with the banks, according to Roy Cooper, the attorney general for North Carolina.

"We don't want to stop foreclo-

sures on homes that should be foreclosed," Mr. Cooper added, a tacit acknowledgement that too broad a modification effort could cause the housing market to grind to a halt, and delay any broad recovery in home prices for several years.

Major servicers, including Bank of America, Citigroup, Wells Fargo and JPMorgan Chase, all declined to comment last week. However, in recent financial filings with the Securities and Exchange Commission, several big banks warned that the continuing regulatory investigations could have a significant effect on their results.

As expensive as a settlement could be for the big banks, industry lobbyists in Washington privately say that they are eager to put the issue behind them, especially given the public relations fallout from a protracted fight

with the government.

And though the banks have said that the number of actual victims of foreclosure abuses is small, it is likely that any settlement will force them to acknowledge broader problems with their procedures.

"The servicers themselves acknowledge there have been very serious problems in foreclosure servicing," said John Suthers, the attorney general of Colorado. "They know there are problems."

Since last fall, the nation's biggest mortgage servicers have been under investigation by all 50 state attorneys general, after a nationwide furor was set off by revelations that documents in many foreclosure cases were signed with only a cursory review, a practice known as robo-signing.

Settlement talks are running on two tracks. The attorneys gen-

erals, backed up by a host of federal agencies, last week presented the five biggest mortgage servicers with a 27-page draft settlement proposal that could profoundly change how homeowners in default are treated.

The attorneys general, the federal consumer bureau and the Federal Deposit Insurance Corporation are also pushing for a large monetary settlement from the servicers. Much of that money would be used to modify the loan terms for borrowers who are delinquent or facing foreclosure, perhaps reducing the interest rate or the principal to lower monthly payments.

But regulators disagree over how big that settlement should be. The Office of the Comptroller of the Currency and the Federal Reserve do not favor as large a penalty as the attorneys general and the consumer bureau do.

In addition, Mr. Miller admitted that it was not always clear who had final say in the negotiations. "Nobody's driving the bus," he said. "Nobody really has the lead or is in control of this. It's a real joint effort."

Under the blueprint presented last week, banks would be prohibited from starting foreclosure proceedings while a borrower was actively trying to lower the interest rate or ease other terms of the home loan.

Any borrower who successfully made three payments in a trial loan modification would be given a permanent modification. When a modification was denied, it would be automatically reviewed by an ombudsman or independent review panel. In addition, banks would have to reward their employees for pursuing modifications over foreclosures, while late fees would be curtailed.



HAVE MERS-Y: Dawn Lind (right) with the foreclosure papers for this house on North Willis Boulevard.

# LOAN WOLF

## A PORTLANDER TAKES ON A MORTGAGE GIANT TO SAVE HER PROPERTY—AND SHE'S NOT ALONE.

BY JAMES PITKIN jpitkin@wweek.com

After a North Portland rental home owned by Dawn Lind went into foreclosure last fall, she jumped into a nationwide legal fight that could affect millions of residential properties.

Lind, who learned the real-estate business from the inside working as a mortgage broker for eight years, is taking on a company critics say helped cause the housing crisis and could now threaten the fundamentals of American property rights—the innocuously named Mortgage Electronic Registration Systems, or MERS.

A 46-year-old mother of three, Lind filed suit Feb. 23 in Multnomah County Circuit Court claiming MERS has no right to foreclose on her two-bedroom house unless the company can prove it owns the mortgage.

Legal experts say her case is not isolated and that it could determine the fate of thousands of Oregon homes facing foreclosure.

"Collectively, that case and cases like it are forcing accountability in the financial system," says Christopher Peterson, a law professor at the University of Utah. "There's a chance that these kinds of cases will put pressure, both in the legislatures and in the courts, to build a law that is more protective of borrowers in their homes."

For Lind, the case is personal.

"I was part of the problem. Now I want to be part of the solution," says Lind, who recalls signing at least one questionable loan before she was forced out of the faltering mortgage business in January due to lack of business.

"MERS is the center of the problem," Lind insists.

Both in court and in past press interviews, executives at MERS have strongly rejected allegations of wrongdoing. MERS Vice President Doug Danko declined to comment on Lind's case.

Based in Reston, Va., MERS was created in 1995 by industry insiders associated with the Mortgage Bankers Association of America. Companies saved billions of dollars in fees bypassing local governments by creating a private database of property information.

MERS made it possible to quickly bundle and transfer debt—a key to selling mortgage-backed securities cooked up during the housing bubble. Critics say MERS was also central in disguising the toxic nature of those assets.

Lind, who lives in Northwest Portland, bought the house in Kenton as an investment in 2005 for $170,000. Like many homeowners, she didn't know about MERS's role until foreclosure papers arrived listing MERS as "nominee" for the lender, Greenpoint Mortgage Funding.

Lind learned MERS has foreclosed on thousands of homes across the country—in some cases without the proper paperwork or legal standing, according to state and federal court rulings. Judges in Arkansas, Kansas and Maine have found MERS lacks standing to foreclose in those states, and the company faces lawsuits for racketeering in New York, Florida and Kentucky.

The legal problems with MERS's approach are twofold, observers say. First, MERS claims to be both the mortgage owner and an agent of the mortgage holder—a claim a New York judge last month labeled "absurd at best." Second, the company's database bypasses public-recording laws in place since colonial times.

How many properties are affected? More than 60 million—roughly 60 percent of all mortgage loans in America, according to Peterson.

"The entire national economy is exposed to this one undemocratic shell company that's maintained and controlled for the benefit of financial institutions," Peterson says.

For the first time in history, Peterson has written, Americans lack reliable records of who owns many properties. And a string of recent legal defeats has thrown into question whether foreclosures on those properties can hold up in court.

"The drumbeat of federal court cases of the last couple of months has been in favor of the homeowners," says Phil Querin, a Portland real-estate lawyer.

Those rulings include a Feb. 7 decision by U.S. Bankruptcy Court Judge Frank Alley in Eugene. Regarding a home in Southern Oregon, he ruled MERS could not foreclose under Oregon law because the papers were never recorded.

"It sent tremors throughout the industry," Querin says. "There were telephone conferences statewide."

But Patrick Wade, head of the debtor-creditor section of the Oregon State Bar, says no definitive case has arisen in Oregon.

"Maybe this will be that case," Wade says of Lind's lawsuit seeking to stay the foreclosure on her house.

"It's personal to me when they're taking advantage of so many people who don't understand the system," Lind says. "That's what bothers me the most." **WW**

> **FACT:** Massachusetts Attorney General Martha Coakley opened an investigation into MERS last year. In Oregon, "We are looking into MERS," says an email from Tony Green, a spokesman for Oregon Attorney General John Kroger. "I can't say much more than that."



Keep up with Brent Hunsberger on his blog at **oregonlive.com/itsonlymoney**

Through October, stable value funds generated a 12-month rolling return of 3.12 percent, according to Hueler Analytics Inc., a Minneapolis-based independent data and research firm. Over five years, they've returned 4.15 percent annually, on average.

Investors took note and flocked to the funds in late 2008, boosting investments in 27 large stable value funds by 27 percent, according to the Stable Value Investment Association, a trade group.

"It's hard to find a better stress test than what happened in the last couple of years," said Timothy Stumpff, president of Morley Financial Services in Portland, one of the nation's largest stable value fund managers with $14.3 billion in assets. "This product did what it was designed to do."

But what are these funds? How stable is stable? How can anything returning 3 percent in this low-rate environment live up to its promise? What happens if interest rates jump?

First, know that stable value funds aren't available to retail investors. IRA holders are out of luck. They also aren't ideal for young, long-term investors who can take on more risk to increase returns.

Stable value funds invest money in short-term, high-quality bonds. They also invest in money market funds and insurance contracts that pay a fixed-income stream.

Those investments are then wrapped with insurance from banks and insurance companies. These insurance contracts, the "wrappers," protect investors if the values of the fund's fixed-income holdings fall below the amount of money investors have plunged into the fund.

Please see **MONEY,** Page D2

By **JEFF MANNING**
THE OREGONIAN

# As she putters around the sunny kitchen of her rural Multnomah County home, you'd never guess that Stephanie Johnson-King has endured a Job-like journey.

Her marriage ended. Her ex-husband then died of a brain tumor. She had to go to court to fight his last-minute decision to make a nurse, rather than their two children, the beneficiary of his life insurance.

And life continues to pile on. Johnson-King may soon become a statistic in the great foreclosure wars.

In October 2009, after more than a year of effort, Johnson-King finally persuaded her loan servicer, CitiMortgage, to modify her mortgage. She's made the lower, agreed-upon monthly payment ever since.

But though CitiMortgage has cashed Johnson-King's checks, it notified her Oct. 2, 2010, that she was in default and that it intended to sell the house at auction in January.

"The banks don't have to honor their agreements with people," Johnson-King said. "But if people slip up one little bit or suffer some hardship, the banks will make sure they pay the price. It's absolutely frightening."

Three years since the economy tanked, foreclosure has become a national torment that shows no sign of easing. About 8 million homes have entered foreclosure since 2007. An estimated 3 million families have lost their homes.

Foreclosures are more than a personal tragedy. They have helped destabilize the entire housing market, one of the bulwarks of the U.S. economy. Though the national economy is slowly limping toward recovery, housing values continue to decline in Oregon and much of the rest of the country as foreclosures move in the opposite direction.

In the words of Georgetown Law School professor Adam Levitin, a "foreclosure negative feedback loop" has taken hold: Foreclosures lead to declines in house values, which increasingly means people owe more than their house is worth, which leads to more foreclosures.

Add persistently high unemployment to the equation and it's no wonder foreclosures are so numerous. Nearly 10 percent of outstanding mortgages in the U.S. are at least a month delinquent.

The foreclosure disaster took a new twist in recent months with revelations that some loan servicers have forged signatures or repossessed people's homes without the necessary documents proving they have legal standing. Already overwhelmed by the number of delinquent mortgages, banks now face a growing number of homeowner lawsuits challenging the industry's handling of the foreclosure process.

Homeowners may have a new, valuable ally in this fight.

One of the developments that enabled the disastrous housing boom in the first place was the huge growth of the secondary market for mortgage loans. Mortgage lenders knew they didn't have to live with their underwriting decisions because they simply resold the loans in the form of mortgage-backed securities.

The institutional investors who bought trillions of dollars worth of these securities are incensed over the lousy performance of these supposedly rock-solid investments. The Oregon Treasury, for example, sued Countrywide and its parent, Bank of America, claiming that it poured more than $220 million into Countrywide mortgage-backed securities only to see more than half the underlying mortgages go into default.

Further fueling the investors' ire is that many of the banks are blaming them for their refusal to modify mortgages. The inve that in the vast majorit they have no authority fications.

The banks "view u convenient patsy," 

Please see **FORECL** Page D6

BRUCE ELV

**Stephanie Johnson-Kin her children Mackensey 13, and Geoffrey King, 1 struggling to hang onto Multnomah County hom though CitiMortgage ag loan modification with J King in October 2009 a made all the payments loan servicer recently n her that she was in defa Wednesday, however, th said foreclosure is on h**

## Oregon foreclosur

The notice of default is the foreclosure. The next major of the trustee's sale.

Source: Foreclosure Radar (does not come smaller, rural counties in Oreg

DAN AGUA

THE ASSOCIATED PRESS

# Short-circuiting negative equity

## Regulators must find a way to help Oregonians keep their homes

Oregon's propensity for being late into a recession and late out requires a special dose of patience — and humor and hope — when bad news really hits home.

That's how it felt last week when a report on our declining home values echoed other regions of the country in showing that one in five Portland-area homeowners were living in houses worth less than the mortgages they were paying on them.

Ditto — no, worse yet — for Bend, the central Oregon jewel whose popularity by 2007 pushed home values into the stratosphere. Yet that's where home prices have declined more than half, shoving two of five homeowners into negative equity positions. Mortgage defaults in Oregon now increase at a rate outpacing much of the nation.

The new lifestyle term for negative equity is being "underwater" — paying a mortgage debt larger than the value of the house. And thousands of people nationwide have decided, without hope of ever getting out from under, to fold and walk away from their homes, debt unpaid.

The moral failures of walking away are separate from the phenomenon, tangled in a sputtering economy, high unemployment and a decline in per capita income in the Portland-Vancouver-Hillsboro region as well as in Bend.

The phenomenon also is menacing in that it places the American dream of home ownership on unsteady footing. The mortgage interest tax write-off will always be treasured in the hefty first years of payback, as it is a benefit tying income production to home ownership and the build-up of equity. For working people, equity can mean a retirement worth living.

But today's mortgage situation gasps in the wake of subprime lending carnage and big bank bailouts. It needs fixing fast before it gets really out of hand.

Thankfully, it rises to No. 1 on President Barack Obama's agenda in Washington, D.C., on Tuesday, when a mortgage system conference convenes. This comes on the heels of a federal promise last week that Oregon would receive $49 million to help beleaguered homeowners — an effort set to begin later this year and already backed by $88 million from the U.S. Treasury.

But key attempts to provide relief have so far fallen way short.

Obama's Home Affordable Modification Program, bankrolled to the tune of $75 billion, was to have lowered the monthly payments of those facing foreclosure and delivered refinancing at low rates, through Freddie Mac or Fannie Mae, to those punished by lenders for being in negative equity situations. But less than $30 billion has been spent while the underlying problem — how mortgages are structured, secured and traded in the first place — deepens.

Banks worry about committing to fixed interest rates for 30 years — too much risk. Freddie Mac and Fannie Mae this year posted huge losses; their futures are uncertain. Foreclosures are best avoided when loan principal is reduced — nobody wants to eat the costs.

Oregon Sen. Jeff Merkley envisions a replay of the farm buy-back programs America saw years ago. In it, defaulting homeowners would qualify for foreclosure-assisted mortgages, despite trashed credit. He also suggests restructuring subprime loans to eliminate soaring interest rates down the road.

These are quite solid ideas.

But success in Washington also means finding a way to empower bankruptcy judges to modify existing mortgages to help people on the brink. And it means motivating banks to make Obama's loan modification program work.

More than anything it's time to bolster home ownership, and with it the proud will to pay. Few things are more central to living a life that retains dreams and aspirations. Few things are more American.

"I have been reading The Orego[n] including the letters section, and I [see] ubiquitous bumper stickers on eve[ry] Subaru should read, 'Keep Portla[nd] I wonder if the whiny Portland has [become] weird Portland." Christopher Geor[ge] Portland writes at the public blog [...] found at The Stump.

## The Sunday Orego[nian]

Founded December 4, 185[...]
Established as a daily February [...]
The Sunday Oregonian estab[lished]
December 4, 1881. Incorporat[ed]
Oregon Journal since 198[...]

**N. Christian Anderson**
President and Publisher

**Peter Bhatia**               **Robert J[...]**
Editor                         Editorial [...]

**Therese Bottomly**
**Susan Gage**
**JoLene Krawczak**
Managing Editors

**Mario van Dongen**          **Kevin [...]**
Director                       Circu[...]
Sales & Marketing             Dir[...]

**HOW TO CONTACT THE EDITORIAL STAFF:** 503-221-8150; EDITORIAL PAGE EDITOR: **Robert J. Caldwell**, bobcaldwell@news.oregonian.com;